**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Actava TV, Inc., Master Call Communications, Inc., Master Call Corporation, and Rouslan Tsoutiev, )<br><br>　　　　　　　　Plaintiffs, )<br><br>　　-against- )<br><br>Joint Stock Company "Channel One Russia Worldwide," Closed Joint Stock Company "CTC Network," Closed Joint Stock Company "New Channel," Limited Liability Company "Rain TV-Channel," Open Joint Stock Company "ACCEPT", and Limited Liability Company "Comedy TV," and Kartina Digital GmbH, )<br><br>　　　　　　　　Defendants. ) | Index No.: ————1:18-cv-06626<br><br><br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Actava TV, Inc. ("Actava"), Master Call Communications, Inc., Master Call Corporation (together, "Master Call"), and Rouslan Tsoutiev (collectively, the "Actava Parties" or "Plaintiffs"), by way of their undersigned attorneys, as and for their Complaint against Defendants Joint Stock Company "Channel One Russia Worldwide" ("Channel One"), Closed Joint Stock Company "CTC Network" ("CTC"), Closed Joint Stock Company "New Channel" ("New Channel"), Limited Liability Company "Rain TV-Channel" ("Rain TV"), Open Joint Stock Company "ACCEPT" ("ACCEPT"), and Limited Liability Company "Comedy TV" (together, the "Channels"), and Kartina Digital GmbH ("Kartina"), (collectively, the "Channels" or "Defendants"), hereby allege as follows:

**PRELIMINARY STATEMENT**

1.　　This action concerns a remarkable and relentless effort by the Channels Defendants to marshal the judicial process to target – and virtually destroy – Actava, a legitimate business that diligently sought to comply, and did comply, with a Settlement Agreement arising

from a prior action.  Just as Actava was rebuilding its business, Defendants accused Actava of contempt, bringing a flawed contempt motion before this court.  By doing so, the Channels violated the Settlement Agreement themselves.  After nearly nine months, that contempt motion failed, but the damage inflicted on Actava's business was substantial and irreversible.  As if that were not enough, Defendants then wrongfully induced Matvil Corporation, Actava's new business partner, to sever its contract with Actava.  Accordingly, this action seeks damages from Defendants for their illegal campaign to interfere with and destroy Actava's growing competitive business.

2.      The Defendant Channels are the owners, operators, and producers of an assortment of television channels that are broadcast in the Russian Federation.  The Channels control the most popular Russian channels, including state-run Channel One.

3.      2.Actava is a set-top box provider and website operator catering to U.S. based customers seeking access to Russian-language television channels, including content offered by the Defendant Channels.  In 2016, Actava is was appointed as the exclusive Northeastern U.S. dealer and sales agent for non-party Matvil Corporation d/b/a/ eTVnet ("Matvil"), which is one of the few companies licensed to directly transmit the Channels' channels to customers via Internet Protocol Television ("IPTV").  Actava derives revenue from finding and referring customers for Matvil's service to Matvil, and from supplying set-up boxes, software and customer service support to those customers at Matvil's request so that they can enjoy the programming that Matvil provides.

3.      The Defendant Channels are the owners, operators, and producers of an assortment of television channels that are broadcast in the Russian Federation.  The Channels control the most popular Russian channels, including state-run Channel One.

4.      Upon information and belief, the Channels have licensed Kartina to provide IPTV signals containing the Channels' broadcasts to customers worldwide, including in the United States.  As such, Kartina is Matvil's primary competitor, as the non-exclusive licensee of the Channels' television programming in several regions, including the United States.

5.      4.The Channels The Channel Defendants, at the direction and behest of Kartina, have engaged in a widespread campaign of attempting to eliminate competition for the provision of Russian language television programming to North American viewers.  Indeed Funded by Kartina, they and with counsel chosen by Kartina, the Channels have litigated against no fewer than 85 other defendants in cases that have generated no fewer than 645 docket entries.  Actava represented a threat to the Channels Kartina because it offered customers a wholly legal product – Matvil – at a lower cost to consumers than the Channels and their U.S. business partners (mostly U.S. cable television companies).  For that reason, the Channels Kartina for the service provided by the Channels.  In an attempt to protect its profit from higher costs to consumers, Kartina and the Channels wrongfully attempted to eliminate Actava as a competitor by litigating baseless claims not only against Actava, but also against  and the other Actava Parties, including Master Call Communications and Master Call Corporation (where Mr. Tsoutiev also serves as CEO, but ), which never even provided any TV programming and are in a business entirely distinct from Actava and Kartina.

6.      5.Actava previously offered such programming itself directly to consumers, but in 2016, the Channels reached at Kartina's behest, the Channels sued claiming the stream of programming provided by Actava was unauthorized.  As soon as it learned of those claims, Actava immediately investigated, ceased providing the disputed programming stream, and then negotiated a sizeable settlement with the Actava Parties regarding dismissing Actava's prior

alleged infringement of their channels.  Actava ceased agreed to permanently cease providing the allegedly infringing stream, shut down its service, paid the Channels, and reconfigured its business to supply programming directly from by entering into a Referral Agreement under which it derived revenue by referring customers to Matvil, an undisputedly authorized provider.

7.       But to Kartina and the Channels, that was not enough.  Rather, through blatant abuse of the American judicial system, they decided to attempt to crush Actava's revived business model, no matter its legitimacy pursuant to the parties' Settlement Agreement, and no matter the cost to the Actava Parties, via unmeritorious legal accusations and proceedings.

8.       6. Indeed, with substantial bad faith and without any quantum of merit, the Channels initiated contempt proceedings against the Actava Parties on December 13, 2016 claiming that the Referral Agreement violated the injunctions Actava agreed to in the Settlement Agreement.  Upon information and belief, the Channels again did so at Kartina's behest.  As explained below, the contempt motion was baseless, and completely ignored Actava's legitimate arguments why its promotion of Matvil's service was legal.  Actava resisted the baseless motion, but once again, Actava's service was suspended pending the hearing and decision of the contempt motion.  Although the Court ultimately ruled against the Channels, that was over nine months later, the Channels unfortunately and in the meantime, Actava  struggled to recover from the interruption caused by the Channels' baseless motion.  Ultimately, the Defendants succeeded in inducing Matvil to terminate the Referral Agreement, thus preventing Actava from realizing the business revenue and profits that were flowing from it.  Defendants thus succeeded in their larger goal of destroying Actava's business.

9.       7. In light of the substantial and irrevocable damages to Actava's business and the other Actava Parties caused directly by the Channels Defendants' baseless claims of contempt

and subsequent interference with the Referral Agreement, the Actava Parties bring this action

against the ~~Channels~~ Defendants for tortious interference with prospective business advantage,

malicious prosecution, and breach of contract, to recover the damage to them caused by ~~the~~

~~Channels' sham proceedings~~Defendant.

## **PARTIES**

### *Plaintiffs*

10.    ~~8.~~Plaintiff Actava TV is a for-profit domestic business incorporated and organized

under the laws of the State of Delaware with a principal place of business located at 39

Broadway, Suite 1850, New York, New York 10006.

11.    ~~9.~~Plaintiff Master Call Communications, Inc. is a for-profit domestic business

incorporated and organized under the laws of the State of New Jersey with a principal place of

business located at 39 Broadway, Suite 1850, New York, New York 10006.

12.    ~~10.~~Plaintiff Master Call Corporation is a for-profit domestic business incorporated

and organized under the laws of the State of Delaware with a principal place of business located

at 39 Broadway, Suite 1850, New York, New York 10006.

13.    ~~11.~~Plaintiff Rouslan Tsoutiev is the CEO of Master Call Communications, Master

Call Corporation, and Actava.

### *Defendants*

14.    ~~12.~~Defendant Channel One Russia Worldwide is a joint stock company

incorporated and organized under the laws of the Russian Federation with its headquarters

located at 19 Akademika Koroleva St., Moscow, 127427 Russian Federation ~~and is registered~~

~~with the State of New York as "Channel One Russia" with a principal executive office located at~~

~~108 Perry St., 2A, New York, New York 10014 and a CEO by the name of Konstantin Ernst.~~

15. ~~13.~~Channel One is by far the largest and most popular Russian television broadcaster, owning and operating channels including Channel One Russia Worldwide, Telefake, Carousel, Dom Kino, Vremya:dalekoe i blizkoe, and Muzika Pervogo.

16. ~~14.~~Channel One has entered into license agreements with third parties, including non-party Matvil, to distribute its programming via IPTV in the United States and around the world.

17. ~~15.~~Defendant CTC is a joint stock company incorporated and organized under the laws of the Russian Federation. It owns and operates the CTC Network channel, and has entered into license agreements with third parties, including non-party Matvil, to distribute its programming via IPTV in the United States and around the world.

18. ~~16.~~Defendant Darial is a joint stock company incorporated and organized under the laws of the Russian Federation. It owns and operates the Che TV channel (previously named Peretz), and has entered into license agreements with third parties, ~~,~~to distribute its programming via IPTV in the United States and around the world.

19. ~~17.~~Defendant New Channel is a joint stock company incorporated and organized under the laws of the Russian Federation. It owns and operates the Domashny channel, and has entered into license agreements with third parties, including non-party Matvil, to distribute its programming via IPTV in the United States and around the world.

20. ~~18.~~Defendant Rain TV is a joint stock company incorporated and organized under the laws of the Russian Federation. It owns and operates Rain TV Channel, and has entered into license agreements with third parties, including non-party Matvil, to distribute its programming via IPTV in the United States and around the world.

21.    ~~19.~~Defendant Comedy TV is a joint stock company incorporated and organized under the laws of the Russian Federation.  It owns and operates the TNT TV Channel, and has entered into license agreements with third parties, including non-party Matvil, to distribute its programming via IPTV in the United States and around the world.

22.    Defendant Kartina Digital GmbH is a limited liability corporation incorporated and organized under the laws of Germany.  Its principal place of business is in Germany. Kartina distributes programming via IPTV in the United States and around the world, and regularly transacts business in New York via its Brooklyn, New York office, which also operates as Kartina's domestic agent.

## JURISDICTION AND VENUE

23.    ~~20.~~The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this controversy is between citizens of a state and citizens of a foreign state and the amount in controversy exceeds $75,000.

24.    ~~21.~~Defendants are subject to personal jurisdiction in the Southern District of New York because they have engaged in tortious conduct outside and within this jurisdiction causing damage within the jurisdiction, making long arm jurisdiction appropriate under New York law.

25.    ~~22.~~Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c) and 1400 (a).

## STATEMENT OF FACTS

### *Kartina Retains U.S. Counsel to Vindicate the Channels' Interests*

26.    On or around July 7, 2014, Kartina – with the Channels' consent – retained Dunnington Bartholow & Miller LLP ("Dunnington") in order to investigate and litigate against entities that Kartina believed were infringing on the Channels' copyrights.  Via Dunnington,

Kartina alleged that various entities were intercepting and re-transmitting the Channels' content and, to Kartina's competitive detriment, undercutting prices.

27.     By Kartina's own admission in court documents, Kartina knew that it lacked standing to bring the claims on its own as a non-exclusive licensee of the Broadcasters' channels. Rather than pursue claims in Kartina's name, Kartina and the Channels agreed that the Channels would file the lawsuit against allegedly infringing entities, instead of Kartina, their business partner doing so.  Each Channel thereafter granted Dunnington a Power of Attorney ("POA") to prosecute the lawsuit on its behalf.

### *Actava Dismantles its Business Following Original Lawsuits by the Channels*

28.     23.On November 4, 2015, at the direction of Kartina and represented by Dunnington, three Channels – CTC, Darial, and New Channel – filed a lawsuit against Actava in the Southern District of New York, alleging trademark and copyright infringement, among other causes of action, for Actava's alleged "interception" and "retransmission" of the Channels' Russian-language television channels.  The Channels served that complaint only on the New York Secretary of State, whose addresses for Actava were out-of-date at that time, as anyone could realize from checking online public listings of Actava's address on its website.  As it was wholly unaware of the action, Actava failed to respond, and a default judgment was entered. Neither the Channels nor their counsel Dunnington notified Actava of the default or of the existence of the action via any other means.

29.     24.Actava first learned of the three Channel's Channels' claims that Actava did not have authorization to stream those channels, of the prior legal action and of the default judgment from its merchant credit card processor months later, on or about January 21, 2016, when the processor froze Actava's account based on the Channels' letter to it indicating the court had mandated the processor to freeze Actava's account. Judge Moses later ruled that the

Channels' said letter was improper.  The Actava Parties promptly retained counsel within approximately a week in order to vacate the judgment. At this time, Actava also ceased streaming said three Channels' ~~channels~~ programming via internet and set-top box.

30. ~~25.~~On February 19, 2016, an expanded group of Channels – consisting of the Channel Defendants in this action – also served Actava with a second lawsuit alleging the same trademark and copyright violations as the first action, but adding new defendants and causes of action.  Upon information and belief, Kartina was again pulling the strings behind the expanded lawsuit.  Among the added defendants~~, the Channels added~~ were Rouslan Tsoutiev, individually, Master Call Communications, Inc., and Master Call Corporation.  ~~The~~ Kartina and the Channels roped Master Call into the action despite knowing full well that its business provided *phone service*, and had nothing to do with television broadcasts.  Tellingly, beyond identifying Master Call as a party to the action, the entire complaint omitted any further mention of Master Call.  Further, besides spuriously accusing Master Call and Mr. Tsoutiev in the complaint, the ~~Channels~~ Defendants failed to produce an iota of justification for doing so for the remainder of the proceedings (hereinafter referred to as the "Prior Proceedings") leading up to the Settlement Agreement, as well as during the contempt proceedings they initiated on December 13, 2016.

31. ~~26.~~Given the uncertainty of the pending default judgment, Actava stopped streaming via internet and set-top box the remaining Channels' content as well as all other paid content on February 23, 2016, four days after they first appeared in the second action and very shortly after Actava learned of the default judgment.  Since then, Actava has never resumed streaming the Channels' content.

32. ~~27.~~By the summer of 2016, Actava dismantled the technology infrastructure that it had purchased and configured at considerable expense for receiving, storing, and transmitting

video over the internet.  It deactivated its substantial fleet of internet servers and wiped them clean of all programming content.  ~~Although most customers had not requested refunds,~~ Actava also offered and gave refunds to those who had already paid in advance for content it could no longer provide itself.

33. ~~28.~~After voluntarily ceasing the broadcasts, Actava's monthly streaming sales revenues plummeted from an average of nearly $180,000 for each month in the year 2015 – a year in which the sales eclipsed $2 million overall – to zero, beginning in April 2016.

### *Actava and the Channels Reach Settlement Agreement*

34. ~~29.~~The Actava Parties denied liability in the action, but negotiated a resolution in order to avoid further litigation.  On April 26, 2016, the parties disposed of both cases through a global settlement (the "Settlement Agreement"), under which Actava agreed to pay a substantial sum to the Channels in return for a broad release.  The Settlement Agreement also stated that Actava "[is] not presently and will not in the future broadcast, copy, distribute, or otherwise use the Broadcasts in any manner, including on the Website, without the express written consent of the relevant Plaintiffs or an authorized representative thereof."

35. ~~30.~~On June 3, 2016, and June 6, 2016, Magistrate Judge Barbara Moses and Judge George Daniels of the Southern District entered Stipulated Injunctions and terminated each of the actions brought by the Channels against Actava.  The Stipulated Injunctions (attached as Exhibits A and B) enjoined Actava from:

a.  Broadcasting, re-broadcasting or otherwise transmitting
Plaintiffs' Broadcasts as identified in Annex 1 or any other channel
that Plaintiffs may in the future broadcast via any medium,
including but not limited to internet protocol television ("IPTV")
and social media, without authorization;

b.  directly or indirectly infringing or making any use, in any
manner whatsoever, of Plaintiffs' Broadcasts including any
associated programs without authorization;

c.  directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Marks as identified in Annex 1 without authorization; [or]

d.  publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts or Marks; in any medium, including but not limited to the internet (including IPTV and social media), television, radio, newspapers, magazines, direct mail or oral communications without authorization[.]

36.   31.Neither the Settlement Agreement nor Stipulated Injunctions define the terms "broadcasting," "re-broadcasting," "transmitting," "infringing," or "authorization.".

37.   32.Moreover, "Broadcasts" and "Marks" are also not defined, except "as identified in Annex 1" of the Injunctions (the "Annexes").  The Annexes merely list the English names of the Channels' television channels and feature colorized visual logos associated with those channels.

38.   33.Given the ambiguity of these terms – as well as the well-known litigious nature of the Channels – Actava believed it was essential to incorporate a provision in the agreement requiring that the Channels provide Actava with notice of any alleged breach and the opportunity to cure.  Intended as a backstop against the unpredictability of the Channels, the notice-and-cure provision (the "Notice Provision") was incorporated in Paragraph 8 of the Settlement Agreement, which states that in the event of a suspected breach, "Plaintiff shall provide written notice of the suspected breach to the appropriate Defendant(s). . .[and] if any Defendant fails to remedy such suspected breach within (10) business days of receiving written notice, the Plaintiffs shall be entitled to seek all judicial relief…."  Given that protection, Actava agreed to sign the Settlement Agreement and to Stipulated Injunctions.

*Matvil Proposes a Business Relationship with Actava*

39.   34.Matvil Corporation ("Matvil") is a leading global provider of television content to paying customers around the world – and one of Kartina's primary competitors.  As an

IPTV provider, Matvil uses a computer system known as a Content Delivery Network ("CDN") to deliver computerized streams of data to its subscribers.  Although the Channels originally named Matvil as a defendant in one of its numerous actions against third-party competitors, they swiftly dismissed all claims against it.

40.   35.The Defendant Channels (other than Defendant Darial, whose content Matvil has never streamed) have authorized Matvil to transmit, broadcast, distribute, display, and otherwise make use of those Channels' programs, content, and other materials – including the Channels' trademarks, logos, and names.  Specifically, Matvil has obtained licenses from Channel One Russia Worldwide, CTC Network, New Channel (a/k/a Domashny), Rain TV-Channel and TNT-Comedy.

41.   36.Separately, Matvil also provides access to approximately 140 channels other than the Channels.  However, upon information and belief, Matvil's customers devote the vast majority of their viewing time to the Channels' programming, which is highly popular among the Russian-speaking population across North America.  Matvil's popularity, moreover, owes both to its comprehensive offerings and its affordability relative to major American providers.

42.   37.In late spring 2016, Matvil learned of Actava's capabilities and expertise in the areas of marketing, advertising, customer support, technical support, and sales – particularly in the field of IPTV, and particularly to populations that had not previously been Matvil customers. Actava's marketing expertise, contacts in the Northeast United States (particularly New York), and experience with set-top boxes – all of which Matvil lacked – would enable Matvil to expand in the Northeast U.S. market.  Particularly, Actava had expertise in obtaining set-top boxes wholesale, configuring them, re-selling configured set-top boxes, and providing customers related technical support upon installation and throughout their subscription period.

Accordingly, Matvil recognized that Actava could provide complementary capabilities and serve as a viable source of customer referrals for Matvil.

43. 38. In summer 2016, Matvil's CEO, Mikhail Gayster, contacted Mr. Tsoutiev and proposed that Actava might become a dealer for Matvil. In the world of subscription internet content providers, dealers are effectively sales agents who sell subscriptions to new customers on behalf of licensed content providers. Dealers also sometimes receive additional compensation for providing equipment, technical support, and other efforts to sign up and keep paying customers.

44. 39. Until that time, Actava and Matvil had not done any business together. But a dealer arrangement – a common business relationship in the IPTV industry – offered a way for Actava to salvage any leftover portions of its dismantled business and to make Matvil's license agreements with the Prior Plaintiffs more profitable.

45. 40. The parties proposed a mutually beneficial agreement that sought to accomplish two goals: (a) increase Matvil's audience for its licensed streams of the Channels' programming; and (b) restart and revitalize Actava's business in a manner that adhered to the terms of the Settlement Agreement, Stipulated Injunctions, and any other agreements between Matvil and the Channels.

46. 41. In negotiating the Referral Agreement, Actava considered carefully whether it could agree to become a dealer for Matvil without running afoul of the Stipulated Injunctions and Settlement Agreement. Indeed, Actava had every incentive not to jeopardize the settlement it had just concluded, under which Actava paid a substantial sum to the Channels.

47. 42. Because the Referral Agreement would obligate Actava to promote Matvil's services, Actava bargained for – and obtained – specific legal assurances from Matvil that

Matvil's confidential agreements with the Channels authorize Matvil to promote its internet broadcasting services, and to use the trademarks, trade names, and logos of the Channels in connection with such efforts.  Moreover, Matvil similarly represented that its agreements with the Channels do not prohibit Matvil from engaging a third party to act as a dealer and/or marketer for Matvil's services – including the Channels' programming.  Accordingly, Actava had every reason to believe that Actava's *own* promotion of Matvil's streaming service would not violate any contractual term in any agreement between Matvil and any Broadcaster or be otherwise unlawful.

48.  ~~43.~~These assurances were corroborated by the fact that Matvil was not, and has never been, bound by the Stipulated Injunctions.  Therefore, Actava had no reason to doubt that entering into an arrangement with Matvil would be entirely consistent with the Settlement Agreement, Stipulated Injunctions, and Matvil's agreements with the Channels.

### Matvil and Actava Sign the Referral Agreement

49.  ~~44.~~After several months of negotiations beginning in late June 2016, by September 8, 2016, the parties had signed a confidential agreement (the "Referral Agreement"), under which Matvil "engage[d]" Actava "to provide and perform [certain] services," and Actava became Matvil's exclusive dealer in New York, New Jersey, Connecticut, Pennsylvania, and Massachusetts.

50.  ~~45.~~Under the Referral Agreement, Actava agreed to, among other things: (a) "serve as a source of referrals" for Matvil; (b) to "diligently promote Matvil's Service Offerings" (defined as both real-time and on-demand broadcasting; (c) "sign up" and "register customers" to Matvil's site; (d) "provide customer support and technical support related to set-top boxes"; and (e) "manage payments" of customers.

51.   46.Actava and Matvil agreed to split monthly revenue for each customer (or subscriber) that Actava refers (or signs up) pursuant to a formula designated in the Addendum to the Referral Agreement.

52.   47.The Referral Agreement codified the specific assurances made by Matvil during negotiations that the parties' arrangement was wholly consistent with any and all obligations to the Channels.  For example, the preamble states that Matvil "has licenses to broadcast television content from certain television providers," and that "in providing its services to [Matvil], [Actava] *will not be engaged in broadcasting television content*" (emphasis added).  Moreover, under Matvil's Representations and Warranties, Matvil "represents and warrants that it is fully licensed to transmit, broadcast, and otherwise use all channels, programs, content and other materials (including, without limitation, all third party trademarks, logos, and names) constituting or comprising the Service Offerings".

53.   48.Both before and after the Agreement was signed, Actava devoted significant time, effort, and resources towards ensuring its full compliance with the Stipulated Injunctions.  In particular, Actava confirmed that it in no way accessed, controlled, or touched the Channels' programming.  Moreover, Actava had no role in, access to, or control over the servers, Internet Protocol ("IP") addresses, or any other equipment involved in delivering the Channels' programming.

54.   49.Pursuant to existing agreements between Matvil and the Channels, the flow of the signal containing the Channels' programming is as follows:  Matvil receives the data from the Channels and streams that data onto its Content Delivery Network ("CDN"), which feeds the content to edge servers on which Matvil has leased space.  The edge servers then deliver Matvil's broadcasting streams directly to Matvil's customers.

55.   50.Matvil's customers access Matvil's streaming services through their computers or smart televisions, or through their televisions via a set-top box.  To be clear, Matvil customers access a stream provided strictly by Matvil through its CDN, and not via Actava.  This technological architecture would be readily apparent to anyone who examined the equipment and website in use.

56.   51.Actava does not provide the stream of programming to customers, whether they access Matvil's services via computer or smart television.  If users visit the ActavaTV.com website and want to subscribe to Matvil's services upon seeing Actava's promotions of Matvil, they must first sign up and create a customer account with Matvil.  Once users subscribe to Matvil, they can – via Actava's website – be re-directed to a Matvil webpage, http://act.etvnet.com, where they can enter their Matvil credentials and access Matvil's stream, including the Channels' programming.  Actava provides promotion, technical and billing support.

57.   52.Actava also does not stream the Channels' or anyone else's content to customers who access Matvil's services through their televisions via a set-top box.  Actava merely pre-loads Matvil's software onto the set-top boxes, and Matvil's application then connects to Matvil's CDN, which Actava neither accesses nor controls.

58.   53.Furthermore, Actava does not collect subscription payments for the Broadcasts.  Rather, Matvil – as the content provider – charged customers' credit cards and monitors their payments.  Under the Referral Agreement, Actava assists when payments are skipped or must be paid via some other method or credit card.

59.   54.Importantly, the Channels themselves stood to benefit economically from the successful implementation of the Referral Agreement.  Pursuant to the licensing agreements

between Matvil and the Channels, Matvil's procurement of each new customer referred by Actava ultimately yielded a profit for the Channels and made the licenses more valuable.

### *Actava Promotes Matvil's Services and Begins to Revive its Business*

60. ~~55.~~The Matvil service proved popular with consumers in the US.  As Matvil's dealer, Actava was obligated to promote and support the sale of Matvil's streaming services in return for its share of the revenue from those customers.  Accordingly, in October 2016, Actava contacted a Russian language over-the-air and online radio station, to place a radio advertisement to promote Matvil's service.  Actava worked with the radio station to create a script that would describe Matvil's services in a general way and list the channels orally and colloquially in Russian, which Actava understood to be permissible under the Injunctions.  The Channels' logos were not used.

61. ~~56.~~Furthermore, Actava repurposed its website as an advertisement to attract and refer customers to Matvil's services.  The site offers a link to Matvil's platform that only paying Matvil customers with Matvil-provided login credentials can access.  Actava's site is devoid of references to the Channels' Marks, which consist of the logos identified in the Annexes.

62. ~~57.~~Due to Actava's efforts in promoting Matvil, Actava sales re-materialized beginning in the fall of 2016 – and quickly and substantially grew.  Specifically, in referring customers to Matvil, Actava was succeeding both in attracting new users and re-establishing relationships with prior customers.

### *The Channels Falsely Accuse Actava of Violating the Settlement Agreement*

63. ~~58.~~On October 19, 2016, the Defendants' counsel Raymond Dowd, of Dunnington, sent Mr. Tsoutiev a letter notifying him of a "suspected breach of the Settlement Agreement" by Actava.  Specifically, the letter asserted that the Stipulated Injunction prohibited "Actava from using Matvil to distribute Broadcasters' channels," and that "Broadcasters will

pursue all judicial relief if Actava does not terminate the distribution of Broadcasters' channels with service from Matvil within 10 days of receipt of this letter."

64.   59.At the time of this letter, Mr. Dowd, Kartina, and the Channels knew full well that Matvil was authorized to offer the Channels' programming, and Mr. Dowd's letter in no way claimed that Matvil was forbidden from offering them.

65.   60.Significantly, the letter made no mention of Actava's radio advertisement, and referred only to the "use" of the Broadcasts on Actava's set-top box and website.  The letter stated the Channels' intention to "pursue all judicial relief," without suggesting they would immediately move for contempt of court, rather than claiming for breach of the Settlement Agreement, as indicated by the letter's title.

66.   61.Actava promptly replied via its prior counsel to Mr. Dowd on October 26, 2016, in order "to clarify the nature of Actava's relationship with Matvil, and to reassure [the Channels] that Actava's conduct is consistent with its obligations" under the Stipulated Injunction.  In fulsomely denying the Channels' allegations, the letter emphasized that "Actava is not broadcasting, copying, distributing, or otherwise making any direct or indirect use of the Plaintiffs' Broadcasts," nor "using the Plaintiffs' Marks. . .on its website or in any other medium in any manner whatsoever."  It continued that "both Actava and Matvil have taken pains to ensure that their collaboration complies with both parties' respective obligations," and that they both "wish to avoid any further conflict with the Channels."

67.   62.In a response dated November 14, 2016, Mr. Dowd reiterated the flawed and conclusory reasoning in his prior letter to argue that Actava was "in breach of the settlement." He further stated, however, that "we will consider" the Referral Agreement "if Actava provides us with a copy" by November 16, 2016.

68.   63.Actava's then-counsel immediately agreed to provide a redacted copy of the Referral Agreement to Kartina's and the Channels' counsel.  In fact, for weeks, Actava's prior counsel attempted – to no avail – to arrange a time to show Kartina's and the Channels' counsel the Referral Agreement, despite the fact that it contains sensitive confidential business information.

69.   64.When Mr. Dowd finally responded, he insisted that the document be provided at his offices immediately or the next day, or a contempt motion would follow.  Actava's counsel obliged, and brought the Referral Agreement to ChannelsDefendants' counsel's office on December 12, 2016.  Upon Actava's counsel's arrival, however, the Channels' counsel Mr. Dowd refused even to look at the document.

*The At Kartina's Behest, the Channels File an Overreaching and Meritless Contempt Motion*

70.   65.The following day, on December 13, 2016, the Channels filed a motion for civil contempt and sanctions (the "Contempt Motion") before Magistrate Judge Moses, seeking, among other things:  a ruling that the Actava Parties were all in contempt of the Stipulated Injunction; damages in the amount of Actava's "profits from their contempt," or in the alternative, statutory damages under the Communications Act and Copyright Act; attorneys' fees; and a $10,000 coercive penalty "for each day following this Court's contempt order that the Actava Parties remain in contempt."  Upon information and belief, Kartina directed the Channels to file the Contempt Motion.

71.   66.The ChannelsThe Defendants' Contempt Motion demonstrated that Kartina and the Channels had no qualms over wielding judicial process as a weapon to destroy Actava's burgeoning business.  Not only was the Contempt Motion sudden and unexpected, but it was also wholly baseless and unwarranted.

72.    67.Beyond summarily alleging that the Referral Agreement – which their counsel previously refused to review – somehow violated the Stipulated Injunction, the ~~Channels~~ Defendants referred in their supporting brief to Actava's Russian-language radio advertisements. Remarkably, the Contempt Motion was the first avenue by which the ~~Channels~~ Defendants lodged their objections to Actava's radio advertisements.  Accordingly, Actava was deprived of any notice or opportunity to cure pursuant to the Notice Provision of the Settlement Agreement.

73.    68.Actava was ultimately deprived of much more than notice and the opportunity to cure, however.  Because the contempt motion threatened day-to-day penalties and other excessive redress based in large part on the Referral Agreement's alleged violation of the Stipulation Injunctions, Actava voluntarily ceased advertising and signing up new customers to Matvil under the Referral Agreement altogether.  Actava did so on the same day that the ~~Channels~~ Defendants filed the baseless motion for contempt (December 13, 2016). Subsequently, the ~~Channels~~ Defendants went so far as to seek a court order that Actava's own website be transferred to the Channels, under penalty of day-to-day ongoing financial penalties.

74.    69.Further, notwithstanding that Actava previously signed up subscribers for services that included over one hundred channels other than the Channels, the Contempt Motion forced Actava to renege on its obligation to diligently sign up subscribers for *all channels* under the Referral Agreement.

75.    70.Although the legal basis for the above wide-ranging and draconian contempt penalties and severe private legal consequences was completely lacking, as the Court later found and a reasonable due diligence by the ~~Channels~~ Defendants would have yielded, due to their gravity Actava saw no alternative but to cease performing under the Referral Agreement.

76.   71.The effects of the contempt proceeding were catastrophic on Actava's business.  Actava had recently begun to seriously revive following the dismantling of its prior IPTV infrastructure.

77.   72.But because of Kartina's and the Channels' baseless actions, Actava's fast-growing business suffered a toppling blow.  Specifically, when the Channels initiated the contempt proceedings, growth in monthly and yearly referral sales plummeted, and Actava's monthly active referrals plateaued, leaving only those whom Actava made efforts to subscribe prior to the Channels' malicious interference with Actava's business.  The Moreover, the contempt proceedings effectively forced Actava to lay off personnel en masse in the spring of 2017.

78.   73.The effects of the contempt proceedings eroded Actava's reputation within the relatively tight-knit community of Russian-language broadcast customers to such an extent that its business never recovered, and most likely will never meaningfully recover to the level it enjoyed previously.  By way of contrast, after the first lawsuit, Actava's business recovery was not only possible, but it did in fact materialize.

79.   74.As even Kartina and the Channels should have reasonably expected and, upon information and belief, *did* reasonably expect, on September 27, 2017, Magistrate Judge Moses found unequivocally that there was no basis for any finding of contempt.  In her opinion rejecting any basis for certifying facts constituting contempt to the district judge (attached hereto as Exhibit C), Judge Moses confirmed the baselessness of the Channels Defendants' allegations on multiple occasions:

- "Plaintiffs did not tie any of [their] charges to any specific provision of the Stipulated Injunction."  Op. at 9.
- "Advertising and promoting Matvil's service, whether on the Website or on the radio, does not violate [Paragraph 2(a) of the Stipulated Injunction,] which

"prohibits the Actava [Parties] from 'broadcasting, re-broadcasting or otherwise transmitting' Plaintiffs' Broadcasts 'without authorization'." *Id.* at 22.

- "[I]n the scenario where the customer accesses Matvil's CDN directly. . . Actava's role in 'referring' the customer to Matvil does not appear to violate ¶ 2(a) of the Stipulated Injunction."  Op. at 23.

- "Plaintiffs concede that Matvil itself has the necessary licenses to transmit plaintiffs' Channels via IPTV.  Further, while plaintiffs *argue* that Matvil cannot sublicense its rights. . . they have not submitted any *evidence* to support that claim.  Nor, for that matter, have they 'complained to Matvil' about the Referral Agreement."  Op. at 25.

80.  75.The impact of the nearly 9-month-long stretch of the contempt proceedings has taken a remarkable toll on Actava.  Since Actava resumed advertising in February 2018, promptly after the Court's September 27, 2017 Order, sales growth has been was relatively stagnant, and have had not reached the growth levels that Actava would have attained but for the Channels' misconduct in baselessly targeting Actava.

81.  On July 30, 2018, five days after the Complaint in this action was originally filed, upon information and belief, the Defendants pressured and induced Matvil to end its relationship with Actava.  Shortly thereafter, Matvil indeed terminated the Referral Agreement due to this wrongful interference by Kartina and the Channels with Actava's and Matvil's business relationship.

82.  76.Upon information and belief, as a direct and proximate result of Kartina's and the Channels' misconduct and interference with Actava's business, Actava has lost revenues totaling over $30 million which it would have attained over the next 10 years.

## FIRST CAUSE OF ACTION

### *(Tortious Interference with Prospective Economic Advantage against all Defendants)*

83.  77.The Actava Parties hereby re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

84.   78.From Actava's voluntary disclosure to the Channels and by extension Kartina, they Defendants were aware of the actual and continuing business relationship between Actava and Matvil pursuant to the Referral Agreement signed by the parties by September 8, 2016.

85.   79.The Kartina and the Channels unlawfully and maliciously interfered with Actava's business relationship and its Referral Agreement with Matvil by initiating, or causing to be initiated, baseless contempt proceedings against the Actava Parties and by inducing Matvil to end its relationship with Actava.

86.   80.Moreover, Kartina and the Channels unlawfully and maliciously interfered with Actava's business relationships with existing and prospective customers by initiating, or causing to be initiated, baseless contempt proceedings against the Actava Parties and by inducing Matvil to terminate the Referral Agreement and end its relationship with Actava.

87.   81.The Kartina and the Channels engaged in such conduct for the sole purpose of inflicting intentional harm on the Actava Parties.

88.   82.Because Actava's business prospects – and Mr. Tsoutiev's career – are largely based on reputation and trust, the ChannelsDefendants'- tortious conduct have has significantly diminished Actava's and Mr. Tsoutiev's income potential.

89.   83.Accordingly, Kartina and the Channels tortiously interfered with Actava's contract and with its prospective economic advantage, and the Actava Parties are entitled to reasonable attorneys' fees and damages in an amount to be determined at trial, in an amount the Actava Parties believe will exceed $25 million, together with any such other relief as the Court deems just, proper, and equitable.

## SECOND CAUSE OF ACTION

### *(Malicious Prosecution against all Defendants)*

90. ~~84.~~The Actava Parties hereby re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

91. ~~85.~~On December 13, 2016, Kartina and the Channels filed ~~,~~ or caused to be filed, the baseless Contempt Motion against the Actava Parties, making spurious and patently unwinnable arguments that the Actava Parties violated the Stipulated Injunctions.

92. ~~86.~~On September 27, 2017, Judge Moses denied the Contempt Motion, ruling in the Actava Parties' favor.

93. ~~87.~~In bringing the Contempt Motion, Kartina and the Channels lacked probable cause, acted in actual malice, and acted with a wrong and improper motive. Thereby, the Channels maliciously prosecuted the Actava Parties.

94. ~~88.~~As a direct and proximate result of the ~~Channels~~Defendants' Contempt Motion and/or malicious prosecution, the Actava ~~has~~ Parties have suffered and ~~continues~~ continue to suffer significant economic damages to which the Actava Parties are entitled in an amount to be determined at trial, in an amount the Actava Parties believe will exceed $25 million, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION

### *(Breach of Contract against the Channel Defendants)*

95. ~~89.~~The Plaintiffs hereby re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

96.   90.On April 26, 2016, the Channels and the Actava Parties entered into the Settlement Agreement, which included a Notice Provision requiring the provision of notice and opportunity to cure any suspected breach.

97.   91.The Actava Parties abided by the Settlement Agreement in every respect.

98.   92.The Channels Channel Defendants violated the Notice Provision of the Settlement Agreement by initiating contempt proceedings after failing to provide Actava notice of, and the opportunity to cure, its purported violation of the Settlement Agreement and/or Stipulated Injunction with respect to Actava's radio advertisement.

99.   93.This breach of contract caused Actava significant economic damages to which the Plaintiffs are entitled in an amount to be determined at trial, in an amount the Plaintiffs believe will exceed $25 million, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION

### *(Violation of N.Y. General Business Law § 349 against Kartina)*

100.   The Plaintiffs hereby re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

101.   Kartina is a corporate competitor of Actava.

102.   Upon information and belief, Kartina directed the Channel Defendants' pursuit of the contempt motion.  Upon information and belief, Kartina also paid the Channel Defendants' attorneys fees in the Prior Proceedings.

103.   The Channel Defendants pursued the contempt motion.  Upon information and belief, the Channel Defendants induced Matvil to terminate the Referral Agreement.  Plaintiffs' investigation into Kartina and the Channel Defendants' coordinated attack on Plaintiffs and its

business is continuing, and these allegations may be amended and expanded as additional evidence is discovered.

104.    Upon information and belief, Kartina's activities as alleged above caused damage to competition between Kartina and Actava, harming consumers via the reduced competition in the market for IPTV service to Russian-speaking audiences.  For example, consumers in that market suffered decreased competition for low prices and quality service to consumers.  In addition, by portraying Kartina's actions as actions by the Channel Defendants, Kartina materially misled consumers of Russian-language television channels.

105.    Kartina's activities as alleged above constitute unfair and deceptive business practices in violation of § 349 of the New York General Business Law.

106.    As a direct and proximate result of the foregoing acts of Kartina, the Actava Parties have suffered and continue to suffer significant economic damages to which the Actava Parties are entitled in an amount to be determined at trial, in an amount the Actava Parties believe will exceed $25 million, together with reasonable attorneys' fees and any other such relief as the Court deems just, proper, and equitable.

## PRAYER FOR RELIEF

WHEREFORE, the Actava Parties respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.    An award to the Plaintiffs of monetary damages, in an amount the Plaintiffs believe will exceed $25 million, together with reasonable attorneys' fees and prejudgment interest;

B.    An award to the Plaintiffs of exemplary damages; and

C.      An award of any such other relief as the Court deems just, proper, and equitable.

Dated: New York, New York
        ~~July 23~~October 4, 2018

                                    Respectfully submitted,

                                    MOSES & SINGER LLP


                            By: _/s/ Toby Butterfield_____
                                    Toby Butterfield
                                    Michael Rosenberg
                                    405 Lexington Avenue
                                    New York, NY  10174
                                    Telephone: (212) 554-7800
                                    Facsimile: (212) 554-7700

                                    *Attorneys for Plaintiffs*