```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ACTAVA TV, INC., et al.,

 4              Plaintiffs,

 5         v.                                 18 CV 6626 (ALC)(KNF)
                                              Telephone Conference
 6   JOINT STOCK COMPANY "CHANNEL
     ONE RUSSIA WORLDWIDE," et al.,
 7
                Defendants.
 8
     ------------------------------x
 9                                            New York, N.Y.
                                              May 28, 2020
10                                            10:35 a.m.

11   Before:

12                         HON. KEVIN N. FOX,

13                                      Magistrate Judge

14                              APPEARANCES

15   FRANKFURT KURNIT KLEIN & SELZ PC
          Attorneys for Plaintiffs
16   BY:  TOBY M.J. BUTTERFIELD
          -and-
17   MOSES & SINGER LLP
     BY:  VALERIE M. CASTANARO
18        MICHAEL M. ROSENBERG

19   DUNNINGTON BARTHOLOW & MILLER LLP
          Attorneys for Defendants
20   BY:  RAYMOND J. DOWD
          AKBAR AZAM KHAN
21        HARDIN P. ROWLEY

22

23

24

25
```

1  (The Court and all parties appearing telephonically)
2  (Case called)
3  THE COURT:  Counsel to the plaintiffs, please note
4  your appearance.
5  MR. BUTTERFIELD:  Good morning, your Honor.  This is
6  Toby Butterfield, of Moses & Singer.  Your Honor, with your
7  permission, I will probably defer on the substance of the
8  applications today to my colleague, Michael Rosenberg, who I
9  understand is on the line along with other -- my other
10  colleagues.
11  MR. ROSENBERG:  Yes, your Honor.  Michael Rosenberg,
12  also for the plaintiffs, also of Moses & Singer LLP.
13  THE COURT:  Good morning to both of you.
14  MS. CASTANARO:  And Valeria Castanaro, also for the
15  plaintiffs.  Good morning, your Honor.
16  THE COURT:  Good morning.
17  Counsel for defendants, please note your appearance.
18  MR. DOWD:  Good morning, your Honor.  This is Raymond
19  Dowd, of the Dunnington firm.  And with me today -- and,
20  similarly, we'd ask the Court's permission to divide the
21  argument -- are Hardin Rowley and Akbar Khan.  I'll ask them to
22  introduce themselves.
23  MR. ROWLEY:  This is Hardin Rowley, from Dunnington.
24  Good morning, your Honor.
25  THE COURT:  Good morning.

1        MR. KHAN:  Good morning.  This is Akbar Khan.
2        THE COURT:  Good morning.
3        I want to begin with the writing that appears at
4 docket entry No. 163.  With respect to that writing, the
5 plaintiffs contend that the nondisclosure agreement, the NDA,
6 cannot be disclosed without Matvil's consent, which Matvil has
7 withheld.
8        Have the defendants sought to subpoena the NDA from
9 Matvil?
10       MR. DOWD:  No, your Honor, we have not.
11       THE COURT:  Is there a reason why you haven't done
12 that?
13       MR. DOWD:  Well, there's case law that says plaintiffs
14 have effective control over the document, that they can produce
15 it themselves.  They're in a business relationship with them
16 that's ongoing that's evidenced by a U.S. trademark filing, and
17 they refused to even tell us what's in the NDA.  We don't know
18 what's in it.  And it would be a great expense for our client
19 to file letters rogatory in Canada to get this information.
20 And we only learned about the existence of the NDA about three
21 weeks ago in a footnote of a letter from 2018.  So they've
22 withheld this information from us.  We could have done this
23 earlier, but we learned about it, and we only recently had
24 discovery extended two months, and based on plaintiffs'
25 letters, rogatory experience, which has taken about a year, I

don't think it's in anyone's interests to delay the proceedings another year to go through Canadian courts again.

THE COURT: But if you're aware from the plaintiffs that there is a bar to disclosure without consent from Matvil, which you now know Matvil is not giving, if you are desirous of the document, it seems incumbent upon you to make efforts to get it that you haven't made by a subpoena, even though you may have to pursue foreign channels to get the document.

MR. DOWD: Well, we asked plaintiffs for a copy of their communications with Matvil when Matvil denied this, and we haven't received that either. So we don't really know if what plaintiffs are telling us is accurate.

THE COURT: Well, I think that if you want the document, you should pursue it from Matvil because it's unlikely that the plaintiffs are going to breach their agreement with Matvil. And this is a way, perhaps, to have Matvil, perhaps, reassess its position. Maybe you can contact Matvil short of a subpoena, and Matvil may not want to expend resources to litigate over a subpoenaed document and might reassess its view on whether it would agree to have the plaintiffs surrender the document to you.

MR. DOWD: We can reach out to Matvil, your Honor. We can do that.

THE COURT: All right.

In that same writing, appearing at docket entry

1    No. 163, the plaintiffs contend that the defendants did not
2    meet and confer regarding the plaintiffs' performance under the
3    referral agreement with Matvil or the defendants' contention
4    that the plaintiffs' responses to document requests that
5    pertained to the plaintiffs' claimed $30 million projected
6    losses are deficient.  Parties must meet and confer on issues,
7    such as these, before presenting them to the Court.
8            So, the only reference to meet and confer in the
9    document appearing at docket entry 163 pertains to a
10   meet-and-confer on another topic back in April 2019.  So the
11   parties are going to have to meet and confer on these contested
12   issues unless there's some evidence that there has been a
13   meet-and-confer on these two matters.
14           MR. DOWD:  Your Honor, we did meet and confer, and I
15   have a letter from April 5th, 2019, from Mr. Butterfield
16   talking about that anticipated meet-and-confer, which we did
17   have around April 11th.
18           A lot of the issues that we met and conferred with
19   plaintiff -- most of their responses are not really objections.
20   They said they would produce documents, and we waited patiently
21   until December of 2019, when they told us they were completed.
22   That's when we realized they weren't producing documents
23   related to damages, discovery, and just generally in support of
24   their claims, and that's why we filed this application.
25           So, we did meet and confer with them.

1        THE COURT:  I'm sorry, I didn't hear clearly
2   everything that you said.  Would you mind repeating it, please?
3        MR. DOWD:  Sure.
4        On April 5th, 2019, we have a letter, and we can
5   provide it to you, from Mr. Butterfield discussing this
6   meet-and-confer, which we had around April 11th, 2019.  And
7   when we met during that meet-and-confer, we focused on,
8   obviously, their objections, plaintiffs' objections.  The
9   majority of their responses said they would produce responsive
10  documents.  What happened was we waited, and we expected them
11  to come on a rolling basis, and then in December of 2019, they
12  said they were finished.  That's why we made inquiries if they
13  were completed, and they said yes, and that's why we filed this
14  application, which is seeking documents related to their
15  damages and to our damages, because we've alleged breach of
16  contract, and a lot of these documents would go to our damages
17  against plaintiffs, and they haven't produced them.  A lot of
18  these are basic things about communications with Matvil, which
19  they have not produced either and that certainly help support
20  the case, and we're just trying to find that out.  So we did
21  meet and confer.
22       THE COURT:  I want to be clear:  The meet-and-confer
23  back in April 2019 was specific to the performance on the
24  referral agreement and the $30 million that are referenced in,
25  I think it is, paragraph 82 of the amended complaint; that's

1    defendants' position?

2             MR. DOWD:  Yes, your Honor.

3             THE COURT:  All right.  Let me turn to plaintiffs'
4    counsel.

5             Do you recall, back in April 2019, a specific
6    meet-and-confer exchange with defendants on the issue of
7    performance under the referral agreement and the projected
8    losses?

9             MR. ROSENBERG:  Your Honor, we do recall that the
10   issue --

11            THE COURT:  Would you identify yourself for the
12   reporter, please.

13            MR. ROSENBERG:  Yes, your Honor.  Michael Rosenberg,
14   for the plaintiffs.

15            Your Honor, we did not have a meet-and-confer
16   specifically covering what's in the application today.  I
17   believe that in passing, the issue arose, and we represented
18   that we would be producing documents on an ongoing basis, which
19   is what we have continued to do.  We have indicated that we
20   will produce all documents by seven days prior to the
21   depositions in this case, which will occur sometime in June.
22   Contrary to the representation just made, we never stated that
23   by December of last year, the productions had already been
24   complete.  But our position is that we have produced documents
25   reflecting the performance of the referral agreements, and the

1   same goes for documents relating to our damages.

2          We haven't certified, yet, that our productions are
3   complete, however, and that goes for all the parties in this
4   case.  We do not recall a meet-and-confer specifically about
5   the issues raised in this application, and that's part of the
6   problem with the motion practice in this case, is that it's
7   hard to keep track of what applications refer to a certain
8   meet-and-confer.  However, we're willing to diligently work
9   with the defendants in good faith to produce what they believe
10  is deficient.  And, again, by the application today, it's still
11  unclear to us exactly what they believe we have not produced.

12         THE COURT:  Defense counsel, do you want to be heard
13  further?

14         MR. DOWD:  I would ask --

15         MR. BUTTERFIELD:  Toby Butterfield.

16         May I supplement with one other point, your Honor?
17  This is Toby Butterfield.

18         THE COURT:  Go ahead, Mr. Butterfield.

19         MR. BUTTERFIELD:  This is the problem:  The defendants
20  are relying on a meet-and-confer conference back in April 2019,
21  before many, many document productions were made by the
22  defendants.  And they came to this Court on this application
23  seeking, without having raised the issue again, for a motion to
24  compel about 65 different undifferentiated requests.  The list
25  of the categories is very lengthy.

1    And the problem, I think, as I see it, is that they
2    should have identified which documents they are saying we
3    haven't produced rather than just coming to this Court and
4    saying every single one of these is deficient, because we
5    produced a lot of documents since then.
6    THE COURT:  How would the defendants be able to
7    identify for you what you haven't produced unless the
8    defendants are privy to all of the documents in your possession
9    and under your control?
10    MR. BUTTERFIELD:  Well, I think the issue may be, in
11    part, the question of which documents respond to which request.
12    And, as required, we've identified for them which documents
13    respond primarily to which response.  But this is all a bit
14    moot, your Honor, and premature because we're in the middle of
15    preparing damages reports from experts, who will presumably be
16    deposed, and those are going to identify the basis for the
17    damages contentions and the support for them.
18    So, there are also damages documents which we're
19    seeking from Matvil pursuant to the letters rogatory.  So, our
20    position is really this application is, we think, misguided and
21    not really the most efficient way to get to the issue that
22    Mr. Dowd wants to try and nail down as to all the different
23    categories of requests to which every single document in our
24    document production responds to.
25    THE COURT:  When is it that the damages calculation

1  and expert submission to you is going to be provided to your
2  adversaries?
3           MR. BUTTERFIELD:  Well, it depends a little bit on
4  what happens in the Canadian proceeding, as we explained to
5  your Honor in a recent letter requesting a slight extension of
6  the time for remaining discovery.  But we are contemplating
7  that we will finalize our expert's report in late June or early
8  July.
9           THE COURT:  So the defendants should just wait until
10 then because you cannot give any information about the
11 allegation in the complaint that projects $30 million of losses
12 until July?
13          MR. BUTTERFIELD:  No, your Honor.  We think we've
14 given lots of documents that relate to that, and they're all
15 within our document production.  Mr. Dowd's complaint seems to
16 be that he isn't -- he wants us to sort of -- it's sort of like
17 without having served contention interrogatories, in which he
18 would request us to identify which document -- all the
19 different categories to which every single document we have
20 produced relates, he wants the Court to order production of
21 documents, many of which, and not all of which, we have already
22 produced.
23          THE COURT:  I'm not altogether certain I'm
24 understanding what you're saying.  There's an allegation in the
25 complaint that there are projected losses of $30 million.  If

1    there is a request for information about that allegation, is it
2    the plaintiffs' position that the defendants should wait until
3    the expert prepares something about all damages or that the
4    plaintiffs have provided information key to that allegation in
5    the complaint -- I think the paragraph is 82, I could be wrong
6    about that -- and if it's the latter, can you identify which
7    document or documents you believe address the allegation of a
8    projected loss of $30 million?  And maybe that would pinpoint
9    for the defendants exactly what you say has been provided and
10   close this matter.
11            MR. BUTTERFIELD:  I guess what I'm saying, your Honor,
12   is that I think that this application is misguided because it's
13   based on a meet-and-confer, on communication, 13 months ago, in
14   which it was impossible for us, because we hadn't yet produced
15   documents, to have any of those conversations.  What Mr. Dowd
16   should have done, if he wanted to identify all the different
17   documents concerning damages, he should have served a
18   contention interrogatory asking for that.  We will undoubtedly
19   identify all the different documents that we're relying on at
20   the time that we produce our expert report.
21            THE COURT:  I'm not understanding the position,
22   because, in the first set of interrogatories, under the local
23   rules of this Court, a party can ask for a calculation of
24   damages, so you don't have to wait until the end of discovery
25   when contention interrogatories can be served.  That's one of

the first categories in the first set of interrogatories that can be addressed by the local rules.  So, that's one thing.

The second thing is that, again, if the plaintiffs' position is, we have addressed the allegation about projected losses of $30 million in some document or documents we have already submitted to the defendants, if that's the plaintiffs' position, tell me that now.

MR. BUTTERFIELD:  Yes, that is our position, your Honor.

THE COURT:  Okay.

Which document or documents, can you pinpoint them for the defendants, so that they can look at them and know, okay, here is where the plaintiffs are responding providing information about that $30 million projected, it's in document X dated this document, it's in document Y dated that date?  Can you do that for the defendants?

MR. BUTTERFIELD:  If that is what you want to direct us to do, without us having been heard on all these other approximately 65 different categories, your Honor, which I think we should go back and do the proper meet-and-confer with the defendants to resolve this issue, but if you want us to just deal with this by identifying documents which confirm damages, we can do that.

THE COURT:  No, not documents that concern damages. I'm focusing only on the allegation that was raised in document

1   163 about the $30 million projection.  You've already told me
2   there's going to be a submission from an expert on all
3   damages -- that's fine, that will come when it comes -- but I
4   want to forestall having these numerous writings sent to me,
5   seemingly daily, on matters that can be resolved rather
6   quickly.  There's a question about these projected losses,
7   you've indicated you've already provided documents that address
8   that, if it's identified for the defendant, these are the
9   documents that speak to the $30 million directives, that closes
10  the door on that, we don't have to waste any more time on that.
11  Certainly not my time.
12          I have made clear earlier that meeting and conferring
13  is absolutely required before you bring matters to the Court.
14  The matters now before me, I don't want to come back in a week
15  or two and revisit the same matter.  So let's close the door on
16  it now, if we can.  That's an efficient way to proceed and an
17  economical way to proceed, and that's what Rule 1 of the
18  Federal Rules of Civil Procedure suggest should be done, that
19  the parties should have an efficient and economic litigation.
20          I want to move now to the item at docket entry
21  No. 164, where there is a request by the defendants for 28
22  email messages by Diana Tsutieva, because I'm seeing, without
23  foundation, the defendants assert that these communications are
24  not attorney-client communication because Ms. Tsutieva is the
25  daughter of Defendant Rouslan Tsutiev, and that she once served

1   as general counsel to Actava TV.  This issue of Ms. Tsutieva's
2   stated as counsel to plaintiffs was addressed by me in the
3   conference on May 5, 2020, and we can't continue to resurrect
4   issues already resolved.  That's not productive, it's not a
5   good use of anyone's time.  So, I'm not going to grant the
6   request made by the defendants that's reflected in docket entry
7   No. 164.

8   　　　　　We'll come now to the matter that's docket entry
9   No. 165.  The last time we spoke, on May 5, 2020, the
10  plaintiffs requested an opportunity to submit some legal
11  authority to me on the issue that was discussed about exception
12  to attorney-client privilege.  That issue came up in connection
13  with a number of communications that appeared or were
14  identified on a privilege log, and matters on the privilege log
15  were sent to me for in camera review, review was made.  The
16  writing at docket entry No. 165 isn't as narrowly tailored as I
17  was led to believe would be coming to me, but, in any event,
18  cases and arguments made by the plaintiffs in docket entry
19  No. 165 do not persuade me that the common interest exception
20  does not apply to the contested communications that were at
21  issue when we spoke back on May 5, 2020.  So the position that
22  I took then with respect to those writings, and whether they're
23  under the cover of the common interest exception, I maintain
24  that position.

25  　　　　　So those are the matters I wanted to raise with you.

1    I note that there is another outstanding writing from the
2    parties.  Unfortunately, my time was constrained all of last
3    weekend on criminal matters, and I could not get to that
4    document in time to address it during this conference.  I would
5    have preferred to do that, to be efficient, but it was not
6    possible.  So, I will be back to you when I have analyzed the
7    writing -- I think it's docket entry No. 167 -- and alert you
8    when I can have a conference with you to address that matter if
9    a conference is needed.
10             Thank you very much.  Good day.
11             COUNSEL:  Your Honor, one more issue?
12             THE COURT:  Yes.
13             MR. ROSENBERG:  I'll defer to Toby Butterfield on
14   this.
15             MR. BUTTERFIELD:  No, go ahead, Mr. Rosenberg.
16             MR. ROSENBERG:  Your Honor, I think the remaining
17   issue is the authority of the channels to bring these
18   applications.
19             Again, this is Michael Rosenberg, for the plaintiffs.
20             THE COURT:  Oh, yes, I wanted to raise it, I'm sorry.
21   I have a note to myself about the power of attorney that was
22   discussed during the May 5 conference, and I was given to
23   understand that Mr. Dowd would be making efforts to nail that
24   down quickly because there was raised by the plaintiffs a
25   question of whether there is continued representation by one of

1   the corporate defendants by Mr. Dowd, and, as I mentioned that
2   on May 5, since a corporate entity cannot appear in an action
3   pro se, it might be the Channel defendant might be in a default
4   status if it's not represented by counsel.
5           Mr. Dowd, what is the latest on whether you have been
6   authorized to continue to represent Channel through a power of
7   attorney?
8           MR. DOWD:  Your Honor, I received written assurances
9   yesterday that the issue is being dealt with and that,
10  hopefully, they're trying to speed up the process.  They're
11  dealing with COVID issues in Moscow.  And I reiterate that I've
12  been in communication, and I have authority from the client,
13  it's just a question of having the power of attorney.  So, we
14  are making all efforts, and as soon as I have it, I will
15  provide it, but in the meantime, I've got the authority.
16          MR. ROSENBERG:  Your Honor --
17          THE COURT:  Just a moment.
18          I have made clear what the vulnerability is that
19  Channel has given this, I guess the word is, lapse in the power
20  of attorney and the delay in getting a new power of attorney or
21  a renewed power of attorney -- I don't know what the right
22  phrase is -- but it places Channel in a very vulnerable
23  position, and I don't know what action, if any, plaintiffs will
24  take because of that, but I have made clear what the
25  vulnerability is to Channel because of the lapse of power of

1   attorney.

2         Mr. Rosenberg, you wanted to be heard?

3         MR. ROSENBERG:  Yes, your Honor.  I just point out
4   that we've been requesting this power of attorney for many
5   months now, arguably before COVID took hold on a worldwide
6   scale.  The power of attorney has lapsed as of March 2020, and
7   we would just request that your Honor set a date certain,
8   perhaps June 5th, by which the defendants must submit a power
9   of attorney or else the plaintiffs are permitted to submit an
10  application to hold them in default.

11        MR. DOWD:  May I be heard?

12        There's no precedent or authority for this type of
13  application.  I've never heard of it.  I've made the
14  representations to the Court that we have a retainer agreement,
15  that we have ongoing communications with the client.  I have
16  never seen any case law where the lapse of a power of attorney
17  had any effect on a lawyer's actual or apparent authority.

18        Notwithstanding that, as I said, I'm representing to
19  the Court that I've conveyed faithfully the Court's thoughts on
20  this, or its views, as your Honor expressed, faithfully to the
21  client.  The client has written to me that they're making
22  efforts to get the paperwork resolved, and I hope to report
23  soon, but I don't think any of this, in any way, could possibly
24  be viewed to prejudice the plaintiff or the plaintiffs'
25  actions.  So the client is aware and is fully on notice.

1        THE COURT:  Very well.

2        I am going to reject the request made by Mr. Rosenberg

3   that I put a time certain on you and your client.  You have the

4   document power of attorney in place.  I have, again, made clear

5   the vulnerability that a corporate entity faces that is not

6   represented by counsel in a litigation, and whatever

7   application that any party wants to make with respect to that,

8   any party can make, and I'm not inviting unnecessary motion

9   practice.  Again, I expressed to you today the desire that you

10  have an economical litigation, an efficient litigation, but the

11  vulnerability of the defendant entity has been expressed, and

12  we proceed in that fashion.

13       Thank you very much.  Good day.

14       COUNSEL:  Thank you, your Honor.

15                              * * *