UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Actava TV, Inc., Master Call Communications, Inc., Master Call Corporation, and Rouslan Tsoutiev,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　-against-<br><br>Joint Stock Company "Channel One Russia Worldwide," Closed Joint Stock Company "CTC Network," Closed Joint Stock Company "New Channel", Limited Liability Company "Rain TV-Channel," Open Joint Stock Company "ACCEPT", Limited Liability Company "Comedy TV," and Kartina Digital GmbH,<br><br>　　　　　　　　　　　　Defendants. | Index No.: 1:18-cv-06626<br><br>**PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |

　　　　　Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, Plaintiffs Actava TV, Inc. ("Actava"), Master Call Communications, Inc., Master Call Corporation, and Rouslan Tsoutiev (the "Actava Parties") by and through their attorneys, Moses & Singer LLP and Foley Hoag LLP, respectfully submit this statement of undisputed material facts in support of their motion for summary judgment dismissing Defendants' Counterclaims, dated April 6, 2020 (Ex. 47 hereto (ECF No. 150; the "Counterclaims")) in their entirety.

**Background**

　　　　　1.　　　Actava was founded by Rouslan Tsoutiev in 2010. (Tsoutiev Decl., ¶ 2).

　　　　　2.　　　Actava was a for-profit business that catered to customers of Russian-language Internet Protocol Television ("IPTV") broadcasts, including the content offered by Joint Stock Company "Channel One Russia Worldwide," Closed Joint Stock Company "CTC Network," Closed Joint Stock Company "New Channel", Limited Liability Company "Rain TV-Channel," Closed Joint Stock Company "TV DARIAL", and Limited Liability Company "Comedy TV" (together, the "Defendant Channels"). (Ex. 1 (Tsoutiev Decl., ¶ 2)).

4907606v2

3. From 2013 to February 23, 2016, Actava provided its customers the ability to stream Russian language IPTV television broadcasts through Actava and Actava's website (www.actava.tv). (Ex. 1 (Tsoutiev Decl., ¶¶ 9-11)).

4. Actava's website became operational on August 25, 2013. (Exs. 14, 14-1 (Makhotin Decl., ¶ 4)).

5. The Defendant Channels are the owners, operators, and producers of an assortment of television channels that are broadcast in the Russian Federation. The Defendant Channels control the most popular Russian channels, including state-run Channel One. (Ex. 48, (Second Am. Compl., ECF No. 147, ¶ 2); Ex. 47 (Answer, ECF No. 150, ¶ 2)).

6. Defendant Kartina Digital GmbH ("Kartina") is a German entity that broadcasts the content of certain Defendant Channels, including that of Defendant Channel One. (Ex. 22 (2/9/21 Tr. of Andreas Reich, 109:2-4)).

### Acquisition of Russian Telekom, Inc. Assets

7. On May 31, 2013, Actava purchased certain assets (the "Purchased Assets") of RussianTelekom, Inc. ("RT" or "RussianTelek"). (Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7).

8. The Purchased Assets included: RT's hardware and platform software; its customer list, including all of RT's approximately 800 subscribers; and its website and domain name, www.russiantelek.com (the "RT Website"). (Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7).

9. Screenshots of the RT Website collected and indexed by the Internet Archive establish that on June 25, 2014, Actava was displaying banner advertisements on the RT Website directing customers to Actava's website and services. (Exs. 14, 14-1 (Makhotin Decl., ¶ 5); Ex. 15).

10. After Actava purchased RT, Actava fully integrated RT's prior subscribers into

Actava's subscriber database. (Ex. 1 (Tsoutiev Decl., ¶ 11); Exs. 8-9).

11. After Actava purchased RT, any traffic to RT's server (iptv.russiantelek.com) was redirected to Actava's server (iptv.actava.tv). (Exs. 14, 14-1 (Makhotin Decl., ¶ 7)).

12. On June 4, 2014, RussianTelekom, Inc. formally dissolved. (Ex. 17 (Butterfield Decl., ¶ 2), Ex. 18).

13. By December 5, 2014, any visits to the RT Website were fully re-directed to Actava's website. (Exs. 14, 14-1 (Makhotin Decl., ¶ 6); Ex. 16).

### Prior Actions, Settlement, and Injunctions

14. Defendant Kartina retained Dunnington, Bartholow, & Miller ("Dunnington") on or around July 7, 2014 to investigate and litigate against alleged unlicensed broadcasters on behalf of the Defendant Channels. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 26); Ex. 47 (Answer, ECF No. 150, ¶ 26); Ex. 23).

15. On November 4, 2015, certain Defendant Channels (CTC Network, DARIAL, and New Channel) filed *CTC Network, et al. v. Actava TV, Inc.*, No. 15-cv-08681, in the Southern District of New York on November 4, 2015, against Actava (the "*CTC* Action"). (Ex. 24).

16. On February 19, 2016, certain Defendant Channels (Joint Stock Company 'Channel One Russia Worldwide', Closed Joint Stock Company 'CTC Network', Closed Joint Stock Company 'TV DARIAL', Closed Joint Stock Company 'New Channel,' Limited Liability Company 'Rain TV-Channel,' Limited Liability Company 'Veriselintel,' and Limited Liability Company 'Comedy TV') filed *Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*, 1:16-cv-01318, in the Southern District of New York against Actava, the Master Call Entities, and Rouslan Tsoutiev, together with other defendants (the "*Infomir*

Action"). (Ex. 25).

17. The *Infomir* Action listed 55 defendants apart from the Actava Parties. (Ex. 25).

18. Defendant Kartina was not a party to either the *Infomir* Action or the *CTC* Action. (Exs. 24, 25).

19. On April 26, 2016, the Actava Parties and the Defendant Channels executed a Settlement Agreement to "fully and finally resolve the claims between them" in the CTC and *Infomir* Actions (together, the "Prior Litigations"). (Ex. 2).

20. The Settlement Agreement "shall be interpreted and enforced in accordance with the laws of the State of New York, without regard to its conflict-of-law principles." (Ex. 2, ¶ 10).

21. Defendant Kartina is not a party to the Settlement Agreement. (Ex. 2, p. 1).

22. Defendant Kartina is not a third-party beneficiary of the Settlement Agreement. (Ex. 2, ¶¶ 1(a-d)).

23. Defendant Kartina testified that the Actava Parties did not owe Defendant Kartina any duties under the Settlement Agreement. (Ex. 22 (2/9/21 Tr. of Andreas Reich at 227:15-24)).

24. Paragraph 4 of the Settlement Agreement states that "within twenty-four (24) hours of the entry of the Orders, Defendants shall furnish to Plaintiffs' counsel, Dunnington, the identity or identities; location or locations; contact and purchase information sufficient to permit Plaintiffs to ascertain the source of the signal and/or other data (the 'Source') by which the Broadcasts were copied and streamed through the Website." (Ex. 2, ¶ 4).

25. On April 26, 2016, the Actava Parties' counsel e-mailed Defendant Channels' counsel, Dunnington, attaching "sample invoices from Actava's source for 2015, 2014, and 2013" and stating that "As you will see from the invoices, "the name of the source is ███████

4

███████████████████████████████████

███████████" (Ex. 1 (Tsoutiev Decl., ¶ 8); Ex. 5).

26. The April 26, 2016 e-mail referenced above in Paragraph 25 was sent within 24 hours of the execution of the Settlement Agreement. (Ex. 1 (Tsoutiev Decl., ¶ 8); Ex. 5).

27. On April 29, 2016, Mr. Raymond Dowd of Dunnington responded that the Source information provided in the April 26, 2016 e-mail was "satisfactory." (Ex. 1 (Tsoutiev Decl., ¶ 8), Ex. 6).

28. In the Settlement Agreement, the Actava Parties represented and warranted as follows:

> i. Other than as identified in the Plaintiffs' pleadings in the First Action and Second Action, [the Actava Parties] have not previously broadcast, copied, distributed or otherwise used the Broadcasts other than through Actava and the Website;
> ii. [The Actava Parties] have not and do not own or have any interest in any other website, application or other property engaged in the business of providing internet protocol television ("IPTV");
> iii. [The Actava Parties] maintain no ownership or management interest in any other IPTV service;
> iv. [The Actava Parties] are not presently and will not in the future broadcast, copy, distribute or otherwise use the Broadcasts in any manner, including on the Website, without the express written consent of the relevant Plaintiffs or an authorized representative thereof, as set forth in subparagraph (e) below.

Ex. 2, ¶ 6(d).

29. Prior to the parties' execution of the Settlement Agreement, Dunnington conducted an investigation into Actava. (Ex. 1 (Tsoutiev Decl., ¶ 12); Ex. 26).

30. Before the parties executed the Settlement Agreement, the Actava Parties' then-counsel produced to Dunnington, *inter alia*, multiple tax returns, approximately eight-hundred pages of "credit card payment processor statements showing payments to Actava," over 100 pages of "invoices issued by Actava's internet service provider," and over 150 pages of "bank

5

account statements for Actava." (Ex. 1 (Tsoutiev Decl., ¶ 12); Ex. 27).

31. Prior to the parties' execution of the Settlement Agreement, the Actava Parties' then-counsel provided Dunnington Actava's yearly subscriber database, and the "Number of Subscribers at Year-End," for the years 2012-2015.  (Ex. 1 (Tsoutiev Decl., ¶ 13); Exs. 9-10).

32. Prior to the parties' execution of the Settlement Agreement, the Actava Parties' then-counsel provided Dunnington certain of Actava's Profit & Loss statements, including a 2013 Profit & Loss statement.  (Ex. 1 (Tsoutiev Decl., ¶ 14); Ex. 11).

33. The 2013 Profit & Loss statement referred to "Russian Telek" under the headings "Income" and "Sales".  (Ex. 1 (Tsoutiev Decl., ¶ 14); Ex. 11).

34. Before November 4, 2015, CTC issued a Power of Attorney to Dunnington that listed "RussianTelek" as a defendant or potential defendant against whom an action could be brought on its behalf.  (Ex. 28).

35. Every other Defendant Channel issued a Power of Attorney to Dunnington. (Exs. 29-32).

36. None of the Defendant Channels brought suit against RussianTelek in the *CTC Action*.  (Ex. 24).

37. None of the Defendant Channels brought suit against RussianTelek in the *Infomir Action*.  (Ex. 25).

38. Defendants' counsel did not mention, or ask about, RussianTelek during settlement negotiations with the Actava Parties in 2016.  (Ex. 1 (Tsoutiev Decl., ¶ 14)).

39. The Settlement Agreement does not define the term "authorized representative." (Ex. 2).

40. The Settlement Agreement does not define the term "distribute." (Ex. 2).

6

41.     On June 3, 2016, and June 6, 2016, respectively, Magistrate Judge Barbara Moses and Judge George Daniels of the Southern District entered Stipulated Injunctions and terminated each of the actions brought by the Defendant Channels against Actava. The Injunctions enjoined Actava from:

> a. Broadcasting, re-broadcasting or otherwise transmitting Plaintiffs' Broadcasts as identified in Annex 1 or any other channel that Plaintiffs may in the future broadcast via any medium, including but not limited to internet protocol television ("IPTV") and social media, without authorization;
>
> b. directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization;
>
> c. directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Marks as identified in Annex 1 without authorization; [or]
>
> d. publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts or Marks; in any medium, including but not limited to the internet (including IPTV and social media), television, radio, newspapers, magazines, direct mail or oral communications without authorization[.]

(Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 35); Ex. 47 (Answer, ECF No. 150, ¶ 35); Exs. 3-4).

### The Parties' Authorized Dealer Relationships

42.     On December 14, 2015, Kartina World LLP executed a license agreement with Defendant Channel One (the "Channel One/Kartina License"). (Ex. 33).

43.     Section 1.4 of the Channel One/Kartina License ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 33, ¶ 1.4).

44.     On September 7, 2016, Matvil Corporation d/b/a eTVnet ("Matvil") executed a license agreement with Channel One (the "Channel One/Matvil License"). (Ex. 34).

7

45. Section 1.5 of the Channel One/Matvil License ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 34, ¶ 1.5).

46. The Channel One/Matvil License does not prohibit Matvil from using dealers to advertise or sell subscriptions to its service. (Ex. 34).

47. Defendant Kartina has ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 22 (2/6/21 Tr. of Andreas Reich at 21:19 – 22:3)).

48. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 22 (2/6/21 Tr. of Andreas Reich at 189:23 – 190:2)).

49. Alexander Shprekher, Defendant Channel One's Deputy Director of Strategy and Development ("Shprekher"), testified that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. 35 (12/26/20 Tr. of Alexander Shprekher at 72:16-22)).

50. In late Spring 2016, after the Actava Parties and the Defendant Channels executed the Settlement Agreement, Actava and Matvil began discussing a potential relationship in which Matvil would hire Actava to serve as a dealer for Matvil's services. (Tsoutiev Decl., ¶ 15).

51. On September 8, 2016, Actava and Matvil executed the Referral Agreement. (Ex. 1 (Tsoutiev Decl., ¶ 19); Ex. 12).

52. Section 1(b) of the Referral Agreement provides that "[Matvil] hereby engages [Actava] to provide and perform the services set forth in this sub-paragraph [(b)]. . . and [Actava] hereby accept the engagement." (Ex. 12, ¶ 1(b)).

53. Section 1(b)(i) of the Referral Agreement provides that "[Actava] shall diligently promote [Matvil's] Service Offerings for the benefit of [Matvil] and [Actava]. [Actava] shall create, enlarge and exploit the marketplace through sales, special events, fieldwork, meetings and/or other customary means of promotion." (Ex. 12, ¶ 1(b)(i)).

54. Section 1(b)(ii) of the Referral Agreement provides that "[Actava] shall sell [Matvil's] IPTV services to customers (i.e., sign up customers) and register customers to the Broadcaster's site / database…." ((Ex. 12, ¶ 1(b)(ii)).

55. In Section 1(f)(i) of the Referral Agreement, Matvil represented and warranted "that it is under no contractual or other restrictions or obligations that are inconsistent with the execution of this Agreement or that prohibit [Matvil] from covenanting to and/or performing all the terms of this Agreement." (Ex. 12, ¶ 1(f)(i)).

56. In Section 1(f)(ii) of the Referral Agreement, Matvil represented and warranted that "it is fully licensed to transmit, broadcast, display, and otherwise use all channels, programs, content, and other materials (including, without limitation, all third party trademarks, logos, and names) constituting or comprising the Service Offerings." (Ex. 12, ¶ 1(f)(ii)).

57. Mykola Skrynnyk, CEO of Matvil ("Skrynnyk"), testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 50:6-11)).

58. Skrynnyk testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 152:25 – 153:3)).

59. Skrynnyk testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 153:6-16)).

60. Skrynnyk testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 51:6-11)).

61. In 2016, Matvil signed licensing agreements with New Channel, CTC, and Comedy TV, in addition to Channel One. (Exs. 37-39).

62. Defendant Kartina is not a party to any of Matvil's licensing agreements with the Defendant Channels. (Exs. 34, 37-39).

63. The Defendant Channels authorized Matvil to act as their agent to distribute and market their broadcasts. (Exs. 34, 37-39).

64. Mikhail Gayster, who was the President and CEO of Matvil at the time of the contempt proceedings, testified in the contempt proceedings that "Matvil's agreements do not prohibit Matvil from engaging Actava (or any other third party) to act as a dealer and/or marketer for Matvil's services." (Ex. 46, ¶ 24).

## Operation of the Referral Agreement

65. Pursuant to existing agreements between Matvil and the Defendant Channels, the flow of the signal containing the Defendant Channels' programming is as follows: Matvil receives the data from the Defendant Channels and streams that data onto its Content Delivery Network ("CDN"), which feeds the content to edge servers on which Matvil has leased space. The edge servers then deliver Matvil's broadcasting streams directly to Matvil's customers. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 54); Ex. 47 (Answer, ECF No. 150, ¶ 54)).

66. When Actava entered into the Referral Agreement, Actava did not operate a CDN. (Exs. 14, 14-1 (Makhotin Decl., ¶ 10); Ex. 1 (Tsoutiev Decl., ¶ 18)).

67. Pursuant to the Referral Agreement, Actava "provided customer support and technical support related to [Actava's] set-top boxes," which were pre-loaded with the Matvil application. (Ex. 12, ¶ 1(b)(iii); Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at 80:8-18); Ex. 1 (Tsoutiev Decl.), ¶ 15).

68. Brad Gilmer, whom the Actava Parties previously retained as an expert in the contempt proceedings, referenced below, testified in this action that in late 2016, he "saw encrypted communications between the [Actava] set-top box and . . . URLs that were owned by Matvil, and then I saw the streams begin to flow from a different location, from the CDN, or content distribution network, to the set-top box." (Ex. 40 (3/18/21 Tr. of Brad Gilmer at 40:12-19)).

69. The Actava set-top box contained an Android application (the "Android Application") that used an "authorization module." (Exs. 14, 14-1 (Makhotin Decl., ¶ 12)).

70. The "authorization module" used a "dual authorization" system, requiring both Actava and Matvil to authenticate a user. (Exs. 14, 14-1 (Makhotin Decl., ¶ 12)).

71. No customer was able to access the Matvil CDN until Matvil authorized the delivery of the stream to that user's set-top box. (Exs. 14, 14-1 (Makhotin Decl., ¶ 12)).

72. The credit card "charge operation" in the Android application "goes through [Matvil]." (Ex. 41 (4/19/21 Declaration of Andrey Chechulin, ¶ 19)).

73. Gilmer testified that he did not "observe anything to show that the streams originated from Actava . . . [via] PC or set-top box." (Ex. 42 (3/19/21 Tr. of Brad Gilmer at 287:15-17)).

74. Gilmer testified that he was "confident" that the subdomain "iptv.russiantelek.com" was "not involved" in the streaming process "where I documented that other URLs were." (Ex. 42 (3/19/21 Tr. of Brad Gilmer at 291:12-25)).

75. Andreas Reich, CEO of Defendant Kartina, testified that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Ex. 22 (2/9/21 Tr. of Andreas Reich at 155:19-23)).

11

76. ETVnet.com is the address for Matvil's website. (Ex. 34 at p. 2).

77. On December 13, 2016, the Defendant Channels moved for contempt against the Actava Parties in the *Infomir* Action, alleging that the Actava Parties violated the Injunction entered in that action. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 8); Ex. 47 (Answer, ECF No. 150, ¶ 8)).

78. On September 27, 2017, Judge Moses denied the Defendant Channels' contempt motion. (Ex. 43).

79. Judge Moses stated in her September 27, 2017 Opinion that "[a]dvertising and promoting Matvil's service, whether on the Website or the radio," does not violate the provision of the Injunction that prohibits "'[b]roadcsting, re-broadcasting, or otherwise transmitting' [Defendant Channels'] Broadcasts (that is, their Channels) 'without authorization'." (Ex. 43 at p. 22).

80. Judge Moses stated in her September 27, 2017 Opinion that "Nor is Actava in contempt merely by redirecting customers from its Website to the Matvil website, where they can sign up for Matvil's service or download the Matvil app, so long as it is Matvil, not Actava, that delivers plaintiffs' content through its own servers, using its own software, and authenticates the customers through its own website." (Ex. 43 at p. 22-23).

### The Actava Parties' Lawsuit

81. The Actava Parties filed this suit against the Defendant Channels on July 23, 2018 (Ex. 49 (ECF No. 1)).

82. Mykola Skyrnnyk, CEO of Matvil, testified that after Actava filed its lawsuit, by the fall of 2018, ███████████████████████████████████████████ ███████████████████████████████████████████████ (Ex. 36 (4/27/21 Tr. of Mykola

Skrnnyk at 69:4 - 70:5)).

83. Skyrnnyk testified that after Actava filed its lawsuit, by the fall of 2018, ███████████████████████████████████████████████████ (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 70:2-5)).

84. Skyrnnyk testified that as of today, ███████████████████████████████████████████████████. (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 70:16-20)).

85. On August 9, 2018, Matvil and Actava signed a Non-Disclosure Agreement (the "Matvil NDA"). (Ex. 44).

86. On September 1, 2020, Judge Kevin Nathaniel Fox ordered, *inter alia*, that "Matvil consent to Plaintiffs' production of documents or information withheld subject to the confidentiality and non-disclosure provisions of the Referral Agreement and Matvil NDA," and that "Plaintiffs produce . . . responsive documents and communications withheld because of the confidentiality and non-disclosure provisions of the Referral Agreement and Matvil NDA." (Ex. 50 (ECF No. 196 at 4).

87. On September 8, 2020, the Actava Parties' counsel produced to Defendants documents and communications pursuant to Judge Fox's September 1, 2020 Order. (Ex. 17 (Butterfield Decl., ¶ 3).

88. On November 1, 2018, the Actava Parties issued document requests to the Defendant Channels seeking, *inter alia*, "a copy of any license . . . between any Channel and Matvil," "[d]ocuments showing yearly license fees paid to each Channel by Matvil from 2015 to the present," and "[d]ocuments showing yearly revenues received by the Channel from any licensee authorized to transmit, distribute, display, and/or use any Channel programming or

content in North America." (Ex. 51 (ECF No. 90-3, ¶¶ 14-15)).

89. The Defendant Channels produced the Channel One/Matvil License, which

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████ (Ex. 34, ¶ 4.1).

90. On December 15, 2020, every Defendant other than Channel One changed counsel in this action from Dunnington to BochnerIP. *See* Ex. 52 (ECF Nos. 217-18).

91. On January 26, 2021, the Actava Parties' counsel e-mailed Mr. Hardin Rowley of Dunnington, copying BochnerIP, asking "[w]ill your affirmative expert be the same as your rebuttal expert? If not, please identify him/her." (Ex. 17 (Butterfield Decl., ¶ 4); Ex. 20).

92. On March 6, 2021, Mr. Rowley of Dunnington e-mailed two attachments to the Actava Parties' counsel, copying BochnerIP, whose file names were titled "Defendants Rebuttal Report.pdf" and "Defendants Damages Report.pdf" (the "Defendants' Damages Report"). (Ex. 17 (Butterfield Decl., ¶ 5; Ex. 21).

93. The Defendants' Damages Report is in the form of a letter from Mark Gottlieb and states that "this letter is to provide the computation of damages as specified under Section 605 of the Federal Communications Act." (Ex. 21).

94. The Defendants' Damages Report does not mention any loss of income potential from any agreement with Matvil. (Ex. 21).

95. The Defendants' Damages Report does not mention any loss from alleged breaches of the Settlement Agreement. (Ex. 21).

96. The Defendants' Damages Report does not mention any loss from alleged

constructive fraud. (Ex. 21).

97. Mark Gottlieb testified that he did not "come to any conclusion, or render any other opinion, about the Defendants' damages on their counterclaims, other than" the Defendants' Damages Report. (Ex. 45 (4/12/21 Tr. of Mark Gottlieb, 79:12-16)).

98. Defendants did not present a damages expert apart from Mark Gottlieb. (Ex. 17 (Butterfield Decl., ¶ 6)).

99. Defendants did not disclose any other computations of categories of damages claimed. (Ex. 17 (Butterfield Decl., ¶ 7).

100. Actava's founder, Rouslan Tsoutiev, testifies that Actava filed this action to protect its own interests and not to interfere with any Matvil license agreements. (Ex. 1 (Tsoutiev Decl., ¶¶ 23-24)).

101. The Actava Parties were unaware of any "anti-piracy requirements" of Matvil's licenses. (Ex. 1 (Tsoutiev Decl., ¶¶ 21)).

Dated: August 3, 2021
      New York, New York

Respectfully submitted,

**MOSES & SINGER LLP**

/s/ *Toby Butterfield*
Toby Butterfield
Michael Rosenberg
The Chrysler Building
405 Lexington Avenue
New York, New York 10174-1299
212-554-7800 (telephone)
212-554-7700 (facsimile)

**FOLEY HOAG LLP**

/s/ *Diana Tsutieva*

Diana Tsutieva
dtsutieva@foleyhoag.com
1717 K Street, NW
Washington, DC 20006-5350
202-223-1200 (telephone)
202-785-6687 (facsimile)

*Attorneys for Plaintiffs/Counterclaim-Defendants*