**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------**X**
Actava TV, Inc., Master Call Communications, Inc.,
Master Call Corporation, and Rouslan Tsoutiev,                    18-CV-06626 (ALC)(KNF)

               Plaintiffs,

       -against-

Joint Stock Company "Channel One Russia Worldwide,"
Closed Joint Stock Company "CTC Network," Closed
Joint Stock Company "New Channel", Limited Liability
Company "Rain TV-Channel," Closed Joint Stock
Company "TV DARIAL," Limited Liability
Company "Comedy TV," and Kartina Digital GmbH

               Defendants.
----------------------------------------------------------------**X**

### DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS UNDER LOCAL CIVIL RULE 56.1

      Defendants Joint Stock Company "Channel One Russia Worldwide" ("Channel One"),

Closed Joint Stock Company "New Channel," Closed Joint Stock Company "CTC Network"

("CTC"), Limited Liability Company "Rain TV-Channel" ("Rain"), Closed Joint Stock Company

"TV DARIAL" ("Darial"), Limited Liability, Company "Comedy TV" ("Comedy TV")

(collectively, "Broadcasters") along with Kartina Digital GmbH ("Kartina" and collectively,

"Defendants") hereby respond to the Local Civil Rule 56.1 Statement of Undisputed Material Facts

submitted by Plaintiffs Actava TV, Inc. ("Actava TV"), Master Call Communications, Inc., Master

Call Corporation, and Rouslan Tsoutiev (collectively, "Plaintiffs" or "Actava" ).

### **Background**

    1.     Actava was founded by Rouslan Tsoutiev in 2010. (Tsoutiev Decl., ¶ 2).

**Defendants' Response**: Defendants do not dispute that Rouslan Tsoutiev founded Actava

around 2010.  Defendants aver that there is undisputed evidence that Tsoutiev founded Actava

with Gregory Goldfedib. (September 17, 2021 Declaration of Raymond J. Dowd, Esq. ("Dowd Decl.") Ex. 1)(February 26, 2016 Forum Daily article).

2.  Actava was a for-profit business that catered to customers of Russian-language Internet Protocol Television ("IPTV") broadcasts, including the content offered by Joint Stock Company "Channel One Russia Worldwide," Closed Joint Stock Company "CTC Network," Closed Joint Stock Company "New Channel", Limited Liability Company "Rain TV-Channel," Closed Joint Stock Company "TV DARIAL", and Limited Liability Company "Comedy TV" (together, the "Defendant Channels"). (Ex. 1 (Tsoutiev Decl., ¶ 2)).

**Defendants' Response**: Defendants do not dispute that Actava was a for profit business that catered to Russian-language IPTV viewers. Defendants dispute that Actava was a legitimate business because it provided unlicensed and unauthorized programming to its customers, including programming of Broadcasters. (Dowd Decl. Ex. 2 (December 18, 2020 and January 22, 2021 Deposition of Rouslan Tsoutiev ("Tsoutiev Tr.") at 26:2-19, 58:15-25); Dowd Decl. Ex. 3 (August 2, 2021 Declaration of Alexander Shprekher ("Shprekher Decl.") ¶ 26; September 17, 2021 Declaration of Vitaly Kan ("Kan Decl.") ¶¶11, 13, 14, September 16, 2021 Declaration of Alexander Koshkin ("Koshkin Decl.") ¶¶12, 14, 15; September 16, 2021 Declaration of Natalya Sindeeva ("Sindeeva Decl.") ¶¶12, 14, 15, September 16, 2021 Declaration of Olga Panfilova ("Panfilova Decl.") ¶¶13). Actava's expert witness, William Kerr, also admitted he did not know whether Actava paid licensing fees for content from 2010 to 2016. (Dowd Decl. Ex. 4 (April 6, 2021 Deposition of William Kerr at 29:18-30:8)).

3.  From 2013 to February 23, 2016, Actava provided its customers the ability to stream Russian language IPTV television broadcasts through Actava and Actava's website (www.actava.tv). (Ex. 1 (Tsoutiev Decl., ¶¶ 9-11)).

**Defendants' Response**: Defendants do not dispute that Actava provided its customers with access to Broadcasters' content.  There is undisputed evidence that Broadcasters did not authorize Actava to stream Russian language IPTV broadcasts.  (Tsoutiev Tr. at 26:2-19, 58:15-25; Koshkin Decl. ¶¶ 12, 14-16, Kan Decl. ¶¶ 11, 13-15, Shprekher Declaration ¶ 26; Sindeeva Decl. ¶¶ 12, 14-16, Panfilova Decl. ¶¶ 13-15.  Defendants also aver that Actava also distributed Russian language IPTV television broadcasts ██████████████████████ ██████████████████████ (Tsoutiev Tr. at 21:16-25, 71:9-73:7; Dowd Decl. Ex. 5 (December 19, 2020 Deposition of Andrey Makhotin ("Makhotin Tr.") at 29:22-30:10, 33:5-34:19).

4.      Actava's website became operational on August 25, 2013. (Exs. 14, 14-1 (Makhotin Decl., ¶ 4)).

**Defendants' Response**: Disputed.  Admissible evidence shows the Actava Website was operational prior to August 25, 2013.  A WHOIS registration shows that Mastercall Corporation registered the Actava website domain on June 24, 2010.  (Dowd Decl. Ex. 6).  Tsoutiev testified that ██████████████████████.  (Tsoutiev Tr. 21:6-25).  Internet Archive screenshots show the Actava website active in January 2011.  (Dowd Decl. Ex. 7).  Actava also submitted a sworn affidavit to the United States Patent and Trademark Office stating that the ACTAVA mark was first used in commerce on January 1, 2012.  (Dowd Decl. Ex. 8).

5.      The Defendant Channels are the owners, operators, and producers of an assortment of television channels that are broadcast in the Russian Federation. The Defendant Channels control the most popular Russian channels, including state-run Channel One. (Ex. 48, (Second Am. Compl., ECF No. 147, ¶ 2); Ex. 47 (Answer, ECF No. 150, ¶ 2)).

**Defendants' Response**: Undisputed.  For completeness, Defendants aver that

Broadcasters also license their content for distribution outside of Russia and own all rights for the use of their content. (Kan Decl. ¶ 6, Koshkin Decl. ¶ 7, Shprekher Decl. ¶¶ 17-18, Sindeeva Decl. ¶ 7). Rain TV channel may also be referred to as "Dozhd," in English, which is an English transliteration of the Russian word for "rain." (Sindeeva Decl. ¶ 7). Channel One channel may also be referred to as "Perviy," in English, which is an English transliteration of the Russian word for "First Channel." (Dowd Decl. Ex. 47 (Apr. 24, 2018 Shprekher Deposition in the *Infomir* Action at 36:16-25).)

6.     Defendant Kartina Digital GmbH ("Kartina") is a German entity that broadcasts the content of certain Defendant Channels, including that of Defendant Channel One. (Ex. 22 (2/9/21 Tr. of Andreas Reich, 109:2-4)).

**Defendants' Response**: Disputed. Kartina does not currently broadcast Channel One programming. The full context of the Reich testimony indicates ██████████████████████

██████ (Plaintiffs' August 3, 2021 Rule 56.1 Statement of Undisputed Facts ("Actava SUF") Ex. 22 (2/9/21 Tr. of Andreas Reich at 107:5-109:4)). ████████████████████████

████████████████████████████████ (*Id*. at 34:17-22; Shprekher Decl.¶ 25).

### Acquisition of Russian Telekom, Inc. Assets

7.     On May 31, 2013, Actava purchased certain assets (the "Purchased Assets") of RussianTelekom, Inc. ("RT" or "RussianTelek"). (Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7).

**Defendants' Response**: Defendants do not dispute that Actava acquired certain assets of RussianTelek. Defendants aver that the Asset Purchase Agreement produced by Actava is not executed by either party to the agreement nor does Tsoutiev provide any explanation for the lack of execution. (Actava SUF Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7).

8.      The Purchased Assets included: RT's hardware and platform software; its customer list, including all of RT's approximately ████████; and its website and domain name, www.russiantelek.com (the "RT Website"). (Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7).

**Defendants' Response**: Disputed.  Defendants aver that Actava purchased more items, ████████████████████████████████████ (Actava SUF Ex. 1 (Tsoutiev Decl., Ex. 7 at ACT002342). Actava's accounting records show Actava purchased ████████████████ ████████████████

9.      Screenshots of the RT Website collected and indexed by the Internet Archive establish that on June 25, 2014, Actava was displaying banner advertisements on the RT Website directing customers to Actava's website and services. (Exs. 14, 14-1 (Makhotin Decl., ¶ 5); Ex. 15).

**Defendants' Response**: Defendants do not dispute that the RT Website was displaying banner advertisements.  Defendants dispute any implication that the website was only displaying banner advertisements.  Internet Archive screenshots from June 25, 2014 also show Actava was advertising a "Watch-Online" feature and a "Shop" selling subscriptions to the RussianTelek Service.  Dowd Decl. Ex. 9 (Internet Archive screenshot and certified translations).

10.     After Actava purchased RT, Actava fully integrated RT's prior subscribers into Actava's subscriber database. (Ex. 1 (Tsoutiev Decl., ¶ 11); Exs. 8-9).

**Defendants' Response**: Disputed.  Paragraph 10 is an identical cut-and-paste of Paragraph 11 of the Tsoutiev Declaration and is improper.  (Ex. 1 (Tsoutiev Decl., ¶ 11).  *See Rodriguez v. Schneider*, No. 95 CIV. 4083 (RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).  Defendants also dispute that Actava "fully integrated" RT's

prior subscribers other than on paper.  On June 25, 2014, more than a year after Actava

purchased the RT Website, Russian Telek still had separate technical, advertising, and sales

departments.  (Dowd Decl. Ex. 10) (Internet Archive screenshot and certified translations).

On June 25, 2014, Actava's website provided different contact information than the RT Website.

(Dowd Decl. Ex.11).

       11.      After Actava purchased RT, any traffic to RT's server (iptv.russiantelek.com)

was redirected to Actava's server (iptv.actava.tv). (Exs. 14, 14-1 (Makhotin Decl., ¶ 7)).

**Defendants' Response**: Disputed.  Paragraph 11 is a cut and paste of Paragraph 7 of the

Makhotin Declaration and is improper.  *See Rodriguez v. Schneider*, No. 95 CIV. 4083 (RPP),

1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).

Makhotin's prior testimony contradicts his declaration.  Admissible evidence collected by

Actava's expert, Brad Gilmer, and his testimony thereto shows that Actava used the

iptv.russiantelek.com website and subdomains to distribute content through at least December

2016.

      Makhotin testified that "███████████████████████████████████

██████████████████████.  (Makhotin Tr. at 88:13-17).  This

contradicts Paragraphs 7 of his declaration where Makhotin now states: "After Actava purchased

RT's hardware and platform software, all traffic to"iptv.russiantelek.com" was re-directed to

Actava's own server at "iptv.actava.tv."  (Actava SUF Ex. 14, Makhotin Decl. ¶ 7).  Makhotin

further testified ███████████████████████████████████████

█████████████████████████.  (Makhotin Tr. at 187:14-188:10).

Makhotin's testimony is consistent with the June 25, 2014 Internet Archive screenshots of the

RT Website with a "Watch Online" IPTV function.  (Dowd Decl. Ex. 9).

As late as December 28, 2016, and more than three years after Actava's acquisition of

RTV ███████████████████████████████████. (Dowd Ex. 12 (March 18-19,

2021 Deposition of Brad Gilmer ("Gilmer Tr.") at 220:2-222:23; Dowd Decl. Ex. 13(Gilmer

produced packet capture file)[1]. Plaintiffs' technical expert, Brad Gilmer, testified that he ████

████████████████████████████████████████████████████████

████████ (Gilmer Tr. at 290:15-292:8). Gilmer testified that ████████████████

████████████████████████████████████████████████

████████ (Gilmer Tr. at 223:13-224:17).

12.     On June 4, 2014, RussianTelekom, Inc. formally dissolved. (Ex. 17 (Butterfield

Decl., ¶ 2), Ex. 18).

**Defendants' Response**: Undisputed.

13.     By December 5, 2014, any visits to the RT Website were fully re-directed to

Actava's website. (Exs. 14, 14-1 (Makhotin Decl., ¶ 6); Ex. 16).

**Defendants' Response**: Undisputed. Though Defendants aver that the RT Website continued to

distribute programming on the RT Website at least 18 months after Actava TV purchased certain

Russian Telek assets on May 31, 2013. (Dowd Decl. Ex. 9; Tsoutiev Decl.¶ 9).

<u>**Prior Actions, Settlement, and Injunctions**</u>

14.     Defendant Kartina retained Dunnington, Bartholow, & Miller ("Dunnington")

on or around July 7, 2014 to investigate and litigate against alleged unlicensed broadcasters on

behalf of the Defendant Channels. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 26); Ex. 47

---

[1] "Packet capture is the process of intercepting and logging traffic. As data streams flow across the network, the analyzer captures each packet and, if needed, decodes the packet's raw data, showing the values of various fields in the packet, and analyzes its content …." https://en.wikipedia.org/wiki/Packet_analyzer

(Answer, ECF No. 150, ¶ 26); Ex. 23).

**Defendants' Response**: Undisputed

15.    On November 4, 2015, certain Defendant Channels (CTC Network, DARIAL, and New Channel) filed *CTC Network, et al. v. Actava TV, Inc.*, No. 15-cv-08681, in the Southern District of New York on November 4, 2015, against Actava (the "*CTC* Action"). (Ex. 24).

**Defendants' Response**: Undisputed.

16.    On February 19, 2016, certain Defendant Channels (Joint Stock Company 'Channel One Russia Worldwide', Closed Joint Stock Company 'CTC Network', Closed Joint Stock Company 'TV DARIAL', Closed Joint Stock Company 'New Channel,' Limited Liability Company 'Rain TV-Channel,' Limited Liability Company 'Veriselintel,' and Limited Liability Company 'Comedy TV') filed *Joint Stock Company Channel One Russia Worldwide v. Infomir LLC*, 1:16-cv-01318, in the Southern District of New York against Actava, the Master Call Entities, and Rouslan Tsoutiev, together with other defendants (the "*Infomir* Action"). (Ex. 25).

**Defendants' Response**: Undisputed.

17.    The *Infomir* Action listed 55 defendants apart from the Actava Parties. (Ex. 25).

**Defendants' Response**: Defendants do not dispute that there were 55 defendants listed but aver that there were only five named defendants apart from Actava and up to 50 possible John Does. Matvil Corp., Mikhail Gayster, Infomir, LLC and Panorama Alliance, LP were co-defendants of Actava.  (Actava SUF Ex. 25 ¶¶ 58-61).

18.    Defendant Kartina was not a party to either the *Infomir* Action or the *CTC* Action. (Exs. 24, 25).

**Defendants' Response**: Undisputed

19.     On April 26, 2016, the Actava Parties and the Defendant Channels executed a Settlement Agreement to "fully and finally resolve the claims between them" in the CTC and *Infomir* Actions (together, the "Prior Litigations"). (Ex. 2).

**Defendants' Response**: Disputed.  Actava's quotation is incomplete.  The complete recital states: "[T]he Parties wish to fully and finally resolve the claims between them in the First Action and the claims between them in the Second Action and all other claims between them relating to subscriptions, services or hardware sold through the website www.actava.tv ('Website')." (Actava SUF Ex. 2 at 1).

20.     The Settlement Agreement "shall be interpreted and enforced in accordance with the laws of the State of New York, without regard to its conflict-of-law principles." (Ex. 2, ¶10).

**Defendants' Response**: Undisputed

21.     Defendant Kartina is not a party to the Settlement Agreement. (Ex. 2, p. 1).

**Defendants' Response**: Undisputed

22.     Defendant Kartina is not a third-party beneficiary of the Settlement Agreement. (Ex. 2, ¶¶ 1(a-d)).

**Defendants' Response**: Disputed. A third-party beneficiary is a legal construct that is improper to conclude in a statement of facts.

23.     Defendant Kartina testified that the Actava Parties did not owe Defendant Kartina any duties under the Settlement Agreement. (Ex. 22 (2/9/21 Tr. of Andreas Reich at 227:15- 24)).

**Defendants' Response**: Undisputed

24.     Paragraph 4 of the Settlement Agreement states that "within twenty-four (24) hours of the entry of the Orders, Defendants shall furnish to Plaintiffs' counsel, Dunnington, the

identity or identities; location or locations; contact and purchase information sufficient to permit Plaintiffs to ascertain the source of the signal and/or other data (the 'Source') by which the Broadcasts were copied and streamed through the Website." (Actava SUF Ex. 2, ¶ 4).

**Defendants' Response**: Undisputed

25.     On April 26, 2016, the Actava Parties' counsel e-mailed Defendant Channels' counsel, Dunnington, attaching "sample invoices from Actava's source for 2015, 2014, and 2013" and stating that "As you will see from the invoices, "the name of the source is ████████▌

████████████████████████████████████████████████▌

████████▌." (Ex. 1 (Tsoutiev Decl., ¶ 8); Ex. 5).

**Defendants' Response**: Defendants do not dispute that the described email was sent but dispute that this email contains a complete disclosure of Actava's "source" as defined in Paragraph 4 of the Settlement Agreement.  (Actava SUF Ex. 2, ¶ 4).  Admissible evidence disclosed in the present action shows Actava had ███████████████████████ that it failed to disclose on April 26, 2016.  Between 2012 and 2013 Actava TV was ████████████▌

██████████████████████████████.(Dowd Decl.

Ex.14 ████████████████████████; Dowd Decl. Ex. 15

██████████████████ Tsoutiev testified that ████████████▌

████████████████. (Tsoutiev Tr. at 23:4-25:8, 62:11-64:22; 269:19-22).

26.     The April 26, 2016 e-mail referenced above in Paragraph 25 was sent within 24 hours of the execution of the Settlement Agreement. (Ex. 1 (Tsoutiev Decl., ¶ 8); Ex. 5).

**Defendants' Response**: Undisputed.

27.     On April 29, 2016, Mr. Raymond Dowd of Dunnington responded that the Source information provided in the April 26, 2016 e-mail was "satisfactory." (Ex. 1 (Tsoutiev

Decl., ¶ 8), Ex. 6).

**Defendants' Response**: Defendants do not dispute that Mr. Dowd sent the communication.

28.    In the Settlement Agreement, the Actava Parties represented and warranted as

follows:

> i.   Other than as identified in the Plaintiffs' pleadings in the First Action and
> Second Action, [the Actava Parties] have not previously broadcast, copied,
> distributed or otherwise used the Broadcasts other than through Actava and the
> Website;
> ii.  [The Actava Parties] have not and do not own or have any interest in any other
> website, application or other property engaged in the business of providing internet
> protocol television ("IPTV");
> iii. [The Actava Parties] maintain no ownership or management interest in any
> other IPTV service;
> iv.  [The Actava Parties] are not presently and will not in the future broadcast, copy,
> distribute or otherwise use the Broadcasts in any manner, including on the Website,
> without the express written consent of the relevant Plaintiffs or an authorized
> representative thereof, as set forth in subparagraph (e) below.

Ex. 2, ¶ 6(d).

**Defendants' Response**: Undisputed.

29.    Prior to the parties' execution of the Settlement Agreement, Dunnington

conducted an investigation into Actava. (Actava SUF Ex. 1 (Tsoutiev Decl., ¶ 12); Ex. 26).

**Defendants' Response**: Undisputed

30.    Before the parties executed the Settlement Agreement, the Actava Parties' then-

counsel produced to Dunnington, *inter alia*, multiple tax returns, approximately eight-hundred

pages of "credit card payment processor statements showing payments to Actava," over 100

pages of "invoices issued by Actava's internet service provider," and over 150 pages of "bank

account statements for Actava." (Ex. 1 (Tsoutiev Decl., ¶ 12); Ex. 27).

**Defendants' Response**: Disputed.  Tsoutiev does not have personal knowledge of the

documents produced by Actava's former counsel to Dunnington.  (Actava SUF Ex. 1 (Tsoutiev

Decl., ¶¶ 1,12); Ex. 27)).

31.     Prior to the parties' execution of the Settlement Agreement, the Actava Parties' then-counsel provided Dunnington Actava's yearly subscriber database, and the "Number of Subscribers at Year-End," for the years 2012-2015. (Ex. 1 (Tsoutiev Decl., ¶ 13); Exs. 9-10).

**Defendants' Response**: Disputed.  Tsoutiev does not have personal knowledge of the documents produced by Actava's then counsel to Dunnington.  (Actava SUF Ex. 1 (Tsoutiev Decl., ¶¶ 1,13).  Nor does Tsoutiev cite evidence showing that the Actava Parties' then-counsel provided Dunnington Exhibit 9 (Actava SUF Ex. 9) in 2016.  (Actava SUF Ex. 1 (Tsoutiev Decl. *passim*)).

32.     Prior to the parties' execution of the Settlement Agreement, the Actava Parties' then-counsel provided Dunnington certain of Actava's Profit & Loss statements, including a 2013 Profit & Loss statement. (Ex. 1 (Tsoutiev Decl., ¶ 14); Ex. 11).

**Defendants' Response**: Disputed.  Tsoutiev does not have personal knowledge of the documents produced by Actava's then counsel to Dunnington.  (Actava SUF Ex. 1 (Tsoutiev Decl., ¶¶ 1, 14).

33.     The 2013 Profit & Loss statement referred to "Russian Telek" under the headings "Income" and "Sales". (Ex. 1 (Tsoutiev Decl., ¶ 14); Ex. 11).

**Defendants' Response**: Undisputed.

34.     Before November 4, 2015, CTC issued a Power of Attorney to Dunnington that listed "RussianTelek" as a defendant or potential defendant against whom an action could be brought on its behalf. (Ex. 28).

**Defendants' Response**: Defendants do not dispute that Russian Telek is one of 22 possible infringers listed in the CTC Power of Attorney.  (Actava SUF Ex. 28).

35.     Every other Defendant Channel issued a Power of Attorney to Dunnington. (Exs. 29-32).

**Defendants' Response**: Defendants do not dispute that the remaining Broadcasters issued powers of attorney to Dunnington.  Defendants aver that the Channel One and Rain TV Powers of Attorney do not identify Russian Telek as a potential infringer.  (Actava SUF Exs. 29-30).

36.     None of the Defendant Channels brought suit against Russian Telek in the *CTC* Action. (Ex. 24).

**Defendants' Response**: Defendants do not dispute that CTC did not bring suit against Russian Telek or 20 other possible infringers in the *CTC* action.  (Actava SUF Ex. 24).  Defendants aver that the remaining Broadcasters were not plaintiffs in the *CTC* action.  (Actava SUF Ex. 24).

37.     None of the Defendant Channels brought suit against RussianTelek in the *Infomir* Action. (Ex. 25).

**Defendants' Response**: Broadcasters do no dispute that they did not bring suit against Russian Telek in February 2016.  (Actava SUF Ex. 25).  Defendants aver that on April 5, 2017 they amended the complaint in the *Infomir* Action to add ███████████████████████ ██████, MHCOM GmbH, as a defendant. (Dowd Decl. Ex. 16).

38.     Defendants' counsel did not mention, or ask about, RussianTelek during settlement negotiations with the Actava Parties in 2016. (Ex. 1 (Tsoutiev Decl., ¶14)).

**Defendants' Response**: Disputed.  Tsoutiev lacks personal knowledge of the settlement negotiations or communications between Actava's prior counsel and Dunnington.  (Actava SUF Ex. 1 (Tsoutiev Decl., ¶¶ 1,14).  Actava has admitted it did not disclose ownership of the www.russiantelek.com domain during settlement negotiations.  (Answer ¶ 177, Answer to Counterclaims ¶ 177; Tsoutiev Tr. at 274:3-22).  Actava also failed to disclose its prior dealer

relationship with Russian Telek or its control or use of the domain www.russiantelek.com in the

Settlement.  (Answer ¶ 178, Answer to Counterclaims ¶ 178).

39.     The Settlement Agreement does not define the term "authorized representative."

(Ex. 2).

**Defendants' Response**: Disputed. Paragraphs 6.d.iv. and 6.e of the Settlement Agreement and

Exhibit D to the Settlement Agreement define a procedure for Actava to follow to request

authorization to distribute Broadcasters' programming:

> 6.d.iv.  Defendants are not presently and will not in the future broadcast, copy,
> distribute or otherwise use the Broadcasts in any manner, including on the
> Website, without the express written consent of the relevant Plaintiffs or an
> authorized representative thereof, as set forth in subparagraph (e) below;
>
> 6.e.     The parties jointly agree and represent that Tsoutiev may seek to enter into
> a license agreement with a Plaintiff or Plaintiffs following the Effective Date
> without breaching this Agreement. Plaintiffs have agreed to provide Defendant
> Tsoutiev with a letter in the form annexed hereto as Exhibit D, which may be
> disclosed to a third party.

(Actava SUF Ex. 2)

40.     The Settlement Agreement does not define the term "distribute." (Ex. 2).

**Defendants' Response**: Defendants do not dispute that the Settlement Agreement does not

define the term "distribute."  Defendants aver that the words "distribute" and "distributed" are

included in similar clauses in Paragraphs 6.i and iv. where Actava warrants they "have not

previously broadcast, copied, distributed or otherwise used the Broadcasts other than through

Actava and the [Actava] Website."  (Actava SUF Ex. 2).

41.     On June 3, 2016, and June 6, 2016, respectively, Magistrate Judge Barbara Moses

and Judge George Daniels of the Southern District entered Stipulated Injunctions and terminated

each of the actions brought by the Defendant Channels against Actava. The Injunctions enjoined

Actava from:

a.    Broadcasting, re-broadcasting or otherwise transmitting Plaintiffs' Broadcasts as identified in Annex 1 or any other channel that Plaintiffs may in the future broadcast via any medium, including but not limited to internet protocol television ("IPTV") and social media, without authorization;

b.    directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization;

c.    directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Marks as identified in Annex 1 without authorization; [or]

d.    publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts or Marks; in any medium, including but not limited to the internet(including IPTV and social media), television, radio, newspapers, magazines, direct mail or oral communications without authorization[.]

(Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 35); Ex. 47 (Answer, ECF No. 150, ¶ 35); Exs. 3-4).

**Defendants' Response**: Undisputed.

### The Parties' Authorized Dealer Relationships

42.    On December 14, 2015, Kartina World LLP executed a license agreement with Defendant Channel One (the "Channel One/Kartina License"). (Ex. 33).

**Defendants' Response**: Undisputed.

43.    Section 1.4 of the Channel One/Kartina License ███████████████ ███████████████████████ (Ex. 33, ¶ 1.4).

**Defendants' Response**: Undisputed.

44.    On September 7, 2016, Matvil Corporation d/b/a eTVnet ("Matvil") executed a license agreement with Channel One (the "Channel One/Matvil License"). (Ex. 34).

**Defendants' Response**: Undisputed.

45.    Section 1.5 of the Channel One/Matvil License ███████████████████
█████████████████████ (Ex. 34, ¶ 1.5).

**Defendants' Response**: Undisputed.

46.    The Channel One/Matvil License does not prohibit Matvil from using dealers to
advertise or sell subscriptions to its service. (Ex. 34).

**Defendants' Response**: Disputed. ██████████████████████████████████
██████████████████████ (September 16, 2021 Declaration of Peter Blehm ("Blehm
Decl.") ¶¶ 8-28).  At the contempt motion oral argument, Judge Moses stated: "But Mr.
Butterfield, let me say this again, [Actava is] not a standard dealer. You are a dealer, your client
is a dealer which has an injunction in force that it has to comply with. So what Tom or Dick or
Harry could do as a dealer may not be coextensive with what you can do as a dealer."  (Dowd
Decl. Ex. 17 (April 24, 2017 Contempt Motion Oral Argument Tr. at 41:1-6)).  Further, Channel
One must approve marketing by Matvil.  Article 1.4 of the Channel One/Matvil License states:

██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████ (Actava SUF Ex. 34 (Channel One/Matvil
License); Actava SUF Ex. 35 (12/16/20 Tr. of Alexander Shprekher) at 126:16-25)).

47.    Defendant Kartina has ████████████████████████████████████
███████████████ (Ex. 22 (2/6/21 Tr. of Andreas Reich at 21:19 – 22:3)).

**Defendants' Response**: Defendants do not dispute that Kartina has approximately 600 dealers
around the world. ████████████████████████████████████████████
█████████████████. (Actava SUF Ex. 22 (2/6/21 Tr. of Andreas Reich at 22:4-6),
Blehm Decl. ¶ 8). ███████████████████████████████. (Blehm Decl. ¶¶ 14-18).



(2/6/21 Tr. of Andreas Reich at 189:20-22)

48. ████████████████████████████████ (Ex. 22

(2/6/21 Tr. of Andreas Reich at 189:23 – 190:2)).

**Defendants' Response**: Kartina does not dispute that its dealers ██████████

██████ Kartina avers t████████████████████████████████

████████████

49. Alexander Shprekher, Defendant Channel One's Deputy Director of Strategy and Development ("Shprekher"), testified that ████████████████████████████████

████████████ (Ex. 35 (12/26/20 [sic] Tr. of Alexander Shprekher at 72:16-22)).

**Defendants' Response**: Disputed. Mr. Shprekher testified ████████████████████

████████████████████████████. (Actava SUF Ex. 35 (12/16/20 Tr. of Alexander Shprekher at 72:19-22)). Mr. Shprekher further testified that ████████████

████████████████████ (*Id*. at 73:15-17).

50. In late Spring 2016, after the Actava Parties and the Defendant Channels executed the Settlement Agreement, Actava and Matvil began discussing a potential relationship in which Matvil would hire Actava to serve as a dealer for Matvil's services. (Tsoutiev Decl., ¶ 15).

**Defendants' Response**: Disputed.  Paragraph 50 violates Rule 2.E.i of Judge Carter's Individual Practices because it contains more than one factual assertion.  Actava began negotiating with Matvil prior to the Effective Date of the Settlement Agreement.  Actava did not have a dealer relationship with Matvil.

"The 'Effective Date' of [the Settlement] Agreement [was] the first date on which the

17

Settlement Amount ha[d] been paid, the source ha[d] been revealed and the Orders [had] been entered." (Actava SUF Ex. 2, ¶ 2). The Effective Date of the Settlement was June 6, 2016, when Judge Daniels entered a "Stipulation, Order & Permanent Injunction" in the *Actava* Action. (Actava SUF Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 35); Actava SUF Ex. 47 (Answer, ECF No. 150, ¶ 35); Exs. 3-4). Actava initiated negotiations with Matvil in May or June 2016. (Dowd Decl. Ex. 18 ("Skrynnyk 11/19 Aff.") ¶ 14).

The word "dealer" does not appear in the Referral Agreement, Addendum or Second Addendum. (Actava SUF Ex. 12). Under the Referral Agreement,  (Tsoutiev Tr. at 84:6-14; Makhotin Tr. at 61:21-62:10, 73:5-14; Dowd Decl. Ex. 19 ("Pliss Tr.") at 154:20-34). Actava's engineer, Andrew Makhotin, testified (Makhotin Tr. at 69:2-15). (Blehm Decl. ¶¶ 27-28.)

51.     On September 8, 2016, Actava and Matvil executed the Referral Agreement. (Ex. 1 (Tsoutiev Decl., ¶ 19); Ex. 12).

**Defendants' Response**: Undisputed

52.     Section 1(b) of the Referral Agreement provides that "[Matvil] hereby engages [Actava] to provide and perform the services set forth in this sub-paragraph [(b)]. . . and [Actava] hereby accept the engagement." (Ex. 12, ¶ 1(b)).

**Defendants' Response**: Undisputed, though Plaintiffs' aver that Actava did not use . (Actava SUF Ex. 12, ¶ 1(b); Tsoutiev Tr. 168:15-170:6, 171:6-12, 172:11-173:14).

53.     Section 1(b)(i) of the Referral Agreement provides that "[Actava] shall diligently promote [Matvil's] Service Offerings for the benefit of [Matvil] and [Actava]. [Actava] shall create, enlarge and exploit the marketplace through sales, special events, fieldwork, meetings and/or other customary means of promotion." (Ex. 12, ¶ 1(b)(i)).

**Defendants' Response**: Undisputed

54.     Section 1(b)(ii) of the Referral Agreement provides that "[Actava] shall sell [Matvil's] IPTV services to customers (i.e., sign up customers) and register customers to the Broadcaster's site / database…." ((Ex. 12, ¶ 1(b)(ii)).

**Defendants' Response**: Undisputed

55.     In Section 1(f)(i) of the Referral Agreement, Matvil represented and warranted "that it is under no contractual or other restrictions or obligations that are inconsistent with the execution of this Agreement or that prohibit [Matvil] from covenanting to and/or performing all the terms of this Agreement." (Ex. 12, ¶ 1(f)(i)).

**Defendants' Response**: Undisputed.

56.     In Section 1(f)(ii) of the Referral Agreement, Matvil represented and warranted that "it is fully licensed to transmit, broadcast, display, and otherwise use all channels, programs, content, and other materials (including, without limitation, all third party trademarks, logos, and names) constituting or comprising the Service Offerings." (Ex. 12, ¶ 1(f)(ii)).

**Defendants' Response**: Undisputed.

57.     Mykola Skrynnyk, CEO of Matvil ("Skrynnyk"), testified that ██████████ ████████████████████████████████████████████ Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at 50:6-11)).

**Defendants' Response**: Disputed.  Actava's responsibility also included authenticating referred

customers by reprogramming Actava's legacy middleware to connect to Matvil's content delivery networks or CDNs.  (Actava SUF Ex. 14, (Makhotin Decl. ¶ 11; Dowd. Decl. Ex. 5 Makhotin Tr.at 69:2-11).  Actava also provided an electronic programming guide for the programming.  (Actava SUF Ex. 41, Chechulin Decl., ¶¶ 13-18).  Advertising of the Matvil platform that mentions Channel One also requires Channel One approval.  (Actava SUF Ex. 34 Channel One/Matvil License ¶ 1.4; Actava SUF Ex. 35, Shprekher Tr. at 126:16-25).  Finally,

██████████████████████████████████████████████████████████████

████████  (Blehm Decl. ¶¶ 27-28)

58.    Skrynnyk testified that ███████████████████████████████

██████████████████████████████████████████████████████████████

████████  (Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at 152:25 – 153:3)).

**Defendants' Response**: Defendants do not dispute Skrynnyk's testimony, but aver that what he

█████████████████████████████████████████████████  (Blehm Decl.

¶¶ 27-28)

59.    Skrynnyk testified that █████████████████████████████

████████████████████████  (Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at

153:6- 16)).

**Defendants' Response**: Undisputed

60.    Skrynnyk testified that ███████████████████████████████

██████████████████████████████████████████  (Ex. 36 (4/27/21 Tr.

of Mykola Skrynnyk at 51:6-11)).

**Defendants' Response**: Defendants do not dispute Skrynnyk's testimony.  Defendants dispute

██████████████████████████████████████████████

███████    (Blehm Decl. ¶¶ 9-28).  Counsel to Actava objected to Channel One's only question to Skrynnyk about the use of Actava's middleware in distributing Matvil programming, so Defendants have been unable to question Matvil about this relationship.  (Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at 142:4-150:9).

61.    In 2016, Matvil signed licensing agreements with New Channel, CTC, and Comedy TV, in addition to Channel One. (Exs. 37-39).

**Defendants' Response**: Undisputed

62.    Defendant Kartina is not a party to any of Matvil's licensing agreements with the Defendant Channels. (Exs. 34, 37-39).

**Defendants' Response**: Undisputed

63.    The Defendant Channels authorized Matvil to act as their agent to distribute and market their broadcasts. (Exs. 34, 37-39).

**Defendants' Response**: Disputed.  Agency is a legal concept that is improper to conclude in a statement of facts.

64.    Mikhail Gayster, who was the President and CEO of Matvil at the time of the contempt proceedings, testified in the contempt proceedings that "Matvil's agreements do not prohibit Matvil from engaging Actava (or any other third party) to act as a dealer and/or marketer for Matvil's services." (Ex. 46, ¶ 24).

**Defendants' Response**: Disputed.  Gayster mischaracterized the limitations of Matvil's licenses with Broadcasters, does not address the Settlement Agreement or injunctions, and contradicts the plain language of the Channel One/Matvil License.

The Channel One/Matvil license:

- Defines ████████████████████████████████████



(Actava SUF Ex. 34).

- Provides in Section 1.1. that

- Provides in Section 2.2.2. that

- Provides in Section 3.4

(Actava SUF Ex. 34).

**Operation of the Referral Agreement**

65.    Pursuant to existing agreements between Matvil and the Defendant Channels, the flow of the signal containing the Defendant Channels' programming is as follows: Matvil receives the data from the Defendant Channels and streams that data onto its Content Delivery Network ("CDN"), which feeds the content to edge servers on which Matvil has leased space. The edge servers then deliver Matvil's broadcasting streams directly to Matvil's customers. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 54); Ex. 47 (Answer, ECF No. 150, ¶ 54)).

**Defendants' Response**: Disputed.  At the time Defendants filed their Second Amended Answer on April 6, 2020, Actava had not disclosed that it had

████████████████████████████████████████████████████████████████ ██

███████████████████████████████████████████ (Makhotin Tr. at

61:21-62:10, 65:17-67:19, 69:2-15, 71:15-20,74:2-75:19).

66.    When Actava entered into the Referral Agreement, Actava did not operate a

CDN. (Exs. 14, 14-1 (Makhotin Decl., ¶ 10); Ex. 1 (Tsoutiev Decl., ¶ 18)).

**Defendants' Response**: Disputed.  Makhotin previously testified that ████████████ █

████████████████████████████████████████████████████████████████ ██

██████████████████████████████ (Makhotin Tr. at 56: 4-16).  Makhotin also

previously testified that ████████████████████████████████████████████ █

████████████████ (Makhotin Tr. at 57:10-18).

67.    Pursuant to the Referral Agreement, Actava "provided customer support and

technical support related to [Actava's] set-top boxes," which were pre-loaded with the Matvil

application. (Ex. 12, ¶ 1(b)(iii); Ex. 36 (4/27/21 Tr. of Mykola Skrynnyk at 80:8-18); Ex. 1

(Tsoutiev Decl.), ¶ 15).

**Defendants' Response**:  Disputed.  Makhotin testified that ███████████████████ █

████████████████ (Makhotin Tr, at 120:5-12).

68.    Brad Gilmer, whom the Actava Parties previously retained as an expert in the

contempt proceedings, referenced below, testified in this action that in late 2016, he "saw

encrypted communications between the [Actava] set-top box and . . . URLs that were owned by

Matvil, and then I saw the streams begin to flow from a different location, from the CDN, or

content distribution network, to the set-top box." (Ex. 40 (3/18/21 Tr. of Brad Gilmer at 40:12-

19)).

**Defendants' Response**: Disputed.  Paragraph 68 violates Rule 2.E.i of Judge Carter's Individual

Practices because it contain more than one factual assertion.  When Gilmer was asked 

(Actava SUF Ex. 40 (3/18/21 Tr. of Brad Gilmer at 44:14-23).  Gilmer also admitted that he did not

███████████████████████████████████████ (*Id*. at 164:10-18).

69.    The Actava set-top box contained an Android application (the "Android Application") that used an "authorization module." (Exs. 14, 14-1 (Makhotin Decl., ¶12)).

**Defendants' Response**: Undisputed.

70.    The "authorization module" used a "dual authorization" system, requiring both Actava and Matvil to authenticate a user. (Exs. 14, 14-1 (Makhotin Decl., ¶ 12)).

**Defendants' Response**: Disputed.  Makhotin previously testified that ███████████████ ███████████████████████████████████ (Makhotin Tr. at 68:2-6; 71:15-20).  Actava has not provided Defendants access to the native "authorization module" files or source code to test Makhotin's new testimony.  (April 15, 2021 Addendum to Protective Order, ECF 297 ¶ 4)(limiting Defendants inspection of the source code to eight hours).

71.    No customer was able to access the Matvil CDN until Matvil authorized the delivery of the stream to that user's set-top box. (Exs. 14, 14-1 (Makhotin Decl., ¶12)).

**Defendants' Response**: Disputed.  Gilmer testified that it █████████████ ██████████████████████████ (Actava SUF Ex. 42 (3/19/21 Tr. of Brad Gilmer at 228:12-229:2).  Gilmer admitted he did not believe it was "testable" to answer if "'No content is streamed to users via the ActavaTV.com website?'" (*Id*. at 171:2-6).

72.    The credit card "charge operation" in the Android application "goes through [Matvil]." (Ex. 41 (4/19/21 Declaration of Andrey Chechulin, ¶ 19)).

**Defendants' Response**: Disputed.  Mr. Chechulin did not inspect a functioning application. Makhotin testified on December 19, 2020 that the Android application was "shut down" and "no longer in use" (Makhotin Tr. at 178:24-179:12).  The. Android application source code reviewed remotely by Mr. Chechulin via Team Viewer in April 2021 was not functioning.  (Actava SUF Ex. 41 (4/19/21 Declaration of Andrey Chechulin, ¶¶ 1-2).  Mr. Chechulin also described the processing of credit parameters in the Android application source code as a two-step process: (1) a make payment function that interacts with Actava's database and (2) a charge function which goes through the "Etvnet API."  (Actava SUF Ex. 41 (4/19/21 Declaration of Andrey Chechulin, ¶ 19)).  Mr. Chechulin also concluded that Actava's middleware was necessary to the processing of credit card payments.  (*Id*. ¶ 12)).

73.    Gilmer testified that he did not ███████████████████████ (Ex. 42 (3/19/21 Tr. of Brad Gilmer at 287:15-17)).

**Defendants' Response**: Disputed: Gilmer testified that ███████████████ ██████████████████████████ (Actava SUF Ex. 42 (3/19/21 Tr. of Brad Gilmer at 228:12-229:2).  Gilmer admitted ██████████████████ ███████████████████████ (*Id*. at 171:2-6).

74.    Gilmer testified that he was "confident" that the subdomain "iptv.russiantelek.com" was "not involved" in the streaming process "where I documented that other URLs were." (Ex. 42 (3/19/21 Tr. of Brad Gilmer at 291:12-25)).

**Defendants' Response**: Disputed.  The full context of Gilmer's answer to that question

indicates doubt rather than confidence.  (Actava SUF Ex. 42 (3/19/21 Tr. of Brad Gilmer at

290:15-292:8).  Gilmer testified in response to the question that: "█████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ (Gilmer at 291:12-292:8).  Gilmer also

testified that ████████████████████████████████████████████████

██████████████████████████ (*Id.* at 215:17-21; 290:19-21).

    75.    Andreas Reich, CEO of Defendant Kartina, testified that ████████████

████████████████████████████████████████████████

██████████ (Ex. 22 (2/9/21 Tr. of Andreas Reich at 155:19-23)).

**Defendants' Response**: Undisputed

    76.    ETVnet.com is the address for Matvil's website. (Ex. 34 at p. 2).

**Defendants' Response**: Undisputed

    77.    On December 13, 2016, the Defendant Channels moved for contempt against

the Actava Parties in the *Infomir* Action, alleging that the Actava Parties violated the Injunction

entered in that action. (Ex. 48 (Second Am. Compl., ECF No. 147, ¶ 8); Ex. 47 (Answer, ECF

No. 150, ¶ 8)).

**Defendants' Response**: Undisputed

    78.    On September 27, 2017, Judge Moses denied the Defendant Channels' contempt

motion. (Ex. 43).

**Defendants' Response**: Undisputed.  Though Judge Moses made clear that Broadcasters'

arguments in favor of contempt against Actava had "some force."  (Actava SUF Ex. 43 at 23).

79.     Judge Moses stated in her September 27, 2017 Opinion that "[a]dvertising and promoting Matvil's service, whether on the Website or the radio," does not violate the provision of the Injunction that prohibits "'[b]roadcasting, re-broadcasting, or otherwise transmitting' [Defendant Channels'] Broadcasts (that is, their Channels) 'without authorization'." (Ex. 43 at p. 22).

**Defendants' Response**: Undisputed.

80.     Judge Moses stated in her September 27, 2017 Opinion that "Nor is Actava in contempt merely by redirecting customers from its Website to the Matvil website, where they can sign up for Matvil's service or download the Matvil app, so long as it is Matvil, not Actava, that delivers plaintiffs' content through its own servers, using its own software, and authenticates the customers through its own website." (Ex. 43 at p. 22-23).

**Defendants' Response**: Undisputed

### The Actava Parties' Lawsuit

81.     The Actava Parties filed this suit against the Defendant Channels on July 23, 2018 (Ex. 49 (ECF No. 1)).

**Defendants' Response**: Undisputed

82.     Mykola Skyrnnyk, CEO of Matvil, testified that after Actava filed its lawsuit, by the fall of 2018, ███████████████████████████████████████ ███████████████████████████████████████ (Ex. 36 (4/27/21 Tr. of Mykola Skrnnyk at 69:4 - 70:5)).

**Defendants' Response**: Undisputed

83.     Skyrnnyk testified that after Actava filed its lawsuit, by the fall of 2018, ████ ███████████████████████████████ (Ex. 36 (4/27/21 Tr. of

Mykola Skrnnyk at 70:2-5)).

**Defendants' Response**: Undisputed.

84.     Skyrnnyk testified that as of today, ███████████████████

████████████████████████████████████ (Ex. 36 (4/27/21 Tr. of Mykola

Skrnnyk at  70:16-20)).

**Defendants' Response**: Undisputed

85.     On August 9, 2018, Matvil and Actava signed a Non-Disclosure Agreement (the

"Matvil NDA"). (Ex. 44).

**Defendants' Response**: Defendants do not dispute the date of execution.  Defendants aver that

the██████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████ September 17, 2021 Declaration of Serge Krimnus ("Krimnus Decl.") ¶¶ 3-

10.)

86.     On September 1, 2020, Judge Kevin Nathaniel Fox ordered, *inter alia*, that

"Matvil consent to Plaintiffs' production of documents or information withheld subject to the

confidentiality and non-disclosure provisions of the Referral Agreement and Matvil NDA," and

that "Plaintiffs produce . . . responsive documents and communications withheld because of the

confidentiality and non-disclosure provisions of the Referral Agreement and Matvil NDA." (Ex.

50 (ECF No. 196 at 4).

**Defendants' Response**: Undisputed

87.     On September 8, 2020, the Actava Parties' counsel produced to Defendants documents and communications pursuant to Judge Fox's September 1, 2020 Order. (Ex. 17 (Butterfield Decl. ¶ 3).

**Defendants' Response**: Undisputed**.**  Though the document production was incomplete.  Actava did not provide inspection of the Actava authorization module and other source code until April 2021.  (Actava SUF Ex. 41 (4/19/21 Declaration of Andrey Chechulin, ¶ 2).

88.     On November 1, 2018, the Actava Parties issued document requests to the Defendant Channels seeking, *inter alia*, "a copy of any license . . . between any Channel and Matvil," "[d]ocuments showing yearly license fees paid to each Channel by Matvil from 2015 to the present," and "[d]ocuments showing yearly revenues received by the Channel from any licensee authorized to transmit, distribute, display, and/or use any Channel programming or content in North America." (Ex. 51 (ECF No. 90-3, ¶¶ 14-15)).

 **Defendants' Response**: Undisputed

89.     The Defendant Channels produced the Channel One/Matvil License, which

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████     (Ex. 34, ¶ 4.1).

 **Defendants' Response**: Undisputed

90.     On December 15, 2020, every Defendant other than Channel One changed counsel in this action from Dunnington to BochnerIP. *See* Ex. 52 (ECF Nos. 217-18).

**Defendants' Response**: Disputed.  BochnerIP made appearances on various days and is not representing Accept (ECF Nos.  217, 218, 230, 232, 242, 252, and 294)

91.     On January 26, 2021, the Actava Parties' counsel e-mailed Mr. Hardin Rowley of Dunnington, copying BochnerIP, asking "[w]ill your affirmative expert be the same as your rebuttal expert? If not, please identify him/her." (Ex. 17 (Butterfield Decl., ¶ 4); Ex. 20).

**Defendants' Response**: Undisputed

92.     On March 6, 2021, Mr. Rowley of Dunnington e-mailed two attachments to the Actava Parties' counsel, copying BochnerIP, whose file names were titled "Defendants Rebuttal Report.pdf" and "Defendants Damages Report.pdf" (the "Defendants' Damages Report"). (Ex. 17 (Butterfield Decl., ¶ 5; Ex. 21).

**Defendants' Response**: Undisputed**.**

93.     The Defendants' Damages Report is in the form of a letter from Mark Gottlieb and states that "this letter is to provide the computation of damages as specified under Section 605 of the Federal Communications Act." (Ex. 21).

**Defendants' Response**: Undisputed.

94.     The Defendants' Damages Report does not mention any loss of income potential from any agreement with Matvil. (Ex. 21).

**Defendants' Response**: Undisputed. Though on February 17, 2021, Channel One noticed its intent to void the settlement agreement, collect the settlement payment of $800,000 as liquidated damages.  Channel One also reserved the right to reinstate its claims in the *Infomir* Action, which included statutory damages under the Federal Communications Act. (Dowd Decl. Ex. 20; Actava SUF Ex. 2, ¶ 4)

95.     The Defendants' Damages Report does not mention any loss from alleged breaches of the Settlement Agreement. (Ex. 21).

**Defendants' Response**: Undisputed.  Though on February 17, 2021 Channel One noticed its

intent to retain the ███████ settlement as liquidated damages.  (Dowd Decl. Ex. 20; Actava SUF Ex. 2, ¶ 4).

96.    The Defendants' Damages Report does not mention any loss from alleged constructive fraud. (Ex. 21).

**Defendants' Response**: Undisputed.  Though on February 17, 2021 Channel One noticed its intent to retain the ███████ settlement as liquidated damages.  (Dowd Decl. Ex. 20; Actava SUF Ex. 2, ¶ 4).

97.    Mark Gottlieb testified that he did not "come to any conclusion, or render any other opinion, about the Defendants' damages on their counterclaims, other than" the Defendants' Damages Report. (Ex. 45 (4/12/21 Tr. of Mark Gottlieb, 79:12-16)).

**Defendants' Response**: Disputed.  Mr. Gottlieb further testified that an answer as to the quantification of damages for Defendants three counterclaims would require a "legal conclusion and I am not -- I am not trained to provide such a conclusion."  (Actava SUF Ex. 45 (4/12/21 Tr. of Mark Gottlieb at 81:23-82:7).

98.    Defendants did not present a damages expert apart from Mark Gottlieb. (Ex. 17 (Butterfield Decl., ¶ 6)).

**Defendants' Response**: Undisputed

99.    Defendants did not disclose any other computations of categories of damages claimed. (Ex. 17 (Butterfield Decl., ¶ 7).

**Defendants' Response**: Disputed**.**  On February 17, 2021 Channel One noticed its intent to retain the ███████ settlement as liquidated damages.  (Dowd Dec. Ex. 20). In response, Actava claimed the retention of the ███████ liquidated damages constituted a penalty.  (Dowd Dec. Ex. 21 (March 3, 2021 Butterfield Letter).

100.    Actava's founder, Rouslan Tsoutiev, testifies that Actava filed this action to protect its own interests and not to interfere with any Matvil license agreements. (Ex. 1 (Tsoutiev Decl., ¶¶ 23-24)).

**Defendants' Response**: Disputed.  Paragraph 2.5 of the NDA stated: 

Actava Ex. 44).  This conflicted with Matvil's obligations to assist Broadcasters with unauthorized distribution efforts.  (Channel One/Matvil License, Actava SUF Ex. 34 ¶ 2.2.15; Krimnus Decl. ¶¶ 3-10.)

101.    The Actava Parties were unaware of any "anti-piracy requirements" of Matvil's licenses. (Ex. 1 (Tsoutiev Decl., ¶¶ 21)).

**Defendants' Response**: Disputed Actava received "assurances" from Matvil about Matvil's obligations under its licenses with Broadcasters.  (Actava SUF Ex. 48, (Second Am. Compl., ECF No. 147, ¶¶ 47, 52; Dowd Decl. 37 (*Infomir* ECF 158, January 12, 2017 Declaration of Tsoutiev ¶¶ 17-18)).  Paragraph 101 is a cut and paste of Paragraph 21 of the Tsoutiev Declaration and is improper.  "Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of "cut-and-paste" efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider*, No. 95 CIV. 4083 (RPP), 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).

## DEFENDANTS' UNDISPUTED FACTS

### Role of Middleware in IPTV Distribution

102.    Andrey Makhotin is a software engineer in the IPTV industry with at least eight years of experience with front-end and back-end components of an IPTV operation.  (Makhotin Decl. ¶¶ 1-3).

103.    Middleware is the " ███████████████████ .  (Makhotin Tr. at 52:22-24).

104.    " ████████████████████████████████ ████████████████████ (Makhotin Tr. at 43:14-18).

105.    Middleware also ████████████████████ .  (Makhotin Tr. at 125:2-5).

106.    Middleware ████████████████████████████████ ████████████ (Makhotin Tr. at 109:17-19).

107.    Different applications ████████████████ .  (Makhotin Tr. at 54:16-18).

108.    Brad Gilmer testified that ████████████████████████ ████████████████ (Gilmer at 292:2-6).

### Actava's Use of Middleware to Distribute IPTV Programming

109.    Before 2016, ████████████████████████████ .  (Makhotin Tr. at 66:4-5).

110.    Makhotin testified that ████████████████████████████ ████████████████████████████ . (Makhotin Tr. at 67:2-13, 71:15-20).

111.    Actava authorized ████████████████████████████████

(Makhotin Tr. at 74:15-19).

112.    The Actava middleware ██████████████████████████████████████.

(Makhotin Tr. at 67:16-68:6).

113.    Gilmer testified that █████████████████████████████████████

████████████████████ (Gilmer Tr. at 200:11-201:21).

114.    ████████████████████████████████████████████

██████████████████████████████ (Gilmer Tr. at

201:10-15; 211:22-212:5).

115.    Actava ███████████████████████ (Makhotin Tr. at 69:16-

21).

116.    Actava ████████████████████████████████████

██████████████ (Makhotin Tr. at 61:22-62:3, 66:6-8, 67:2-13; Tsoutiev Tr. at 325:3-

5).

117.    Actava's accounting records distinguish ████████████████████████

███████████████ (Dowd Decl. 22).

118.    Actava did not ██████████████████████████████████

████████████ (Tsoutiev Tr. at 328:5-329:2).

119.    ████████████████████████████████████████████████

██████████████████████ (Blehm Decl.¶¶ 14-28).

**Role of Dealers in the IPTV Industry**

120.    ██████████████████████████████████████. (Blehm

Decl. ¶ 7).

121.    ███████████████████████████████████████. (Blehm

Decl. ¶¶ 9-13).

122.    Katina's Andreas Mr. Reich testified that ██████████████████

██████████████ (Actava SUF Ex. 22 (2/6/21 Tr. of Andreas Reich at 22:4-6)).

123.    Kartina's dealers ██████████████████████████████

████████████████████ (Blehm Decl.¶¶ 14).

124.    Kartina's dealers, ████████████████████████████████

█████████████████████. (Blehm Decl.¶¶ 16-17).

**Piracy of Broadcasters' Programming by Actava**

125.    Rouslan Tsoutiev is the owner, Chief Executive Officer, and President of

Actava TV, Inc., Master Call Corporation, and Mastercall Communications.  (SAC ¶ 13; Actava

SUF Ex. 1, 8/2/2021 Tsoutiev Decl. ¶ 1).

126.    Actava TV began ██████████████████████████████

████████ (Tsoutiev Tr. at 22:9-15; 33:25-34:3).

127.    Actava TV's first source of programming ████████████.  (Tsoutiev

Tr. at 62:15-64:22).

128.    The ██████████████████████████████████

████████ Actava.  (Tsoutiev Tr. at 34:18-35:11).

129.    Gregory Goldfedib, ████████████████████████████

████████ (Tsoutiev Tr. at 62:11-64:22, 269:19-22).

130.    Actava TV was a ██████████████████████████████

(Dowd Decl. Exs. 14-15 (North Atlantic Broadcasting Corp. NDA; Russian Telekom Inc. Non-

Exclusive Dealer Agreement)).

131.    The product sold by North Atlantic Broadcasting Corp. was Russian Telek,

including middleware and CDN access. (Makhotin Tr. at 78: 10-17).

132.    North Atlantic Broadcasting Corp. is an affiliate of Russian Telek. (Makhotin Decl. ¶ 1).

133.    Mark Pomirtchi incorporated North Atlantic Broadcasting Corp. and Russian Telekom Inc. (Dowd Decl. Exs. 45 and 46).

134.    Makhotin was a system administrator for both North Atlantic Broadcasting Corp., and Russian Telek prior to August 2013. (Makhotin Decl. ¶ 1).

135.    Between 2012 and 2013 Actava TV was a dealer of programming sourced by Russian Telek. and North Atlantic Broadcasting Corp. (*Id.*)

136.    The Plaintiffs, Russian Telek, and North Atlantic Broadcasting Corp. were never licensed or authorized to distribute the programming of Broadcasters. (Kan Decl. ¶ 15, Koshkin Decl. ¶ 16, Shprekher Declaration ¶ 26; Sindeeva Decl. ¶ 16, Panfilova Decl. ¶ 15).

137.    On May 31, 2013, Actava TV purchased certain assets of Russian Telek, including its customers. (Ex. 1 (Tsoutiev Decl., ¶ 9); Ex. 7.)

138.    Actava TV's business model ████████████████████████████ (Tsoutiev Tr. at 32:21-33:24, 62:15-19, 72:14-73:7).

139.    Actava TV ███████████████████████████████████ ██████████████████████ (Makhotin Decl. ¶ 3;Tsoutiev Tr. at 71:18-73:7).

140.    Actava began to use ████████████████████████ ███████████. (Tsoutiev Tr. at 73:2-7).

141.    Master Call Communications, Inc.████████████████ ████████████████████████████ (Dowd. Decl. Ex. 23; ACT002369-74).

142.    Actava TV obtained programming from ███████████████████████

███████████████████ (Tsoutiev Tr. at 23:4-16, 24:4-9).

143.    One "aggregator" for Actava TV was ██████████.  (Tsoutiev Tr. at 24:10-13)

144.    MHCOM GmbH was never licensed or authorized to distribute the programming of Broadcasters.  (Shprekher Declaration ¶ 26, Kan Decl. ¶ 15, Koshkin Decl. ¶ 16, Shprekher Declaration ¶ 26; Sindeeva Decl. ¶ 16, Panfilova Decl. ¶ 15).

145.    Actava TV paid the "aggregators" ███████████████████████
(Tsoutiev Tr. at 24:14-25:19).

146.    Tsoutiev swore that ███████████████████████████████████
███████████████████████ (Tsoutiev Tr. at 27:16-28:14).

147.    Tsoutiev did not ████████████████████████████████
███████████████████████████████████████. (Makhotin Tr. at 83:18-84:19).

148.    Makhotin had ████████████████████████████
████████ (Makhotin Tr. at 83:18-84:15).

149.    Actava TV sold and streamed the ██████████████████████
███████████████████████ (Tsoutiev Tr. at 14:21-15:13, 54:12-19, 71:18-72:10).

150.    Master Call Corporation and Master Call Communications employees ████
███████████████████████████. (Dowd. Decl. Ex. 19 January 19, 2021 Deposition of Irina Pliss ("Pliss Tr.") at 11:2-12:11; Ex. 24 January 21, 2021 Deposition of Tatyana Zhevnerova ("Zhevnerova Tr.") at 110:3-111:17);

Makhotin Tr. at 17:11-18:16).

151.    Actava █████████████████████████████████████████

(Makhotin Tr. 69:2-11; 71:9-14; Makhotin Decl. ¶ 14).

### Broadcasters Litigations Against Actava and Other Alleged IPTV Pirates

152.    On November 4, 2015, Closed Joint Stock Company "New Channel," Closed Joint Stock Company "CTC" Network," and Closed Joint Stock Company "TV Darial," sued Actava Inc. in the Southern District of New York No. 15 Civ. 8681 (GBD) (BCM) ("*Actava* Action") alleging, among nine counts, violations of the Federal Communications Act ("FCA"), copyright infringement, and trademark infringement.  (8/2/21 Tsoutiev Decl. ¶ 3; ECF 150, Defendants' Answer to Second Amended Complaint with Counterclaims ("Answer") ¶ 123).

153.    On January 12, 2016, the Court entered a default judgment, which included a permanent injunction against Actava and referred certain issues, including an inquest as to damages and settlement, to Magistrate Judge Barbara Moses (Dowd Decl Ex. 25 *Actava* Action ECF Nos. 20-21).

154.    On February 29, 2016, CTC and the remaining Broadcasters in this action sued Actava TV, Inc., Master Call Communications, Inc., Master Call Corporation, Rouslan Tsoutiev, Matvil Corp., Infomir, LLC and others asserting claims for violations of the FCA and copyright and trademark infringement.  (*Channel One et al. v. Infomir et al.*) ("*Infomir* Action") (Actava SUF Ex. 1, Tsoutiev Decl. ¶ 3).

155.    According to Actava's accounting records, it had ████ subscribers in February 2016.  (Dowd Decl. Ex. 22)

156.    On October 25, 2019, Judge Moses ordered Actava's co-defendant in the *Infomir* Action, Panorama Alliance, LP, to pay Broadcasters $12,753,607.50 in damages for

violations of the FCA.  (Dowd Decl. Ex. 26, *Infomir* ECF 787).

157.    The *Infomir* Action is ongoing as to Actava co-defendants Infomir, LLC and SK Management of NY, Inc. (*Infomir* Action Docket passim).

## Settlement Agreement and Injunctions

158.    By March 9, 2016, Actava TV had not produced any documents in the *Actava* Action.  (Dowd Decl. Ex. 27 (3/9/16 email from R. Dowd to Actava's prior counsel)).

159.    Broadcasters executed a Settlement Agreement with Actava on April 26, 2016. (Actava SUF Ex. 2).

160.    The recitals to the Settlement Agreement incorporate the *Actava* and *Infomir* Actions.  (Actava SUF Ex. 2).

161.    Section 4 defines "Source" as "identify or identities" of the source by which Broadcasts were copied and streamed through the [Actava] Website."  (Actava SUF Ex. 2, ¶ 4).

162.    Section 4 does not limit the time-frame for Actava to disclose its sources of programming.  (Actava SUF Ex. 2, ¶ 4).

163.    Section 4 of the Settlement Agreement entitles Broadcasters to "declare this [Settlement] Agreement void and retain the Settlement Amount as liquidated damages and seek to reinstate both the [*Actava*] and [*Infomir*] Actions" if Actava failed to disclose the sources of its programming.  (Actava SUF Ex. 2, ¶ 4).

164.    Section 8 of the Settlement Agreement entitles Broadcasters "to seek all judicial relief against [Actava] for [ ] suspected breach: of the Settlement Agreement.  (Actava SUF Ex. 2, ¶ 8).

165.    Section 10 provides: "The Parties agree that in the event a dispute, claim or controversy relating in any way to this Agreement arises, a Party may make an application to the

United States District Court for the Southern District of New York to reopen the Action[s]

without prejudice or commence a plenary proceeding in that District as appropriate.  (Actava

SUF Ex. 2, ¶ 10).

166.    In Section 7.d.i. of the Settlement Actava represented that they had not

"previously broadcast, copied, distributed or otherwise used the Broadcasts other than through

Actava and the [Actava] Website."

167.    In Section 6.d. of the Settlement the Actava  represented that:

> d. Defendants [Actava] represent and warrant collectively and individually that:
> i.      Other than as identified in the Plaintiffs' pleadings in the First Action and Second Action, Defendants have not previously broadcast, copied, distributed or otherwise used the Broadcasts other than through Actava and the Website;
>
> ii.     Defendants have not and do not own or have any interest in any other website, application or other property engaged in the business of providing  internet protocol television ("IPTV");
>
> iii.    Defendants maintain no ownership or management interest in any other IPTV service;
>
> iv.     iv.     Defendants are not presently and will not in the future broadcast, copy, distribute or otherwise use the Broadcasts in any manner, including on the Website, without the express written consent of the relevant Plaintiffs or an authorized representative thereof, as set forth in subparagraph (e) below;

168.    Section 6.e provides:

> The parties jointly agree and represent that Tsoutiev may seek to enter into a license agreement with a Plaintiff or Plaintiffs following the Effective Date without breaching this Agreement. Plaintiffs have agreed to provide Defendant Tsoutiev with a letter in the form annexed hereto as Exhibit D, which may be disclosed to a third party. For the avoidance of doubt, there is no agreement or requirement that any license agreement be entered into by any Party.

169.    In the Settlement Agreement, the Actava Parties represented and warranted as

follows:

> The parties jointly agree and represent that Tsoutiev may seek to enter into a license agreement with a Plaintiff or Plaintiffs following the Effective Date without breaching this Agreement. Plaintiffs have agreed to provide Defendant Tsoutiev with a letter in the form annexed hereto as Exhibit D, which may be disclosed to a third party. For the avoidance of doubt, there is no agreement or requirement that any license agreement be entered into by any Party.

(Actava SUF Ex. 2, ¶ 6(e).

170.     On June 3, 2016 Judge Moses entered a "Stipulation, Order & Permanent Injunction" in the *Infomir* Action. (Actava SUF Ex. 3(*Infomir* Injunction).

171.     On June 6, 2016, Judge Daniels entered a "Stipulation, Order & Permanent Injunction" in the *Actava* Action. (Actava SUF Ex. 4 (*Actava* Injunction).

### Actava's Incomplete Settlement Disclosures

172.     Actava's settlement disclosures are contained in the Settlement Agreement and the April 26, 2016 email from Actava's prior counsel to Broadcasters' counsel. (Actava SUF Exs. 2, 5).

173.     The Settlement Agreement and April 26, 2016 email do not disclose that Actava ███████████████████████████████. (Tsoutiev Tr. at 273:23-274:17).

174.     One of the assets Actava failed to disclose was the domain www.russiantelek.com (Actava Answer to Defendants' Counterclaims, ECF 158, ¶ 177)

175.     Actava was a dealer of ████████████████████████████████ ████████████████ (Dowd Decl. Ex. 15).

176.     The Settlement Agreement and April 26, 2016 email do not disclose that ████████████████████████████████. (Actava SUF Exs. 2, 5, Actava Answer to Defendants' Counterclaims, ECF 158, ¶ 178).

177.    Actava was a dealer of ██████████████████████████████ ██████████████████████████████. (Dowd Decl. Ex. 14 NA Dealer agreement).

178.    The Settlement Agreement and April 26, 2016 email do not disclose ███████ ██████████████████████████████ (Actava SUF Exs. 2, 5)

179.    Actava obtained a signal from ███████████████████. (Tsoutiev Tr. at 23:4-16, 24:4-9, 62:15-64:22).

180.    The Settlement Agreement and April 26, 2016 email did not disclose the ███████████████████ (Actava SUF Exs. 2, 5)

181.    Actava did not and has not ██████████████████████. (Tsoutiev Tr. at 291:23-292:8).

182.    Gregory Goldfedib, ██████████████████████████ ████████ (Tsoutiev Tr. at 62:11-64:22, 269:19-22).

183.    Goldfedib was the founder and CEO of Infomir, LLC (*Infomir* ECF 300 ¶ 1)(June 18, 2017 Affidavit of Gregory Goldfedib).

184.    Infomir, LLC was a co-defendant of Actava in the Infomir Action. (*Infomir* ECF 1).

185.    The Settlement Agreement and April 26, 2016 email do not disclose that Gregory Goldfedib, connected Actava TV to the Ukrainian sources of programming. (Actava SUF Exs. 2, 5)

186.    Broadcasters, under the direction of Kartina, would not have agreed to the Settlement Agreement had they known Actava was withholding this information. (Panfilova Decl. ¶¶ 29-32).

187.    Kartina and Broadcasters incurred additional expenses to prosecute their claims

in the *Infomir* Action due to Actava concealing third parties that aided its piracy. (Panfilova Decl. ¶¶ 29-32; Kan Decl. ¶¶ 29-32; Koshkin Decl. ¶¶ 31-34; Sindeeva Decl. ¶¶ 37-40).

<strong><u>Broadcasters Licenses with Matvil</u></strong>

188.    On January 19, 2016, Rain entered into a licensing agreement with Matvil to distribute Rain's programming.  (Sindeeva Decl. ¶ 13).

189.    On or about March 15, 2016, Matvil entered into licensing agreements with CTC and New Channel entered into a licensing agreement with Matvil to distribute CTC and New Channel programming.  (Actava SUF Ex. 38,39; Koshkin Decl. ¶ 13).

190.    In 2016, Comedy TV entered into a licensing agreement with Matvil  to distribute Comedy TV programming.  (Kan Decl. ¶ 12 ).

191.    On September 7, 2016, Channel One entered into a Licensing Agreement with Matvil.  (Actava SUF Ex. 34).



192.    Article 1.1 of the Licensing Agreement grants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*).

193.    The License Agreement defines ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*).

194.    Article 1.4 states of Channel One's license with Matvil states: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)

195.    Matvil ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Shprekher Tr. at 24:11-25:4).

196.    Matvil advertising ███████████████████████████████████████

███████████████████████

197.    Article 1.5 of Channel One's license with Matvil states: "███████████

████████████████████████████████████████████████████████████

████████████████████████████████  (Actava SUF Ex. 34).

198.    Section 2.2.2. of Channel One's license with ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  (Channel One/Matvil License"). (Actava SUF Ex. 34).

199.    Section 2.2.2. of Channel One's license with Matvil provided the following:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  (Actava SUF Ex. 34).

200.    Section 2.2.10. of Channel One's license with Matvil provided the following:

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████  (Actava SUF Ex. 34).

201.    Section 3.4. of Channel One's license with Matvil provided the following: ████████

████████████████████████████████████████████████████████████

████████████████████████████  (Actava SUF Ex. 34).

**Actava's Referral Agreement with Matvil**

202.    In June 2016, soon after Judges Daniels and Moses entered the stipulated injunctions, Actava began negotiating a confidential agreement with Matvil.  (SAC ¶ 49).

203.    Broadcasters were not aware that Actava was negotiating a business relationship with Matvil as no permission to do so was requested.  (Shprekher Decl. ¶ 42, Sindeeva Decl. ¶18, Kan Decl. ¶ 17, Koshkin Decl. ¶ 18, Panfilova Decl. ¶ 16).

204.    On September 8, 2016, Matvil and Actava entered into the Referral Agreement and addendum and agreed to a Second Addendum on September 30, 2016.  (Actava SUF Ex. 12)("Referral Agreement").

205.    Pursuant to the Referral Agreement, Actava aired radio ads that identified Broadcasters by name, in Russian.  (Dowd Decl. Ex. 35)(translation of radio ad from the contempt proceeding).

206.    On October 14, 2016, Actava filed an application for the ACTAVA mark with the United States Patent and Trademark Office ("USPTO") for "promoting the television broadcasting services of third parties."  (Dowd. Decl. Ex. 8(ACTAVA trademark file wrapper)).

207.    After an office action, the USPTO registered the ACTAVA Mark on November 19, 2019 (*Id.*)

208.    Channel One ████████████████████████████████████ ████████████████████████████████  (Actava SUF Ex. 35 Shprekher Tr. 24:21-25-12).

209.    The Broadcasters negotiated their licenses without knowledge that Matvil would absorb prior Actava customers.  (Actava SUF Exs. 34, 37-39; Sindeeva Decl. ¶ 32, Kan Decl. ¶ 24, Koshkin Decl. ¶ 26, Panfilova Decl. ¶ 24).

210.    Actava TV ████████████████████████████████████

██████████████████████████████████. (Tsoutiev Tr. at 84:6-14;

Makhotin Tr. at 61:21-62:10, 73:5-14; Pliss Tr. at 154:20-34; Dowd. Decl. Ex. 26; Referral

Agreement Addendum a)).

211.    The expected number of customers was based on Matvil's marketing and past

activity.  By Actava and Matvil not informing Broadcasters that Actava would be transferring its

legacy customers to Matvil, Broadcasters could not account for these customers.  (Sindeeva

Decl. ¶ 32, Kan Decl. ¶ 27, Koshkin Decl. ¶ 29, Panfilova Decl. ¶ 27).

212.    Actava's actions harmed Broadcasters because their Matvil licensing fees were

based on the number of customers expected to use Matvil's service.  (Sindeeva Decl. ¶ 32, Kan

Decl. ¶ 27, Koshkin Decl. ¶ 29, Panfilova Decl. ¶ 27).

**Broadcasters File Notice of Breach and Initiate Contempt Proceeding**

213.    Upon learning of a business relationship between Actava and Matvil,

Broadcasters reviewed the Actava website, Settlement Agreement, Injunctions, and Matvil

settlement agreement.  (Dowd. Decl. Ex. 30 (Notice of breach).

214.    Paragraph 8 of the Settlement Agreement specifically provides that if

Broadcasters suspect Actava of a breach of the Settlement, Broadcasters must provide written

notice to Actava of the suspected breach and then if not cured, shall be entitled to seek all

judicial relief.  (Actava SUF Ex. 2).

215.    Broadcasters served a notice of suspected breach on Actava on October 19,

2016.  (Dowd. Decl. Ex. 30).

216.    On October 26, 2016, Actava denied it was breaching the Settlement

Agreement. (Dowd Decl. Ex. 31).

217.    Actava wrote Broadcasters that: "We write now not simply to reject the Broadcasters' allegations out of hand, but instead to clarify the nature of Actava's relationship with Matvil, and to reassure your clients that Actava's conduct is consistent with its obligations under the Settlement and the strictures of the Orders." (*Id.* at 1).

218.    Actava continued: "Please be assured that in referring customers to Matvil's services by linking to Matvil's streaming video player, Actava has neither access to nor any interaction of any kind with your clients' streams, broadcasts, channels, or programming." (*Id.* at 2).

219.    In the October 26 letter, Actava did not disclose it was currently authenticating Matvil subscribers through an "authorization module." (*Id. Cf.* Makhotin Tr. at 61:21-62:10, 65:17-67:19, 71:15-20,74:2-75:19).

220.    In the October 26 letter, Actava did not disclose it was advertising on Davidzon Radio. (Dowd Decl. Ex. 32)

221.    On November 14, 2016, Broadcasters rejected the contentions in Actava's October 26 letter. (Dowd Decl. Ex. 33).

222.    Broadcasters filed a contempt motion on December 13, 2016, alleging that Actava was transmitting and advertising the Broadcasters' content. (Dowd Decl. Ex. 34 *Infomir* Action ECF 149-151).

223.    Actava filed its opposition to the contempt motion on January 13, 2017. (Dowd Decl. Ex. 36 *Infomir* Action ECF 162).

224.    Actava did not seek sanctions against Broadcasters for bringing the contempt motion but rather only asked the court to deny the contempt motion. (*Id*. at 25).

**Actava's Representations Concerning its Relationship with Matvil in the Contempt Proceeding**

225.    Actava supported its opposition to the contempt motion with five declarations and one expert report: (1) Toby Butterfield, Esq. Declaration, (2) Brad Gilmer Expert Report, (3) Tsoutiev Declaration, (4) Gayster Declaration, (5) Alexandr Crivoi (Matvil System Admin) Declaration, and (6) Jonathan Malki, Esq. Declaration. (*Infomir* Action ECFs 157-61) ("Actava Contempt Declarations").

226.    None of the Actava Contempt Declarations nor the Gilmer expert report mention Actava's middleware nor Actava's "authorization module." (*Infomir* ECFs 157-61).

227.    Gilmer testified that ███████████████████████████████ ███████████████ (Gilmer Tr. at 36:14-38:2).

228.    Andrey Makhotin, Actava's lead software engineer, did not provide a declaration in the contempt proceeding despite connecting Actava's middleware to the Matvil CDN and rewriting Actava software. (Makhotin Tr. at 61:14-62:3, 66:3-8, 67:2-8; Actava SUF Ex. 14, Makhotin Decl. ¶¶ 11, 14).

229.    The Actava Contempt Declarations and the Gilmer expert report do not mention Actava's middleware and "authorization module." (Actava Contempt Declarations).

230.    The word "middleware" does not appear in any of the Actava Contempt Declarations nor the Gilmer expert report. (Actava Contempt Declarations).

231.    Gilmer did not ████████████████████████████████████ ██████████████████ (Gilmer Tr. at 206:10-21).

232.    Gilmer testified ███████████████████████████████████ ███████████████ (Gilmer Tr. at 50:6-15)

233.    Gilmer did not ████████████████████████████████████

█████████████████████. (Gilmer Tr. at 50:13-17).

234.    Actava and Matvil's counsel deleted the word "authenticated" from Paragraph 11 of the draft Gayster declaration.  (Dowd Decl. 38, MATVIL003048-59)(email with attached redline Gayster declaration)

235.    Tsoutiev swore in his declaration in opposition to the contempt motion of broadcasters that:

> As explained in a separate declaration by Mikhail Gayster, Matvil does not provide [Actava] with access to its broadcast stream or Content Delivery Network ("CDN"). To the contrary, only paying Matvil subscribers obtain access to that stream, and they can **only do so directly via a computer-to-computer connection** between Matvil and each individual subscriber. Furthermore, a computer may only establish that connection **after it has been authenticated** as being operated by a paying Matvil subscriber.

(Dowd Decl. Ex. 37, January 12, 2017 Declaration of Rouslan Tsoutiev ¶ 22)(emphasis added)

236.    Actava's memorandum of law in the contempt motion asserts:

> As confirmed by Actava's independent technical expert Mr. Brad Gilmer in his Report & Findings of Brad Gilmer, Actava had no role in, access to, or control over the servers, Internet Protocol ("IP") addresses, or any other equipment involved in delivering Plaintiffs' broadcasts.  (*See* Declaration of Toby Butterfield, dated January 13, 2017 ("Butterfield Decl."), Ex. A ("Gilmer Report") at p. 1.)

(Dowd Decl. Ex. 36 at 10).

237.    Gilmer would not swear ████████████████████████████████████████████ ████████  (Gilmer Tr. at 250: 2-252:10; 255:24-256:13)

238.    Actava's memorandum of law in the contempt motion also asserts:  "Actava only pre-loads Matvil's software application on to the set-top boxes, and Matvil's application then works in connection with Matvil's CDN, which Actava cannot access or control. (Gayster Decl. ¶ 14; Gilmer Report pp. 1, 9–10.)"  (Dowd Decl. Ex. 36 at 11)

239.    Gilmer would not ████████████████████████████████████████████

████████ (Gilmer Tr. at 253:16-24; 256:13-20).

240.    Gilmer would not ████████████████████████████████████

████████████████████████████████████ (Gilmer Tr. at 256:21-25).

241.    During oral argument on the contempt motion Actava did not disclose that it authenticated customers or that Actava's middleware connected to Matvil's CDN.  (Dowd Decl. Ex. 17) (April 24, 2017 Oral Argument Tr. *passim*).

242.    In reaching her decision on the contempt motion Judge Moses wrote that "Nor is Actava in contempt … so long as it is Matvil, not Actava, that delivers plaintiffs' content through its own servers, **using its own software, and authenticates the customers through its own website**." (Actava SUF Ex. 43 at p. 22-23)(emphasis added)

243.    In deciding the contempt motion Judge Moses also wrote that: "the parties' Settlement Agreement is not before the Court for enforcement. Consequently, I express no opinion as to whether the Actava Defendants have violated that contract."  (Actava SUF Ex. 43 at 30 n. 18).

**Defendants Amend the *Infomir* Action Complaint Based on Incomplete Disclosures by Actava**

244.    Defendants amended the *Infomir* Action complaint to add MHCOM as a defendant on Defendant on April 5, 2017.  (Dowd Decl. Ex. 16 *Infomir* Action ECF 211).

245.    Defendants did not add Russian Telek, North Atlantic Broadcasting Corp., Mark Pomirtchi, or Gregory Goldfedib as defendants.  (*Infomir* Action ECF 211).

246.    Had Actava disclosed these parties, Kartina would have advised Broadcasters to consider adding Russian Telek, North Atlantic Broadcasting Corp., Mark Pomirtchi, or Gregory Goldfedib as defendants in 2017.  (Panfilova Decl. ¶¶ 29-32)

247.    But for these material omissions, Defendants would have avoided significant

attorney's fees during those four years.  (Panfilova Decl. ¶ 32)

**Actava Sues Defendants**

248.    On July 23, 2018, Plaintiffs sued Channel One, CTC, New Channel, TV Darial, Comedy TV, and Rain TV alleging tortious interference with the Referral Agreement, malicious prosecution, and breach of contract.  (ECF 1).

249.    On July 24, 2018, Actava filed a statement of relatedness of this action to the *Infomir* Action (ECF 6).

250.    ████████████████████████████████████.  (Skrynnyk 4/21 Tr. at 56:20-57:16).

251.    ████████████████████████████ (Skrynnyk 11/19 Aff. ¶ 23; Skrynnyk 4/21 Tr. at 65:24-66:3).

252.    On July 29, 2018, Matvil emailed Tsoutiev ████████████████

████████████████████████████████

████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████    (Dowd Decl. Ex. 48).

253.    Matvil informed Broadcasters about the lawsuit shortly thereafter.  (Skrynnyk 4/21 Tr. at 48:4-65:9; Koshkin Decl. ¶ 23, Shprekher Decl. ¶ 58, Sindeeva Decl. ¶ 29).

254.    On August 9, 2018, Matvil and Actava entered into a non-disclosure agreement. (Actava SUF Ex. 44) ("Matvil NDA").

255.    Paragraph 2.5 of the Matvil NDA stated: ████████████████████



(*Id.*)

256.     The Matvil NDA created a conflict between Matvil's obligations to assist Broadcasters with unauthorized distribution efforts.  (Channel One/Matvil License, Actava SUF Ex. 34 ¶ 2.2.15;  Krimnus ¶¶ 3-10)

257.     On October 4, 2018, Actava added Kartina as a defendant and added a New York Business Law § 349 claim against Kartina.  (ECF 38).

258.     Actava served initial disclosures on February 22, 2019.  (Dowd. Decl. Ex. 41)(Actava Initial Disclosures).

259.     Matvil breached its licensing agreements with Broadcasters through its failure to cooperate in the Defendants' anti-piracy efforts.  (Krimnus Decl. ¶¶ 3-10)

**Broadcasters Serve Second Notice of Suspected Breach on Actava Concerning Russian Telek**

260.     On November 16, 2018, Broadcasters served a second notice of breach on Actava concerning its failure to disclose its control of the RT Website.  (Dowd Decl. Ex. 39)("Second Notice of Breach").

261.     On December 4, 2018 Actava served a reply to the Second Notice of Breach. (Dowd Decl. Ex. 40 ("Actava Reply")

262.     The Actava Reply does not disclose that Actava TV was ███████. (*Id.*)

263.     The Actava Reply does not disclose that Actava TV was also ███████ (*Id*; Makhotin Decl. ¶ 1)

264.    The Actava Reply does not disclose that Actava TV ███████████

███████████████████ (*Id.*)

**December 2020 Andrey Makhotin Deposition**

265.    Defendants subpoenaed Plaintiffs' lead engineer, Andrey Makhotin, on June 26,

2020.  (Dowd Decl. Ex. 42 Makhotin Subpoena).

266.    Makhotin's subpoena requested that he bring certain documents to his

deposition.  (*Id.*).

267.    Defendants deposed Makhotin on December 19, 2020.  (Dowd Decl. Ex. 5)

268.    Makhotin testified ████████████████████.  (Makhotin Tr. at

6:21-7:9).

269.    █████████████████████████.  (Makhotin Tr. at

47:21-24).

270.    On December 19, 2020, Channel One requested copies of the applications and

software, including the dual authentication module that Mr. Makhotin testified about.

(Makhotin Tr. at 193:13-21).

271.    On January 6, 2021, Channel One again requested documents from Actava,

concerning, among other things: native files of the authorization module, the API used for the

Matvil transition, plaintiffs' middleware prior to and during its relationship with Matvil.  (Dowd

Decl. Ex. 43).

272.    On January 15, 2021, Actava refused to produce native versions of the source

code but offered to permit inspection.  (Dowd Decl. Ex. 49)(January 15, 2021 email from

Michael Rosenberg, Esq.)

**April 2021 Inspection of Actava Middleware by Andrey Chechulin**

273.    On April 14, 15, and 16, 2021 Actava permitted inspection of the source code to

Channel One's investigator, Andrey Chechulin.  (Actava SUF Ex. 41)("Chechulin Decl.") ¶ 2.

274.    On April 19, 2021, Mr. Chechulin issued a declaration describing his findings.

(*Id.*).

275.    Chechulin's key conclusions were:

- The Actava source code revealed that Actava's middleware accessed and reused Channel One's electronic programming guides ("EPGs") and transmitted the EPGs to U.S. consumers independently of any access to Matvil content.
- The Actava source code revealed that Actava's middleware enabled the distribution of IPTV programming to U.S. consumers by combining EPGs from Channel One Russia's servers with programming streams from Matvil.
- The Actava source code revealed that Actava generated access codes that authenticated subscribers of Russian-language television programming that originated on Matvil servers.
- The Actava source code revealed that Actava middleware was the first step in a three part process for billing U.S. consumers for programming that originated on Matvil's servers.
- The Actava source code revealed that Actava middleware collected billing information from consumers so that those consumers could access Matvil's servers for programming.
- The Actava source code revealed that Actava's middleware was necessary to the processing of credit card payments by subscribers.

(*Id.*  ¶¶ 7-12)

276.    On April 22, 2021 Actava filed a letter motion to exclude Chechulin's

declaration (ECF 306).

277.    On April 28, 2021 Judge Fox denied Actava's letter motion. (ECF 336).

278.    At that April 28 conference, Judge Fox offered Actava an opportunity to submit

a rebuttal report.  (April 28, 2021 Tr. at 19:4-21).

279.    Mr. Butterfield, counsel to Actava, assured Judge Fox that Actava would inform

Judge Fox of Actava's intention to file a rebuttal report in "short order." (April 28, 2021 Tr. at

19:24-21:21).

280.    After consulting with an expert, Actava wrote Judge Fox on April 30, 2021 that it would not depose Mr. Chechulin.  (ECF 317).

281.    Actava filed the August 2, 2021 Makhotin Declaration on August 3, 2021 in support of its motion for summary judgment (ECF 369-14).

282.    Two paragraphs of the Makhotin declaration provide testimony that attempt to rebut Chechulin's conclusions about the use of an Actava electronic programming guide to obtain programming information from Channel One's website (Makhotin Decl. ¶¶ 14-15).

283.    Actava has not permitted subsequent inspection of the Android Source discussed by Makhotin in Paragraph 14 and 15 of his declaration.  (April 15, 2021 Addendum to Protective Order, ECF 297 ¶ 4)(limiting Defendants inspection of the source code to eight hours).


Date: September 17, 2021                    Respectfully Submitted,

                              By:    /s/ Erik Dykema

                                   Serge Krimnus, Esq.
                                   Andrew Bochner, Esq.
                                   Erik Dykema, Esq.
                                   Michael Gabriel, Esq.
                                   **Bochner IP, PLLC**
                                   295 Madison Avenue
                                   12th Floor
                                   New York, New York 10017
                                   (646) 971-0685
                                   *Attorneys for Defendants*
                                   *CTC Network, New Channel, Rain, TV*
                                   *Darial, Comedy TV, and Kartina*

DUNNINGTON BARTHOLOW & MILLER LLP
*Attorneys for Defendant Channel One*

By:

<u>/s/ Raymond J. Dowd</u>
Raymond J. Dowd, Esq.
Hardin P. Rowley, Esq.
230 Park Avenue, 21st Floor
New York, New York 10169
Telephone: 212-682-8811
Facsimile: 212-661-7769
RDowd@dunnington.com
HRowley@dunnington.com