USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  3/18/2024

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACTAVA TV INC., ET AL.,<br><br>                                   Plaintiffs,<br><br>            -against-<br><br>JOINT STOCK COMPANY "CHANNEL<br>ONE RUSSIA WORLDWIDE", ET AL.,<br><br>                          Defendants. | 18-cv-06626 (ALC)<br><br><u>OPINION AND ORDER</u> |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Actava TV, Inc., Master Call Communications, Inc., Master Call Corporation, and Rouslan Tsoutiev ("Actava" OR "Plaintiffs") bring this action against Defendants Joint Stock Company "Channel One Russia Worldwide," Closed Joint Stock Company "CTC Network," Closed Joint Stock Company "New Channel," Limited Liability Company "Rain TV-Channel," Closed Joint Stock Company "TV DARIAL," Open Joint Stock Company "ACCEPT", Limited Liability Company "Comedy TV," and Kartina Digital GmbH ("Channels" or "Defendants") for malicious prosecution, tortious interference, breach of contract, and unfair competition in violation of New York state law.  Defendants also filed counterclaims against Plaintiffs for tortious interference, breach of contract, and constructive fraud.  For the reasons stated below, the Parties' motions for summary judgment are **GRANTED** in part and **DENIED** in part, motions to seal are **GRANTED** in part and **DENIED** in part, motions to strike are **DENIED**, and motions for judicial notice are **GRANTED**.[1]

---

[1] Because all of the documents which the Parties request the Court take judicial notice of were "filed in other courts," the Court takes judicial notice of them "not for the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings."  ECF No. 565 at 5-6.

## BACKGROUND

### I.   Facts

The following facts are drawn from the Parties' 56.1 Statements, the documents relied upon therein, the Second Amended Complaint, and Defendants' Answer and Counterclaims.

### A.   Parties

Plaintiff Actava TV, Inc. is an internet protocol television ("IPTV") company that sold and streamed Russian language programming and set-top boxes ("STBs") primarily in the northeastern United States through at least late February 2016.  ECF No. 587 ("Defs. 56.1") ¶ 15. President Master Call Communications and Master Call Corporate are companies which purchased server space and performed work for Actava TV, Inc.  *Id.* at ¶¶ 18, 20.  Plaintiff Rouslan Tsoutiev is owner, CEO, and President of Actava TV, Inc. and Master Call Corporation. *Id.* ¶ 16.

Defendants Channel One Russia Worldwide, CTC Network, New Channel, Rain, Darial, and Comedy TV are joint stock companies organized under the laws of the Russian Federation which each generated, owned, and/or operated television broadcasts and/or channels.  *Id.* at ¶¶ 1-12.  With the exception of Channel One Russia Worldwide, the remaining Channel Defendants have previously entered into license agreements with third parties to distribute their respective programming via IPTV in the United States and around the world.  *Id.* at ¶¶ 8-12.  Defendant Kartina Digital GmbH is an IPTV company which distributes programming in the United States and elsewhere.  *Id.* at ¶13.

Non-party Matvil is an IPTV company that sells and streams Russian language television to customers in Canada and the United States which has been licensed to distribute Channel One, CTC, New Channel, Rain, and Comedy TV.  *Id.* at ¶¶ 21-28.

B. Facts

Actava TV began broadcasting Russian television, including Defendant Broadcasters, in 2011 or 2012 without appropriate broadcasting licenses. *Id.* at ¶¶ 35, 37-38. In November 2015 ("*Actava*" action) and February 2016 ("*Infomir*" action), several of the Defendant Broadcasters sued Actava and others alleging that they had pirated their content in violation of the Federal Communications Act and copyright and trademark laws. *Id.* at ¶¶ 48-50. The Parties entered into a Settlement Agreement to resolve these two actions in April 2016. *Id.* at ¶ 51. While Actava agreed in the Settlement Agreement to "not in the future broadcast, copy, distribute or otherwise use the Broadcasts in any manner," they also stated that they "ha[d] not previously broadcast, copied, distributed or otherwise used the Broadcasts other than through" its own platform or website other than as identified in the Broadcasters' pleadings and that Actava did not have any interest in any other IPTV service. *Id.* at ¶ 53. The Agreement stated that Tsoutiev, Actava's CEO could seek a license agreement with any of the Plaintiff-Broadcasters, but that entry into such a license was not mandatory upon any Plaintiff-Broadcaster. *Id.* at ¶ 54. The Agreement also included, as an exhibit, a form letter that Actava was to use when requesting a license from one of the Broadcasters. *Id.* Additionally, the Agreement required that any Channel Plaintiff suspecting that any Defendant was in breach provide written notice of the suspected breach. *Id.* at ¶ 104. Upon giving notice, a Channel could then seek judicial relief only if the Defendant fails to remedy the suspected breach within ten business days of receiving written notice. *Id.* Following entry of the Settlement Agreement, in early June 2016, permanent injunctions ("Injunctions") were entered in both the *Actava* and *Infomir* actions which barred Actava from:

a.) broadcasting, re-broadcasting or otherwise transmitting Plaintiffs' Broadcasts as identified in Annex 1 or any other channel that Plaintiffs may in the future broadcast via any medium, including but not limited to internet protocol television ("IPTV") and social media, without authorization;

b.) directly or indirectly infringing or making any use, in any manner whatsoever, of Plaintiffs' Broadcasts including any associated programs without authorization;

c.) directly or indirectly infringing or making any, in any manner whatsoever, of Plaintiffs' Marks as identified in Annex 1 without authorization; [or]

d.) publishing or distributing any promotional materials referring to Plaintiffs' Broadcasts or marks; in any medium, including but not limited to the internet (including IPTV and social media), television, radio, newspapers, magazines, direct mail or oral communications without authorization).

*Id.* at 56-59. The Injunctions do not define the terms "broadcasting," "re-broadcasting," "transmitting," "infringing," or "authorization," but does identify the Broadcasters' "marks" in an Annex. *Id.* at ¶¶ 227-232. That annex identifies the marks by listing the Channels' English names and displaying their respective colorized visual logos. *Id.* The Injunctions also barred Actava from "register[ing], purchas[ing], manag[ing] or hav[ing] any ownership interest in any website or device" that pirated the Plaintiff-Broadcaster's broadcasts. *Id.* at ¶ 60. Failure to comply with the Injunctions would result in a finding of contempt of Court. *Id.*

Later that year, all the Defendant Broadcasters except Darial entered into licensing agreements with third-party Matvil to distribute their respective broadcasts via Matvil's IPTV service. *Id.* at ¶ 62-63; SAC ¶ 40. Alongside the broadcast rights, Matvil was also permitted to promote and advertise the programming subject to the Channels' approval of promotional materials. *Id.* at ¶ 65. These licenses did not grant Matvil the power to sublicense the Channels' content. *Id.* at ¶¶ 67-68; *see also* ECF No. 606 at 21.

In June 2016, shortly after entry of the Injunctions, Actava and Matvil began negotiating a new Referral Agreement. *Id.* at ¶¶ 70, 75. The Parties executed the new agreement in September 2016. *Id.* Under the Referral Agreement, Actava would promote and advertise Matvil's offerings, sign up and register customers to Matvil's site, provided customer and

technical support related to STBs, and manage customer payment.  SAC ¶ 50.  In exchange, Actava would receive a split of the monthly revenue of each subscriber that Actava referred or signed up.  *Id.* at ¶ 51.  Additionally, Actava transferred hundreds of its prior customers to Matvil's service for a portion of the subscription fee Matvil charged those customers.  ECF No. 672 at ¶ 63.  Matvil also provided assurances that its agreements with the Broadcaster Defendants permitted it to engage Actava in such a manner and that Matvil was fully licensed to use all of the Broadcaster Defendants' "trademarks, logos, and names."  SAC at ¶52.  A Second Addendum to the Referral Agreement, enacted by both Actava and Matvil, stated that Actava could "advertise and offer 1-year subscription[s] priced at [Actava]'s discretion without approval from [Matvil]."  ECF No. 697, Ex. B at 2.

While the instant Parties quibble with the other's characterization of Actava's involvement in Matvil's presentation of Broadcaster content to its customers, Plaintiffs state that, at minimum, Actava provided "initial authorization" to Matvil customers accessing video content.  *Id.* at 80.  This "initial authorization" was part of Actava's "dual authentication module" by which, Plaintiffs maintain Actava "authorized subscribers only to seek further authorization from Matvil."  *Id.* at ¶ 82.  While Plaintiff maintains that "Actava does not provide the stream of programming to [Matvil] customers," SAC ¶ 56, both sides do agree that "Actava TV middleware allowed Actava to authenticate the STBs it sold and configured for the Matvil service."  *Id.* at ¶ 82.

A review of the Actava source code also established that Actava's middleware was at least capable of accessing Channel One's electronic programming guides ("EPGs") which

provides a schedule of upcoming broadcasts[2] and was also at least marginally involved in the collection of Matvil consumers' billing information.[3]  ECF No. 672 ("Pls 56.1 Counter-Statement") at ¶ 170.

Actava also produced advertising for Matvil's services on Russian-language radio and in newspapers in September 2016.  These advertisements ran from September to December 2016.  *Id.* at ¶¶ 86, 94.  A November 2016 translated radio advertisement stated:

> Actava TV offers an annual subscription to the best television service in America. The package includes all the leading TV channels, such as the Perviy, TNT, TVC, Dozhd, CTC, Domashniy, .... and many others. We are together again! As they say: with clear conscience and confidence in today and tomorrow. The TV service is licensed, so we have no need to hide behind other names, as some other companies are regularly forced to do. We have nothing to hide! Actava TV offers an honest and reliable service with ambitious plans for the future. We have been with you already for 7 years and have no plans to stop.

*Id.* at ¶ 91.  The advertisement later stated that "broadcasting is carried out by Matvil, which has permission to broadcast."  *Id.* at ¶ 92.  In October 2016, after receiving communications from Matvil regarding their relationship with Actava, personnel at Channel One wrote that they believed that Matvil had impermissibly entered into a sublicense of the broadcasts.  *Id.* at ¶ 98.  Following further communications with Matvil about the nature of the Actava-Matvil relationship, the Defendants decided not to pursue legal action against Matvil.

Defendants did decide to initiate legal action against Actava though.  On October 19,

---

[2] Plaintiffs dispute Defendants' unequivocal argument that Actava actually accessed, used, or transmitted the EPGs to consumers but do concede that the technological functionality to access schedules was present in the source code. *See* Pls 56.1 Counter-Statement at ¶ 170.

[3] Here also, Plaintiffs dispute Defendants' claims that Actava's involvement in billing, if any, constituted impermissible conduct under the Injunctions or Settlement Agreement.  *Id.*

2016, Channel Defendants served Actava with a written notice of suspected breach which stated that Actava's purported use of Defendants' broadcasts on their STBs and website was in violation of the Parties' Settlement Agreement.  SAC at ¶ 65.  Actava responded to the notice of suspected breach and argued that their relationship with Matvil was consistent with their obligations under the Settlement Agreement because Actava did not have any access or interaction with any of the Defendants' "streams, broadcasts, channels, or programming."  ECF No. 672, at ¶¶ 106-107. Actava's response did not include any mention of their involvement with Matvil's dual authentication module or its advertisements on Russian-language radio.[4]  *Id.* at ¶ 109-110; *see also* ECF No. 646 at 18-19.  When asked by Defendants to provide a copy of the Referral Agreement to review, Actava offered to provide a redacted version, citing confidentiality obligations to Matvil which prevented production of the unredacted Referral Agreement.  *Id.* at ¶¶ 112-113.  Actava's counsel permitted Channels' counsel to inspect the Agreement in December 2016, but Defendants declined to review the Agreement.  *Id.* at ¶ 116-117.[5]

Defendant Broadcasters then filed a contempt motion against Actava, alleging that they violated the *Actava* and *Infomir* injunctions by transmitting and advertising the Broadcasters' content.  *Id.* at ¶¶ 118-119.  Actava opposed the Broadcasters' contempt motion and filed portions of the Referral Agreement in support of their argument.  *Id.* at ¶ 123.  Actava did not include the Second Addendum in their filings.  *Id.* at ¶ 125.  Broadcast Defendants' contempt motion ultimately failed as Judge Moses found that the movants had failed to establish by clear and convincing evidence that Actava had violated the injunction.  *Id.* at ¶¶ 128-129.  Judge

---

[4] While Plaintiffs take issue with Defendants' characterization of Actava's conduct as actually "authenticating" Matvil's subscribers, it is the case, as presented in the authenticated copy of Actava's response to the notice of suspected breach, that Actava did not disclose what involvement, miniscule, immaterial, or otherwise, they had with Matvil's authentication protocol.  *Id.* at ¶ 109-110.

[5] The Court acknowledges Plaintiffs' dispute of Defendants' assertion that Defendants were permitted only "limited inspection" access to the Agreement and, as such, only presents in its recitation of the facts those factual assertions which Plaintiff admits.  ECF No. 672 at ¶¶ 116-117.

Moses arrived at this conclusion based upon: (1) Broadcast Defendants' failure to provide any license agreements, leaving the assertion that Matvil had authority to engage Actava undisputed and (2) a finding that Actava's advertising of, promotion of, or redirection of consumers to Matvil's service did not violate the injunction. *Id.* at ¶¶ 130-132. Judge Moses also stated that while Broadcasters' claim had at least "some force," Actava was not in contempt "so long as it is Matvil, not Actava, that delivers plaintiffs' content through its own servers, using its own software, and authenticates the customers through its own website." *Id.* at ¶¶ 130, 133.

Actava resumed normal advertising for Matvil following the denial of Defendant Broadcasters' contempt motion. *Id.* at ¶ 135. Actava even attempted to negotiate new service plans with Matvil later that year but was ultimately unsuccessful in doing so. *Id.* at ¶ 136. Despite Defendants' contention to the contrary, Plaintiff presents some evidence, in the form of recorded telephone calls including the Matvil CEO, that Defendant Broadcasters contacted Matvil to pressure them to terminate their relationship with Actava. *Id.* at ¶¶ 137-138.

Plaintiffs filed the instant action on July 23, 2018 without Matvil's knowledge. ECF No. 1; ECF No. 672 at ¶¶ 140-141. Upon being made aware of the lawsuit three days after its filing by Tsoutiev, Matvil emailed Tsoutiev and noted their objection to the suit. *Id.* at ¶ 142. Matvil then informed Actava that they would terminate their contractual relationship and sue Actava if they persisted with litigation against the Channels. *Id.*

On August 2, 2018, shortly after that communications with Actava, Matvil served a notice of suspected breach of the Referral Agreement on Actava, warning that Matvil believed Actava breached the Agreement by suing Defendant Broadcasters. *Id.* at ¶ 147. On August 9, 2018, Matvil and Actava executed a non-disclosure agreement by which the two agreed that Matvil would not disclose "any [c]onfidential [i]nformation or any other information regarding Actava

to the [Broadcast Defendants], or to any other party . . . and shall not otherwise cooperate with the [Broadcast Defendants] with respect to Actava's lawsuit." *Id.* at ¶ 149.  After Actava rejected Matvil's notice of breach, Matvil terminated the Referral Agreement.  *Id.* at ¶¶ 150-151.  After this, Matvil and Actava began to negotiate the transfer of the 1,200 customers Actava referred to Matvil.  *Id.* at ¶ 152.  In October 2018, Matvil again asked Actava to withdraw their suit against Broadcast Defendants after a Broadcaster notified Matvil that they were considering terminating their license agreement with Matvil.  *Id.* at ¶ 153.

Overlayed atop these events is also Defendant Kartina's alleged involvement in the Settlement Agreement, *Actava* and *Infomir* injunctions, contempt proceedings, and current litigation.  Kartina, a German entity that broadcasts some of Defendant Broadcasters' content, including Channel One, retained the Dunnington law firm in 2014 to "to investigate and pursue legal efforts to combat unauthorized IPTV broadcasts" and "authorized [Dunnington] to obtain authority from Kartina's licensors of copyrighted television programs and films to commence litigation in the names of those licensors."  *Id.* at ¶¶ 175-178.  Channel One did not become aware of Kartina's retention of Dunnington until the latter half of 2015 but granted the firm Power of Attorney to prosecute lawsuits in the Channels' names in 2016.  *Id.* at ¶ 179-180.  While Kartina was not a party to the *Actava* or *Infomir* actions, they did fund Dunnington's representation of the Channels in both actions.  *Id.* at ¶¶ 190-192.  Kartina's Deputy Director of Strategy & Business Development stated that Kartina "worked very closely" with the firm and helped "craft[] pleadings and coordinate[] a joint legal strategy . . . on behalf of the Broadcasters."  *Id.* at 193.  Yet, Kartina's CEO testified that Kartina "had no involvement, whatsoever, strategically" in Dunnington's litigation on behalf of the Channels and that Kartina merely "relayed" Dunnington's strategy to the Channels because the Channels didn't have

English speakers at their companies. *Id.* at ¶¶ 194-195, 201-202. Nevertheless, Kartina's CEO did acknowledge a meeting in which the Channels and Kartina agreed that Kartina would receive a portion of any awarded money to cover Dunnington's legal expenses. *Id.* at ¶ 199. Kartina received approximately $470,000 of the $800,000 settlement award Defendant Broadcasters obtained from Actava. *Id.* at ¶ 224. Kartina never disclosed its involvement in Dunnington's representation of the Broadcast Defendants in the prior actions to Actava and was never included as a named party in any of the actions. In late September 2016, shortly before Matvil informed Defendants about the nature of its relationship with Actava, Kartina's Chief Legal Officer notified Channel One and CTC personnel that "Actava TV service ha[d] resumed its work," and proposed to the Channels that Dunnington bring the contempt action against Actava. *Id.* at ¶¶ 254, 256, 267. Kartina's Chief Legal Officer also stated that Actava and Matvil's conduct "undoubtedly look[ed] like pure sublicensing." *Id.* at ¶ 257. Channel One's personnel responded that they "did not understand anything about the transaction between Matvil and Actava." *Id.* at ¶ 261. While Matvil attempted to clarify to the Channels that Actava was not broadcasting Channels' broadcasts and was "act[ing] solely as a seller of Matvil's services," Defendants elected to bring contempt proceedings against Actava. *Id.* at ¶ 288.

In March 2017, Kartina's CEO, while negotiating with Defendant Broadcaster Rain for an exclusive license to distribute Rain's content in the U.S., stated that "[i]f [Kartina] do not have an exclusive relationship with Rain in the US market, then . . . all [Kartina's] efforts and costs on attorneys w[ould] go to waste." *Id.* at ¶ 286. The Kartina CEO went on to state that their approach with Actava was "the one correct solution to clear the market." *Id.* at ¶ 287.

    C.  The Present Action

Plaintiffs allege four separate causes of action in their Second Amended Complaint. *See*

Second Amended Complaint ("SAC"), ECF No. 147. The first is a tortious interference with prospective economic advantage claim against all Defendants. *Id.* at 22-23. Here, Plaintiffs allege that Defendants unlawfully interfered with Actava's business relationship with Matvil by bringing the 2016 Contempt Action against Actava, thereby tarnishing Plaintiffs' reputation and inducing Matvil to terminate its Referral Agreement with Matvil. *Id.* at 22-23. Plaintiffs' second claim is one for malicious prosecution against all Defendants. *Id.* at 23. Here, Plaintiffs allege that Kartina and the Channels filed the 2016 Contempt Action without probable cause and with actual malice, causing Actava economic damages. *Id.* The third cause of action is one for breach of contract against the Channel Defendants in which Plaintiffs allege that the Channel Defendants violated the Settlement Agreement's Notice Provision by initiating contempt proceedings without providing Actava notice of or opportunity to cure its alleged violation of the Settlement agreement vis-à-vis its radio advertisement. *Id.* at 24. And finally, the fourth cause of action is brought under N.Y. General Business Law § 349 against Defendant Kartina for allegedly puppeteering Channel Defendants' pursuit of contempt proceedings against Actava to damage competition in the market. *Id.* at 24-25.

Defendants' Answer to the SAC opposes Plaintiffs' causes of action and raises three counterclaims. *See* Answer, ECF No. 150 at 22-26. Defendants' first counterclaim is for tortious interference with contractual relationships and prospective economic advantage in which they allege that Plaintiffs, in full knowledge of Defendant Channels' contractual relationships with Matvil, unlawfully interfered with that business relationship by filing the present action and also interfered with the Channels' ability to obtain prospective customers. *Id.* at 22-23. The second counterclaim for breach of contract alleges that Plaintiffs' conduct pursuant to its Referral Agreement with Matvil, failure to divulge the identity of a source of pirated content, and

enactment of the Matvil NDA constituted breach of its Settlement Agreement with Defendants. *Id.* at 24. Finally, the third counterclaim alleges that Plaintiffs committed constructive fraud by failing to disclose that Actava owned the RT Website and related service prior to the execution of the Settlement Agreement. *Id.* at 25.

Following extensive discovery between the Parties, including the deposition of many corporate personnel and substantial expert witness Daubert motions practice, both sides filed cross-motions for summary judgment. *See* ECF Nos. 606, 611.

Also pending before the Court are several motions to seal, *see* ECF Nos. 585, 593, 624, 639, 650, 651, 658, 678, motions for judicial notice, *see* ECF Nos. 594, 640, 643, and motions to strike, *see* ECF Nos. 676, 679, 681, 688.

## STANDARD OF REVIEW

### I.      Summary Judgment

Summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In deciding a summary judgment motion, courts must construe the evidence in the light

most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252).

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). "[I]n cases where the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988) (citations omitted). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal citations and quotation marks omitted).

## II.     Striking

Rule 56(C)(4) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P.

56(c)(4).  Local Civil Rule 56.1 requires a party seeking summary judgment include a statement

of materials facts as to which the moving party contends there is no genuine issue to be tried.  In

that statement, the moving party must include a "citation to evidence which would be admissible,

set forth, set forth as required by the Federal Rule of Civil Procedure 56(e)."  L.R. 56.1(d).

Therefore, "only admissible evidence" is considered as "[t]he principles governing admissibility

of evidence do not change on a motion for summary judgment."  *Raskin v. Wyatt Co.*, 125 F.3d

55, 66 (2d Cir. 1997).

### III.   Sealing

There is a common-law and First Amendment right of public access to judicial documents."

*Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2020 WL 2190708, at *1

(S.D.N.Y. May 5, 2020) (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir.

2006)).  "The Second Circuit has articulated a three-step process for determining whether

documents should be placed under seal."  *Church Ins. Co. v. ACE Prop. & Casualty Ins. Co.*, No.

10 CV 698 (RJS), 2010 WL 3958791 (quoting *Mut. Marine Office, Inc. v. Transfercom Ltd.*, No.

08 CV 10367 (PGG), 2009 WL 1025965, at *4 (S.D.N.Y. Apr. 15, 2009)).  First, a court must

determine whether the presumption of access attaches.  A presumption of access attaches to any

item that constitutes a "judicial document"—i.e., an "item . . . relevant to the performance of the

judicial function and useful in the judicial process."  *Lusgoch*, 435 F.3d at 119.  Second, if the court

determines that the item to be sealed is a "judicial document," the court must then determine the

weight of the presumption of access.  *Id*.  "The weight to be given the presumption of access must

be governed by the role of the material at issue in the exercise of Article III judicial power and the

resultant value of such information to those monitoring the federal courts."  *Id*. (quoting *United

States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995)).  "Generally, the information will fall

somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id*. Finally, after determining the weight of the presumption of access, the court must "balance competing considerations against it." *Id*. "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.*

Where the submissions "directly affect" the court's adjudication of the case, there is "a strong presumption of access." *See Mut. Marine Office*, 2009 WL 1025965, at *5. In order to rebut such a presumption, the moving party "must offer specific facts 'demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test [for sealing judicial documents]." *E.E.O.C. v. Kelley Drye & Warren LLP*, No. 10 Civ. 655, 2012 WL 691545, at *3 (S.D.N.Y. Mar. 2, 2012). Importantly, "[t]he mere existence of a confidentiality agreement . . . does not demonstrate that sealing is necessary." *Church Ins. Co.*, 2010 WL 3958791, at *3; *see also De Kafati v. Kafati Kafati*, No. 22-CV-9906 (VSB), 2022 WL 17552457, at *1 (S.D.N.Y. Dec. 9, 2022) ("The presumption of public access to judicial documents is not overcome simply because the documents are covered by a confidentiality agreement."). "The party seeking to place the judicial documents under seal bears the burden of overcoming the presumption of public access." *Rogers v. Henry*, No. 16-cv-5271, 2017 WL 5495805, at *5 (E.D.N.Y. Sept. 12, 2017) (collecting cases).

## DISCUSSION

### I.    Motions to Strike

"Because a decision on the motion to strike may affect [a movant's] ability to prevail on summary judgment, it is appropriate to consider the Motion to Strike prior to the Motion for

summary judgment." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) (internal quotation marks omitted).   A court may "strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized or conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *cert. denied*, 528 U.S. 965 (1999), *rehr'g denied*, 528 U.S. 1107 (2000).

While "[m]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute," *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks omitted), "[a] motion to strike is *particularly* disfavored in the Rule 56.1 context."   *Pearlstein v. BlackBerry Ltd.*, 2022 U.S. Dist. LEXIS 1537, at *23 (S.D.N.Y. Jan 3, 2022).   "Where a court does not rely on contested submissions in deciding a motion for summary judgment, it may deny a party's motion to strike as academic."   *Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2020 U.S. Dist. LEXIS 142735, at *43 (S.D.N.Y. Aug. 10, 2020).

Here, the Parties seek to strike portions of the affidavits of witnesses Blehm, Makhotin, Koshkin, Kan, Panfilova, Sindeeva, Tsoutiev, and Krimnus for presenting inadmissible expert testimony, legal conclusions, hearsay, for lacking personal knowledge, and for violating Fed. R. Civ. P. 72(a).   The Court denies most of the motions to strike on the grounds that they are rendered academic because it did not rely on the contested submissions in deciding the cross-motions for summary judgment.   The Court also denies the remainder of the motions to strike for the reasons stated below.

A.   Expert Testimony

Rule 701 of the Federal Rules of Evidence limits the opinion testimony of a lay witness to where that testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly

understand the witness's testimony or to determining a fact in issue; and (c) not based on

scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid.

701. "The rational-basis requirement "is the familiar requirement of first-hand knowledge or

observation." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). Rule 701 does not

preclude testimony whenever a witness presents their specialized knowledge. *See Disability

Advocates, Inc. v. Paterson*, No. 03-CV-3209 (NGG) (MDG), 2008 U.S. Dist. LEXIS 103310, at

*44 (E.D.N.Y. Dec. 22, 2008). Rather, such specialized knowledge is permissible where that

testimony is "rooted in personal perception[] regardless of whether the witness could have

testified on other matters as an expert." *Id.* (quoting *United States v. Rigas*, 490 F.3d 208, 224

(2d Cir. 2007)); *see also Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181-182

(2d Cir. 2004) (permitting the testimony of a witness where it was based upon matters they

perceived while conducting an investigation and barring that testimony which was "rooted

exclusively in his expertise in international banking"). Therefore, "a court must focus on 'the

reasoning process' by which a witness reached his proffered opinion." *United States v. Garcia*,

413 F.3d 201, 2015 (2d Cir. 2005) (quoting 4 Weinstein's Federal Evidence § 701.03[1]).

1. Makhotin Affidavit

Defendants wish to strike paragraphs 14 and 15 of the Makhotin Affidavit for allegedly

containing impermissible expert witness testimony. Def. Mem. Supp Strike 2-3. In the relevant

paragraphs of the affidavit, Mr. Makhotin, who worked as Actava's Lead Software Engineer,

discusses his personal involvement in the "technical implementation[] o[f] Actava's side[] of the

Referral Agreement." Makhotin Aff. ¶¶ 1, 9 (cleaned up). Specifically, in paragraph 14, Mr.

Makhotin discusses the revisions that he made to Actava's source code and what capabilities or

functions that source code did or did not have at the time of his revisions. Here, Mr. Makhotin's

statements were "based on his investigation and reflected his investigatory findings and conclusions." *Rigas* 490 F.3d at 224.  While Mr. Makhotin has specialized knowledge of highly technical matters given his background in software engineering, he did not "improperly stray[] from his own experience" here.  *United States v. Hild*, 2022 U.S. Dist. LEXIS 220841, at *86-87 (S.D.N.Y. Dec. 7, 2022).  Therefore, Defendants' motion to strike as to these paragraphs is denied.

B.  Rule 72(a)

Even though Defendants objected to Plaintiffs' attempts to bar them from filing an opposition to a Rule 72 objection, Defendants' counsel now asks this Court to strike Plaintiffs' 2022 oppositional filing.  *Compare* ECF No. 183 at 1 (arguing that parties "have the authority under Rule 72 of the Federal Civil Procedure to oppose . . . Objections") *with* ECF No. 688 at 2 ("Fed. R. Civ. P. 72(a) . . . does not allow the party opposing objection to submit an opposition.").  Defendants' motion is denied for precisely those reasons laid out in their own 2020 Letter to this court.  Def. Ltr. ECF No. 183; *see also Royal Park Investments SA/NV v U.S. Bank N.A.*, 14 CIV. 2590 (VM), 2017 WL 4174926, at *7 (SDNY Aug. 28, 2017) (treating objections as a motion although not labelled as such); *Walker v. Carter*, No. 112CV05384ALCRLE, 2015 WL 12765380, at *1 (S.D.N.Y. Oct. 21, 2015) (considering and citing to opposition to objections); *MPD Accessories B.V. v. Urban Outfitters*, No. 12 CIV. 6501 LTS KNF, 2013 WL 7211833, at *1 (S.D.N.Y. Dec. 17, 2013) (considering opposition papers); *Moore v. Publicis Groupe SA*, No. 11 CIV. 1279 ALC AJP, 2012 WL 517207, at *1 (S.D.N.Y. Feb. 14, 2012) (accepting opposition to objections); *Gonzalez v. Rakkas*, 846 F. Supp. 229, 233 (E.D.N.Y. 1994) (noting that opportunity to respond exists for both nondispositive and dispositive objections) (citing Fed. R. Civ. P. 72); Fed. R. Civ. P. 72 advisory committee note ("It

also is contemplated that a party who is successful before the magistrate will be afforded an opportunity to respond to objections raised to the magistrate's ruling.") (regarding responses to nondispositive objections); *Royal Park Investments SA/NV v U.S. Bank N.A.*, 14 CIV. 2590 (VM), 2017 WL 4174926, at *7 (SDNY Aug. 28, 2017) (fairness a factor in accepting papers).

Moving on to the substance of Defendants' objection, the Court presumes the Parties' familiarity with the facts surrounding Magistrate Judge Willis' October 31, 2022 Order denying Defendants' request to reopen discovery as well as Defendants' subsequent November 28, 2022 objection.  *See* ECF Nos. 542, 553.

A magistrate judge's ruling on a nondispositive matter, as here, may be set aside only for clear error.  Fed. R. Civ. P. 72(a).  A decision is not clearly erroneous merely where "a reviewing court can reject a finding of fact simply because the court subjectively believes that the factfinder was mistaken."  *Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016); *see also Anderson v. City of Bessamer*, 470 U.S. 564, 573 (1985) ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.").  Rather, clear error lies where the lower court's "account of the evidence is [not] plausible in light of the record viewed in its entirety."  *Anderson*, 470 U.S. at 574.  A district court may reopen discovery "for good cause, depending on the diligence of the moving party."  *Krawec v. Kiewit Constructors Inc.,* 2013 U.S. Dist. LEXIS 37132 at *23 (S.D.N.Y. Mar. 1, 2013) (citing *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)).  Courts in this circuit consider several factors when determining whether to reopen discovery, including:

> (1) [W]hether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence.

*Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011).

Defendants' arguments in opposition to Magistrate Judge Willis' denial of their motion to reopen discovery do not establish clear error.  Magistrate Judge Willis denied Defendants' request following *in camera* review of the documents Defendants requested and upon determining that the Actava-Matvil Settlement Agreement was "irrelevant to the instant Parties' claims and defenses," that Defendants' request was "vague and seeks irrelevant documents as well," and that Defendants were not diligent in obtaining discovery of the relevant documents when they had ample opportunity to do so while discovery was open.  ECF No. 551.

Rather than establishing clear error, many of Defendants' objections merely take aim at Magistrate Judge Willis' substantive decisions without establishing lacking implausibility.  Defendants pontificate, without any real grounds, that the Actava-Matvil settlement agreement *must* be relevant to this action.  They then argue that, despite determining the irrelevancy of the Actava-Matvil settlement agreement, that Magistrate Judge Willis committed clear error by declining to review communications related to that settlement.  Such arguments amount to "mere[] disagreements with the magistrate's ruling."  *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, No. 89 Civ. 0322 (PKL), 1989 U.S. Dist. LEXIS 10253, at *1 (S.D.N.Y. Aug. 30, 1989).  It is therefore "well within the magistrate's discretion to deny the . . . request for the documents."  *Id.*

While Defendants accurately point out that the settlement agreement in the Matvil Litigation was not filed prior to the close of discovery in this case, the Matvil litigation was filed in April 2021.  *See Actava TV, Inc. v. Matvil Corp. d/b/a eTVnet*, No. 1:21-cv-3027-LGS, ECF 1 (S.D.N.Y. Apr. 8, 2021).  Therefore, Defendants could have requested discovery of all "relevant communications and discovery in that case" prior to the close of discovery as they now seek.

ECF No. 544.  Therefore, no clear error lies in Magistrate Judge Willis' determination as to this issue and Defendants' request is denied.

## II.     Summary Judgment

A.  <u>Plaintiffs' Claims</u>

Defendants move for summary judgment on each of Plaintiffs' tortious interference, breach of contract, malicious prosecution, and deceptive trade practices claims.  *See* ECF No. 606 ("Def. Mem. Summ. J.").

1.  Affirmative Defenses

i.  *Noerr-Pennington Doctrine*

Under the *Noerr-Pennington* doctrine, defendants are shielded from liability "for engaging in conduct (including litigation) aimed at influencing decision-making by the government." *Octane Fitness LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014) (citation omitted).  The doctrine, based on the First Amendment's Petition Clause, has been applied to protect the "filing of litigation . . . which has been applied to bar claims of tortious interference predicated on the commencement of litigation," *I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D.3d 206, 208, 793 N.Y.S.2d 379 (1st Dep't 2005) (citations omitted), as well as for common law fraud claims, *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000), and deceptive trade practices claims.  *Id.*  Of course, the immunity is "not absolute."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009).  Under the "sham exception," immunity will not apply where the defendant's government-facing activity "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness, LLC*, 572 U.S. at 556 (citation omitted).  For the sham exception to apply, "a lawsuit must be objectively baseless and must

concea[l] an attempt to interfere directly with the business relationships of a competitor.  In other words, the plaintiff must have brought baseless claims in an attempt to thwart competition (i.e., in bad faith)." *Id.* (cleaned up).  The sham litigation exception does not apply where a defendant had probable cause to institute legal proceedings.  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 62 (1993).  The existence of probable cause and the applicability of the sham exception "may be determinable as matter[s] of law if there is no dispute as to the pertinent events and the knowledge of the of the [defendants]."  *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015); *see also In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019) (stating that "a court may decide" the applicability of the sham exception "as a matter of law where there is no dispute over the predicate facts underlying the legal proceeding") (citing 508 U.S. at 62 ).

Defendants argue that summary judgment is warranted on Plaintiffs' tortious interference, malicious prosecution, and deceptive trade practices claims, insofar as those claims are predicated upon Defendants' filing of the Contempt Motion, because that filing is protected by the *Noer-Pennington* doctrine's immunity.  Def. Mem. Summ. J. 17-19.  Summary judgment on these grounds is improper as Plaintiffs have produced sufficient evidence such that the issue of whether Defendants had probable cause to make the Contempt Motion and whether the sham exception ought to apply should proceed to a jury.  Defendants argue that they had probable cause as a matter of law because Actava's authentication of Matvil customers constituted unlawful distribution of their programming in violation of the Injunctions.  Plaintiffs have produced evidence supporting a potential finding that Defendants lacked probable cause and that their filing was objectively baseless.  This evidence includes, but is not limited to, testimony from Channel representatives stating that they "did not understand anything about the transaction

between Matvil and Actava" prior to bringing the Contempt Motion, that Defendants persisted in bringing the motion even when Matvil personnel indicated that Actava "[wa]s not broadcasting its own content" and that "A[c]tava act[ed] solely as a seller of Matvil's services," evidence showing that Defendants' counsel refused to review the Referral Agreement when offered an opportunity to do so prior to filing the Contempt Motion, and evidence establishing that licensed distributer Matvil, not Actava, distributed the Channels' Broadcasts.  Pl. Mem. Opp. Summ. J. 7-17.  Plaintiffs have also presented sufficient evidence to support a finding that their radio advertisement did not violate the terms of the Settlement Agreement or Injunction because Channel Defendants "grant[ed] to [Matvil] the right to promote, advertise, and market."  SOF ¶¶ 65, 88.  Additionally, there is sufficient evidence supporting a potential finding that the filing was made to thwart competition in the form of, amongst other things, contemporaneous communications between Kartina personnel and Channel representatives in which Kartina advised the Channels to bring the Contempt Motion.  Summary judgment on these grounds is therefore denied.

ii. *Defamation*

"[C]laims brought under the guise of other causes of action [can] actually sound in defamation, even if the plaintiff alleged economic harm."  *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 225 (S.D.N.Y. 2013) (collecting cases).   A reviewing court will construe such claims accordingly where a plaintiff's alleged harm is "precisely the same as that caused by defamation," reputational harm.  *Morrison v. Nat'l Broadcasting Co.*, 19 N.Y.2d 453, 227 N.E.2d 572, 574, 280 N.Y.S.2d 641 (N.Y. 1967); *see also Lindner v. IBM Corp.*, 2008 U.S. Dist. LEXIS 47599, at *43 (S.D.N.Y. June 18, 2008) (collecting cases deciding whether to construe claims as ones for defamation).

Defendants argue that Actava's tort claims are in fact disguised defamation claims to which immunity and a time-bar applies.  Def. Mem. Summ. J. 19-21.  However, Defendants' arguments fail because Plaintiffs do not merely allege reputational harm in their prayer for relief.  Rather, as Plaintiffs establish, they also adequately claim "that [their] economic interests . . . were injured by [D]efendants' intentional acts" such that their claims ought not be construed as ones for defamation.  *Eisenberg v. Yes Clothing Co.*, No. 90 Civ. 8280 (JFK), 1991 U.S. Dist. LEXIS 7863 at *3 (S.D.N.Y. June 7, 1991).  Plaintiffs allege that, amongst other things, Defendants' filing of the Contempt Motion, their alleged communications with Matvil, as well as Defendant Kartina's purported puppeteering prevented Plaintiffs from maintaining their contractual relationship with Matvil and resulted in substantial monetary damages.  Their expert damages report sufficiently establishes, for purposes of adjudicating summary judgment, that their total damages exceed $9 million stemming directly from losses of direct proceeds from the Referral Agreement. Pls. 56.1 ¶ 322.  Therefore, because the alleged harm is "not "precisely the same as that caused by defamation," the Court does not construe them as time-barred defamation claims. *Lindner*, 2008 U.S. Dist. LEXIS 47599, at *45.

2.   Tortious Interference

Under New York law, the elements of a tortious interference claim with prospective business relations requires: "(1) a business relationship with a third party; (2) the defendant's knowledge of that relationship and the intentional interference with it; (3) that the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Actava TV Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, 412 F. Supp. 3d 338, 350-351 (S.D.N.Y. 2019).  Additionally, the offending conduct must be directed "not at the plaintiff itself, but at the party with which the plaintiff has or

seeks to have a relationship." *ADYB Engineered for Life, Inc. v. Edan Admin. Servs.*, No. 1:19-cv-7800-MKV, 2021 U.S. Dist. LEXIS 59666, at *52 (S.D.N.Y. Mar. 29, 2021) (citation omitted).  For a defendant to be liable for tortious interference with prospective business relations claim, their "conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 362, 818 N.E.2d 1100, 1103 (2004).  "Indifferen[ce] to the [plaintiff's] fate" is insufficient.  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015).  An exception to this rule exists "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.*  (citation omitted).

Defendants argue that summary judgment is warranted because the record unambiguously establishes that Plaintiffs were distributing and advertising the Channels' programming in violation of the Settlement Agreement and Injunctions such that Defendants' filing of the Contempt Motion could not be "tortious, unlawful, or outside the sphere of legitimate pursuit of business and legal interests," and that no evidence exists to establish that Defendants interfered with Actava's relationship with Matvil.  ECF No. 606 ("Def. Mem. Summ. J.") 8; *see also id.* at 14, 17, 20, 22, 25-26.

Contrary to Defendants' arguments, Actava has presented sufficient evidence to create issues of material fact as to whether Defendants tortiously interfered with Actava's prospective economic advantage in its relationship with Matvil.  Defendants rely heavily on their assertion that the Actava's relationship with Matvil under the Referral Agreement was barred by the terms of the Settlement Agreement.  Yet, Plaintiffs have presented evidence supporting a finding that Actava did not unlawfully distribute or advertise the programming.  *See infra* III.A.1.i.  Importantly, Plaintiffs have presented direct evidence that Matvil's CEO informed Actava's CEO that the Channels had pressured Matvil to terminate their relationship with Actava.  While the

fact that Matvil's CEO subsequently testified that those statements were untrue merely presents a

question of credibility for the jury, it does not go so far as to eliminate this genuine issue of

material fact.  *See* SOF ¶¶153-154.  Plaintiffs have sufficiently alleged that Defendants' conduct

went beyond "ordinary economic pressure" and included threats of "serious financial and

reputational loses" as well as "reprisals against [Matvil]."  Pl. Mem. Opp. Summ. J. 30.  The

evidentiary record now is littered with evidence including correspondences between the

Channels and Kartina, testimony discussing an alleged litigation strategy by Kartina in the name

of the Channels with anti-competitive aims, and evidence of lacking regard for Plaintiffs'

attempts to prevent the filing of the Contempt Motion that could support an ultimate finding of

fact that the contempt proceedings were brought out of malice or utilized dishonest, unfair, or

improper means.  Summary judgment on this claim is therefore denied.

### 3.   Malicious Prosecution

The elements of a malicious prosecution claim are: "(1) the initiation of an action by the

defendant against the plaintiff; (2) begun with malice; (3) without probable cause to believe it

can succeed; (4) that ends in failure or, in other words, terminates in favor of the plaintiff."  *Id.* at

351.  Where the offending cause of action is a civil one, there must "be a showing of some

interference with plaintiff's person or property," *O'Brien v. Alexander*, 101 F.3d 1479, 1485 (2d

Cir. 1996), and of "special damages." *Korova Milk Bar of White Plains, Inc. v. PRE Properties,*

*LLC*, 2013 U.S. Dist. LEXIS 14937, 2013 WL 417406, at *14 (S.D.N.Y. Feb. 2013) (citation

omitted).  A loss of business can qualify as a special injury "as long as Plaintiff sufficiently

identifies the specific business lost as a result of the civil proceeding." *Korova Milk Bar of*

*White Plains, Inc. v. PRE Props., LLC*, 2013 U.S. Dist. LEXIS 14937, at *48 (S.D.N.Y. Feb. 1,

2013); *see also id.* (stating the heightened pleading requirement can be met with "a specific and

verifiable loss of income by providing the names of clients that refused to do business when they learned of the pending action").

Plaintiff has sufficiently presented triable issues of material fact for their malicious prosecution claim. Defendants' filing of the Contempt Motion qualifies as the initiation of an action by Defendants against Plaintiffs. *See Actava TV, Inc. v. Joint Stock Co.*, No. 18-cv-06626 (ALC), 2023 U.S. Dist. LEXIS 43907, at *13 (S.D.N.Y. Mar. 15, 2023). Judge Moses favorably terminated the contempt proceedings in Plaintiffs' favor by holding that Defendants failed to make out their prima facie case. [6] Plaintiffs have presented evidence that Kartina procured the filing of the action against Plaintiffs such that liability might extend to them as well. *See Dudick v. Gulyas*, 277 A.D.2d 686, 687 (N.Y. App. Div. 2000) (finding that the first element of a malicious prosecution claim had been made out where evidence showed that the defendant directed another to file the offending action); *see also* Pls. 56.1 ¶¶ 176-78, 191-92, 207, 253-73. Plaintiffs have also presented sufficient evidence for special injury, here the loss of projected revenue from the Referral Agreement. Plaintiffs' expert damages report calculating damages stemming from the loss of the Matvil business sufficiently supports a potential finding of special injury in this case. *See infra* III.A.1.i. On probable cause, as stated previously, Plaintiffs have presented sufficient evidence that Defendants lacked sufficient probable cause to bring the Contempt Motion and brought them with malice including the evidence of Kartina's alleged direction and Matvil and Actava's unsuccessful attempts to prevent the contempt proceedings. *See id.*

---

[6] Defendants' request for reconsideration as to these first two elements is denied as they have not presented compelling circumstances justifying reconsideration. *See Scottish Air Int'l v. British Caledonian Grp., PLC.*, 152 F.R.D. 18, 25 (S.D.N.Y. 1993) ("Generally, however, the law of the case counsels against reconsideration absent compelling circumstances, including an intervening change of law, the availability of new evidence, or to correct a clear error or prevent manifest injustice.") (citation omitted).

### 4. Deceptive Trade Practices

A deceptive trade practices plaintiff must include three elements: "(1) acts or practices that are consumer-oriented; (2) that such acts or practices are deceptive or misleading in a material way; and (3) that plaintiff has been injured by reason of those acts." *Lava Trading Inc. v. Hartford Fire Ins. Co.*, 326 F.Supp.2d 434, 438 (S.D.N.Y. 2004). Plaintiffs' theory of liability is that Kartina directed the Channels to file the Contempt Motion and hid their involvement and financial stake from Actava in order to drive them from the marketplace and reduce competition in the Russian-speaking IPTV space. Pls. 56.1 ¶¶ 176-80, 191-93, 207. Plaintiffs have presented sufficient evidence to create material questions of fact as to this claim. Defendants' motion for summary judgment as to this claim is therefore denied.

### 5. Breach of Contract

The elements of a breach of contract claim are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Jill Stuart (Asia) LLC v. Sanei Intern. Co.*, 548 Fed. Appx 20, 21 (2d Cir. 2013) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Generally, "written notice requirements are fully enforceable" and ""serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination." *Art of War Music Publ'g, Inc. v. Andrews*, 98 Civ. 6034(JSR), 2000 U.S. Dist. LEXIS 2509, at *5 (S.D.N.Y. Mar. 2, 2000) (citations omitted). A reviewing court should only "construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal" in certain limited circumstances. *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 182 (S.D.N.Y. 2011) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977)

(declining to find defendants liable where they provided plaintiffs with written notice of a material breach as to only one contractual provision but not another)).

Plaintiffs claim for breach of contract rests upon the Defendant Channels' alleged failure to provide Plaintiffs with notice and opportunity to cure Actava's purportedly violating radio advertisement prior to initiating the contempt proceedings in contravention of the Parties' Settlement Agreement.  *See* SAC ¶¶ 95-99.  Plaintiffs claim that Defendants' written notice of suspected breach referred only to Actava's purported unlawful distribution of broadcasts but was silent on the issue of the radio advertisement.  ECF No. 69-4 at 1 (stating that "Broadcasters recently discovered that Actava, in concert with Matvil, . . . is now selling IPTV packages that include Broadcasters' channels"); *see also* Def. Mem. Summ. J. 37-39.  Assuming *arguendo* that Defendants had an obligation under the Settlement Agreement to provide Plaintiffs with written notice as to their contemplated contempt proceedings under the Injunctions and that Plaintiffs have sufficiently alleged damages arising independently from this failure to provide notice, Plaintiffs claim fails because there is no "dispute of fact regarding whether Plaintiffs were properly notified of the defective conditions."  *Leeber Realty LLC v. Trustco Bank*, 316 F. Supp. 3d 594, 613 (S.D.N.Y. 2018).  The *Contemporary Mission, Inc.* case is instructive here.  In that case, the Second Circuit declined to find lacking notice where, as here, a plaintiff was given notice of their suspected breach as to a different contractual provision from that which the defendant recovered under.  557 F.2d at 925.  Undergirding the appellate court's reasoning in that case is the fact that the provided notice was sufficient "to place [plaintiff] under a duty to communicate immediately with [defendant] and to insure that the contract was being performed according to its terms."  *Id.*  The facts proffered here—that Plaintiff was given notice as to Defendants' suspicion that they had breached the Settlement Agreement provisions enjoining

Actava from "broadcasting" and "indirect[ly] us[ing]" Broadcasters' marks without

authorization"—aligns closely with those deemed "hypertechnical" and unsuccessful in

*Contemporary Mission*.  ECF No. 69-4 at 2-3.  Therefore, Defendants' motion for summary

judgment is granted as to Plaintiffs' breach of contract claim.

    B.  <u>Defendants' Counterclaims</u>

Damages are an essential element of each of Defendants' counterclaims.  *See, e.g.*, *Kirch*

*v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (stating as such for tortious

interference claims); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d

Cir. 2011) (doing the same for breach of contract claims); *Brown v. Lockwood*, 76 A.D.2d 721,

731, 432 N.Y.S.2d 186, 193 (App. Div. 2nd Dept. 1980) (doing the same for constructive fraud

claims).  Under New York law, a breach of contract Plaintiff must plead sufficient "factual

allegations which sufficiently demonstrate a causal relationship between [the] purported conduct

on the part of the defendants and damages suffered by plaintiff."  *Bisceglia v. Recovery Racing,*

*LLC*, 2023 NY Slip Op 30509(U), ¶¶ 2-3 (Sup. Ct.) (citing *Gall v. Summit, Rovins & Feldesman*,

222 A.D.2d 225, 226, 635 N.Y.S.2d 17, 18 (App. Div. 1st Dept. 1995)).  "One who is liable to

another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the

benefits of the contract or the prospective relation; (b) consequential losses for which the

interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are

reasonably to be expected to result from the interference."  *Rich v. Fox News Network, LLC*, 939

F.3d 112, 128 (2d Cir. 2019) (citing Restatement (Second) of Torts § 774A(1) (1979)).  "A

plaintiff asserting a fraud claim must also demonstrate that a defendant's misrepresentations were

the direct and proximate cause of the claimed losses."  *Ambac Assurance Corp. v. Countrywide*

*Home Loans, Inc.*, 2017 NY Slip Op 03919, ¶ 1, 151 A.D.3d 83, 86, 56 N.Y.S.3d 21, 25 (App. Div. 1st Dept.) (quotation marks omitted).

Defendants advance several interesting damages theories for their claims.  First, Defendants' expert damages report calculated Defendants' damages under the Federal Communications Act ("FCA") to tally between approximately $9 million and $900 million.  ECF No. 589-21 ("Damages Report") 1-2.  Defendants' expert arrived at this damages calculation range by multiplying the alleged number of subscribers Actava had signed up on its platform prior to the enactment of the Settlement Agreement and Injunctions by the statutory minimum and maximum damages applicable under the federal statute.  *Id.*  Defendants' expert made no other damages calculation as to any of Defendants' counterclaims in the Damages Report or in any of their oral deposition testimony.

Separately, Defendants also allege that they are entitled to liquidated damages as set out in the Settlement Agreement.  ECF No. 646 ("Def. Mem. Opp. Summ. J.") 20-23.  Section 4 of the Settlement Agreement reads as follows:

> "Within twenty-four (24) hours of the entry of the Orders, Defendants shall furnish to Plaintiffs' counsel, Dunnington, the identity or identities; location or locations; contact and purchase information sufficient to permit Plaintiffs to ascertain to the source of the signal and/or other data (the "Source") by which the Broadcasts were copied and streamed through the Website. Plaintiffs represent that they will not identify Defendants as the source of this information absent written authorization from Defendants or a court order. The failure to provide this information shall entitle Plaintiffs to declare this Agreement void and retain the Settlement Amount as liquidated damages and seek to reinstate both the First and Second Actions."

ECF No. 589-2 at 2.  As set out, this provision permits Defendants to retain the liquidated damages amount only in the event where Plaintiffs failed to reveal their alleged source of pirated content.

Defendants also make passing reference in their motion opposing summary judgment that "[t]he record includes evidence from which a reasonable jury could conclude that Defendants have lost subscriptions, lost licensing revenues, and were subjected to hundreds of thousands of dollars in legal fees in the Infomir Action that would have been avoided had Actava revealed the sources of its content prior to executing the Settlement." Def. Mem. Opp. Summ. J. 24. Tellingly, Defendants provide no citation to the evidentiary record supporting this claim. *Id.* Indeed, a thorough investigation of the record establishes that no such factual evidence has been produced. Defendants failed to disclose any computation of damages that could support such a finding as required under Fed. R. Civ. P. 26(a)(1)(A)(iii) during discovery and they present no cogent factual evidence supporting such a damages theory in their pleadings.

All of Defendants' damages theories are insufficient to survive summary judgment as to the entirety of their tortious interference and constructive fraud claims and as to the majority of their breach of contract claim. First, the Damages Report focuses entirely on damages stemming from potential claims under the FCA which Defendants never brought against Plaintiffs in this action. Second, Defendants' reliance on the liquidated damages provision of the Settlement Agreement is entirely misplaced because it has no causal or factual nexus with Plaintiffs' allegedly unlawful conduct. The conduct which forms the foundation of Defendants' counterclaims—Plaintiffs' alleged distribution of the Channels' broadcasts through its accessing of EPGS and dual-authorization technology, Actava's alleged usage of Defendant Channel's marks in a radio advertisement, Actava's alleged insufficient disclosure of its interest in the Russian Telek website, the Actava-Matvil NDA—is not at all related to Actava's disclosure of its content sources. Defendants' insistence on the imposition of the Settlement Agreement's liquidated damages clause therefore amounts to nothing more than an attempt to improperly

bootstrap their actual counterclaims to this liquidated damages provision.  Therefore, Plaintiffs'

motion for summary judgment as to these counterclaims is granted.

From this, all that remains of Defendants' counterclaims is that breach of contract

counterclaim centering around Section 4 of the Settlement Agreement.  Despite initially

premising their breach of contract counterclaim on Plaintiffs' alleged "distributi[on of] the

Broadcasts without authorization in violation of the Settlement Agreement," Defendants instead

now advance the allegation that Plaintiffs breached Section 4 by failing to provide the identity of

a source.  Answer ¶ 200; *see also* Def Mem. Opp. Summ. J. 18.  Parties generally cannot

advance novel theories of liability in motions opposing summary judgment because such conduct

does not sufficiently "put defendants on notice of th[e] new allegation."  *Kearney v. Cty. of

Rockland*, 373 F. Supp. 2d 434, 441 (S.D.N.Y. 2005).  In recognition of this, Defendants are

granted leave to amend their counterclaims to incorporate these allegations.  Therefore, the Court

withholds judgment as to this theory of breach until receiving the benefit of more fulsome

briefing.

### III.    Sealing

Except as expressly stated herein, the Court grants the parties' requests to seal.  The

Court denies the requests to seal the documents listed below because it has relied upon them in

this decision, thereby rendering them judicial documents, and the Parties have failed to

sufficiently articulate a sufficiently compelling countervailing interest supporting their sealing.

| TABLE 1 | | |
|---|---|---|
| ECF No. | Exhibit No. | Exhibit Name |
| 587 | 36 | Matvil Deposition Transcript |
| 587 | 44 | Actava-Matvil NDA |
| 596 | 1 | Settlement Agreement |
| 596 | 32 | Matvil-Actava Email |
| 596 | 33 | Matvil-Actava Email |
| 596 | 34 | Notice of Breach |
| 596 | 35 | Actava-Matvil NDA |
| 596 | 36 | Actava Response to Notice of Breach |
| 596 | 38 | Matvil-Actava Email |
| 596 | 39 | Actava Demand Letter to Matvil |
| 596 | 40 | Actava Demand Letter to Matvil |
| 633 | A | Skrynnyk Deposition Excerpt |
| 633 | B | Matvil Declaration |
| 641 | 1 | Tsoutiev Declaration |
| 641 | 3 | Reich Deposition |
| | | |
| 641 | 23 | Actava-Matvil Call Transcript |
| 641 | 23 | Actava-Matvil Call Transcript |
| 641 | 27 | Actava-Matvil Call Transcript |

The following requests to seal are denied because the Parties have failed to provide specific justification to the Court as to why they should remain under seal.

| TABLE 2 | | |
|---|---|---|
| ECF No. | Exhibit No. | Exhibit Name |
| 587 | 15 | Deposition Transcript |
| 596 | 16 | Deposition Transcript |
| 596 | 21 | Tsoutiev Deposition Transcript |
| 596 | 24 | Makhotin Deposition Transcript |
| 663 | | Butterfield Decl. |

Additionally, Defendants are reminded that this Court previously denied their request to seal the Gottlieb Rebuttal Report in its Opinion docketed at ECF No. 564.  In accordance with that Order, Defendants resubmitted that Report without seal at ECF No. 573-3.  As such, Defendants request to seal the Gottlieb Rebuttal Report here is denied.

## CONCLUSION

For the foregoing reasons, the Parties' motions for summary judgment are **GRANTED in part** and **DENIED in part**, motions to strike are **DENIED**, motions to seal are **GRANTED in part and DENIED in part**, and motions for judicial notice are **GRANTED**.  The Parties are hereby **ORDERED** to refile their memoranda of law, Rule 56.1 statements of fact, and corresponding exhibits in compliance with the Court's determination as set out in this Order, and, alternatively or in parallel, present redacted versions of those documents referenced in Table 1 and/or specific justification for sealing those documents referred to in Table 2 if so desire, by **April 18, 2024.**  The Parties are also hereby **ORDERED** to submit a briefing schedule as to Defendants' remaining breach of contract action claim by **April 25, 2024.**

The Clerk of the Court is respectfully directed to terminate ECF Nos. 585, 593, 594, 624, 639, 640, 643, 650, 651, 658, 676-679, 681, and 688.

**SO ORDERED.**

**Dated:  March 18, 2024**
          **New York, New York**

          **ANDREW L. CARTER, JR.**
          **United States District Judge**